**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
CASE NUMBER 08-CV-1722

GD DEAL HOLDINGS, LLC                                                    PLAINTIFF

v.

SURINDER MULTANI, et al.                                              DEFENDANTS

**RESPONSE TO AMENDED MOTION FOR LEAVE**
**TO FILE AMENDED RESPONSE TO MOTION FOR ORDER OF SALE**

Comes now the Plaintiff, GD Deal Holdings, LLC, by and through counsel, and for its Response to Surinder Multani and Safanpreet Multani's Amended Motion to File Amended Response to Motion for Order of Sale, states as follows:

FACTUAL BACKGROUND

1.      This case concerns the efforts by GD Deal Holdings, LLC to collect on a judgment in the amount of $10,048,295.12 entered on May 11, 2007 against Surinder Multani by the United States District Court for the Western District of Kentucky.

2.      The judgment debtor Surinder Multani has not filed a supersedeas bond pursuant to FED. R. CIV. P. 62(d) or taken any other action to stay enforcement of the judgment.

3.      The judgment debtor Surinder Multnai owns multiple homes that have been appraised at values in excess of $1,000,000.00.  Two homes owned by Surinder Multani and his wife, Safanpreet Multani, are located at: a) 24 Bright Ridge Drive, Schaumburg, Cook County, Illinois (the "Bright Ridge Drive Property"); and b) 302 Midwest Club, Oak Brook, DuPage County, Illinois (the "Midwest Club Property").

4.      The Bright Ridge Drive Property was conveyed to the Multanis by way of a deed filed in the real property records of the Cook County Recorder of Deeds on February 25, 2004.  The

deed states that the Multanis took such property as tenants by the entirety. A copy of the deed is attached hereto as "Exhibit A" for the Court's consideration.

5.    The Midwest Club Property was conveyed to the Multanis by way of a deed filed in the real property records of the DuPage County Recorder of Deeds on February 5, 2007. The deed provides that the Multanis hold such property as joint tenants. A copy of the deed is attached hereto as "Exhibit B" for the Court's consideration.

5.    The Multanis granted a mortgage in the amount of $1,860,000.00 on the Midwest Club Property by way of a Mortgage filed in the real property records of the DuPage County Recorder of Deeds on February 5, 2007. A copy of the Mortgage is attached hereto as "Exhibit C" for the Court's consideration. On Page 7 of the Mortgage, the paragraph labeled as "6. Occupancy" states as follows:

> **6. Occupancy.** Borrower shall occupy, establish, and use the Property [the Midwest Club Property] as Borrower's principal residence within 60 days after execution of this Security Instrument and shall continue to occupy the Property [the Midwest Club Property] as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

Both the judgment debtor Surinder Multani and Safanpreet Multani signed the 2007 Mortgage for the Midwest Club Property. The signatures are notarized.

6.    On March 25, 2008, GD Deal Holdings, LLC filed its Complaint (Docket # 1) herein. The relief requested within the Complaint includes judicial sale of the judgment debtor's personal property and the Bright Ridge Drive Property.

7.    The judgment debtor Surinder Multani was served with a copy of the Complaint on April 11, 2008. A copy of the associated affidavit of service is attached hereto as "Exhibit D" for the Court's consideration.

8.    On June 10, 2008, GD Deal Holdings, LLC filed its Motion for Order of Sale (Docket # 30).  Within the Motion, GD Deal Holdings, LLC requests sale of the judgment debtor Surinder Multani's personal property and the Bright Ridge Drive Property.

9.    The Court conducted a status conference for this case on June 16, 2008.  Counsel for the Multanis attended the status conference.

10.    Pursuant to the status conference, the Court entered an Order (Docket # 32) on June 16, 2008.  The Order provided for Defendants to file a response to the Motion for Order of Sale by July 16, 2008.

11.    Surinder Multani and Safanpreet Multani failed to file an Answer in this case or otherwise respond to the Motion for Order of Sale prior to the expiration of the July 16, 2008 deadline.  Likewise, Surinder Multani and Safanpreet Multani did not file any motion requesting an extension of time to respond to the Motion for Order of Sale prior to the expiration of the July 16, 2008 deadline.

12.    On July 31, 2008 Surinder Multani and Safanpreet Multani filed their Amended Motion for Leave to File Amended Response to Motion for Order of Sale (Docket # 56).

DISCUSSION

**I.    The judgment debtor's Motion for Leave to File a Response to the Motion for Order of Sale should be denied.**

The Multanis were served with process in this case on April 11, 2008.  They did not respond until their counsel attended the status conference conducted by the Court on June 16, 2008.  Pursuant to the status conference, the Court provided for the Defendants to file a response to the Motion for Order of Sale by July 16, 2008.

The Multanis failed to respond to the Motion for Order of Sale within the allowed time period.  Their Motion for Leave to File a Response to the Motion for Order of Sale (Docket # 56)

was not filed until July 31, 2008.  The Court has broad discretion in deciding whether to allow the Defendants to file a response several weeks subsequent to the relevant deadline.  *See Riggins v. Walter*, 279 F.3d 422, 428 (7th Cir. 1995) (explaining that a trial court has discretion to determine if a late pleading should be allowed).

Notably, the Multanis failed to request an extension of time to respond to the Motion for Order of Sale prior to the deadline.  Further, the Motion for Leave to File Response to the Motion for Order of Sale (Docket # 56) does not offer any reason why the Multanis could not have filed their response prior to the applicable deadline.  The Multanis make no effort to show cause to allow the late pleading.  In the absence of any effort by the Defendants to show cause for allowing the late pleading, Plaintiff submits that the Motion for Leave to File Response to the Motion for Order of Sale should be denied.

## II.     The Defendants' ownership of the Bright Ridge Drive Property as tenants by the entirety was converted by operation of law to a joint tenancy.

Even if it is assumed for the purpose of argument that the Defendants' may file their Response to Motion for Order of Sale, the Motion for Order of Sale should still be granted.  The proposed Response to the Motion for Order of Sale is attached to the Motion for Leave to File the Response.  Within the proposed Response, the Multanis assert that they own the Bright Ridge Drive Property as tenants by the entirety.

However, tenants by the entirety is limited to homestead property.  765 ILCS 1005/1c.  The pertinent statute, 765 ILCS 1005/1c, provides that property held by a husband and wife as tenants by the entirety becomes a joint tenancy by operation of law upon the maintenance of other property as a homestead.  Upon the occurrence of such event, a judgment lien becomes enforceable against the real property.  *In re Tolson*, 338 B.R. 359, 369 (Bankr. C.D. Ill. 2005).  As such, if the Multanis

maintained another residence as a homestead subsequent to the date on which they took the Bright Ridge Drive Property as tenants by the entirety, then the tenancy by the entirety was converted by operation of law to a joint tenancy.

The real property records in the office of the DuPage County Recorder of Deeds demonstrate that the Multanis maintained another property as their homestead after the date they took ownership of the Bright Ridge Drive Property.  In particular, the Mortgage for the Midwest Club Property unmistakably demonstrates that the Multanis utilized the Midwest Club Property as a principal residence.  The Multanis signed the Mortgage for the Midwest Club Property in 2007, several years after they received the Bright Ridge Drive Property.

The Multanis ownership of the Bright Ridge Drive Property was converted by operation of law from tenancy by the entirety to a joint tenancy.  The Bright Ridge Drive Property is subject to GD Deal Holdings, LLC's judgment lien.  The Motion for Order of Sale of the Bright Ridge Drive Property should be granted.

**III.    It is undisputed that the Motion for Order of Sale should be granted regarding the judgment debtor's personal property.**

While Surinder Multani's proposed Response to the Motion for Order of Sale asserts arguments in connection with the real estate located at Bright Ridge Drive, the proposed Response does not contest judicial sale of the judgment debtor's personal property.  Accordingly, there is no dispute regarding GD Deal Holdings, LLC's request for judicial sale of Surinder Multani's personal property with application of the proceeds to be applied to the debt at issue.  A proposed order providing for judicial sale of the personal property is tendered simultaneously herewith.

WHEREFORE, the Plaintiff, GD Deal Holdings, LLC, requests as follows:

1.      The Defendants' Amended Motion for Leave to File Amended Response to Motion for Order of Sale (Docket # 56) be denied;

2.      The Plaintiff's Motion for Order of Sale (Docket # 30) be granted; and

3.      Such other and further relief as is appropriate.

This day, August 4, 2008.

THOMAS M. FALKENBERG
WILLIAMS MONTGOMERY & JOHN LTD.
20 North Wacker Drive, Suite 2100
Chicago, Illinois 60606-3094
Telephone: (312) 443-3200

-and-

HARNED, BACHERT & DENTON, LLP
324 East Tenth Avenue
Post Office Box 1270
Bowling Green, Kentucky  42102-1270
Telephone:  (270) 782-3938

/s/ Scott A. Bachert_____
SCOTT A. BACHERT

CERTIFICATION:

This is to certify that a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court this day, August 4, 2008, by using the CM/ECF system, which will send a notice of electronic filing to the following:

Hon. Lucia Nale
Hon. Diane Renae Sabol
Hon. Nicole Joy Highland
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 630606-4637

Hon. Robert T. Kuehl
WELTMAN, WEINBERG & REIS CO., L.P.A.
180 N. LaSalle Street, Suite 2400
Chicago, Illinois 60601

Hon. James O. Stola
LAW OFFICE OF JAMES O. STOLA
3701 West Fullerton
Chicago, Illinois 60647

This is to certify that a true and correct copy of the foregoing document was this day, August 4, 2008, placed in the US Mail, postage prepaid, addressed to the following:

Hon. Leroy Simms
6061 Savoy Drive
Houston, Texas 77036

Capital Access & Investments, LLC
c/o: Narendra Bhalla, Registered Agent
1718 Fry Road, Suite 415
Houston, Texas 77084

Babaji PS, LLC
c/o: Narendra Bhalla, Registered Agent
1718 Fry Road, Suite 415
Houston, Texas 77084

G & S Portage, Inc.
c/o: Ajai Agnihotri, Registered Agent
1856 Samuelson Road
Portage, Indiana 46368

/s/ Scott A. Bachert
SCOTT A. BACHERT

**Warranty Deed
Statutory (ILLINOIS)**

Doc#: 0405642030
Eugene "Gene" Moore   Fee: $28.00
Cook County Recorder of Deeds
Date: 02/25/2004 07:55 AM Pg: 1 of 3

*Above Space for Recorder's Use Only*

THE GRANTOR (S)
MAJESTIC HOMES, INC.

corporation created and existing under and by virtue of the laws of the State of ILLINOIS and duly authorized to transact business in the State of ILLINOIS for and in consideration of the sum of ($10.00) TEN DOLLARS, in hand paid, and pursuant to authority given by the Board of BOARD OF DIRECTORS of said corporation, **CONVEYS** and **WARRANTS** to

**SURINDER S. MULTANI AND SAFANPREET K. MULTANI**, husband and wife, not as Joint Tenants, nor as Tenants in Common, but as **TENANTS BY THE ENTIRETY**, 2140 S. Goebberg Road, Arlington, Heights, IL 60005

the following described Real Estate situated in the County of COOK in the State of Illinois, to wit:

**SEE ATTACHED**

Permanent Index Number (PIN): **07-23-102-021**

Address(es) of Real Estate: **124 BRIGHT RIDGE DRIVE, SCHAUMBURG, IL 60194**

SUBJECT TO: General Taxes for 2003 and subsequent years, covenants, restrictions, and conditions of record.

In Witness Whereof, said Grantor has caused its corporate seal to be hereto affixed, and has caused its name to be signed to these presents by its President, and attested by its Secretary, this ____ day of ___January___, 2004.

MAJESTIC HOMES, INC.

By _____
                                     President

Attest: _____
                                     Secretary

VILLAGE OF SCHAUMBURG
REAL ESTATE TRANSFER TAX
1-22-04
0923        $0

STATE OF ILLINOIS
FEB.23.04
0000065262
REAL ESTATE TRANSFER TAX
DEPARTMENT OF REVENUE

REAL ESTATE
TRANSFER TAX
01367.00
FP 102808

COOK COUNTY
REAL ESTATE TRANSACTION TAX
FEB.23.04
0000065433
REVENUE STAMP

REAL ESTATE
TRANSFER TAX
0068350
FP 102802

State of Illinois, County of COOK ss, I, the undersigned, a Notary Public In and for the County and State aforesaid, DO HEREBY CERTIFY that Matt Schweibenz personally known to me to be President of the corporation, and Irene Schweibenz personally known to me to be the Secretary of said corporation, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person, and severally acknowledged that as such President and Secretary, they signed, sealed and delivered the said instrument and caused the corporate seal of the corporation to be affixed thereto pursuant to authority given by the Board of Directors said corporation, as their free and voluntary act, and as the free and voluntary act and deed of corporation, for the uses and purposes therein set forth.

Given under my hand and official seal this _____ 22 _____ day of _____, 2004.

Commission expires

OFFICIAL SEAL
ARTHUR W WENZEL
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:12/19/07

NOTARY PUBLIC

This instrument was prepared by:  Arthur W. Wenzel, 1111 Plaza Drive, Suite 405, Schaumburg, Illinois 60173

**MAIL TO:** *ABACUS FINANCE INC.*
*To SUPINDER MULTANI*
*~~200 E. Oak Street~~*
*2015 S. ARLINGTON HEIGHTS*
*Suite 120 .*
*ARLINGTON HEIGHTS . IL- 60005*

SEND SUBSEQUENT TAX BILLS TO:

SURINDER S. MULTANI
124 BRIGHT RIDGE DRIVE
SCHAUMBURG, IL 60194

LOT 9 IN SUMMERFIELD ESTATES SUBDIVISION, BEING A SUBDIVISION OF PART OF THE
SOUTHWEST 1/4 OF SECTION 23, TOWNSHIP 41 NORTH, RANGE 10, EAST OF THE THIRD
PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED AUGUST 2, 2000, AS
DOCUMENT 00675392, IN COOK COUNTY, ILLINOIS.

UNOFFICIAL COPY

FIRST AMERICAN TITLE
ORDER #: _____

**QUIT CLAIM DEED**
Illinois Statutory



**FRED BUCHOLZ**
**DUPAGE COUNTY RECORDER**
FEB.05,2007          RHSP     1:52 PM
DEED                 06 − 33 − 202 − 015
**003 PAGES    R2007−022926**

THE GRANTOR, Abbe Properties, L.L.C., an Illinois limited liability company, of the Village of Schaumburg, County of Cook, State of Illinois for and in consideration of the sum of Ten Dollars ($10.00) DOLLARS, and other good and valuable consideration in hand paid, CONVEYS and QUIT CLAIMS to Surinder P  Multani and Safanpreet Multani, not as tenants in common, but as joint tenants, 302 Midwest Club, Oak Brook, Illinois 60523 of the County of DuPage, all interest in the following described Real Estate situated in the County of DuPage in the State of Illinois, to wit:

> See Exhibit 'A' attached hereto and made a part hereof

Subject to covenants, conditions and restrictions of record, general taxes for 2006 and subsequent years including taxes which may accrue by reason of new or additional improvements during the year 2006

hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois. TO HAVE AND TO HOLD said premises not as tenants in common, but as joint tenants forever.

Permanent Real Estate Index Number(s): 06-33-202-015-0000
Address(es) of Real Estate: 302 Midwest Club, Oak Brook, Illinois 60523

Dated this ⎯⎯ day of December, ~~2007~~ 2006

Abbe Properties, LLC

By: _____
     Surinder PS Multani

STATE OF ILLINOIS COUNTY OF ___Dupage___ ss.

I, the undersigned, a Notary Public in and for said County, in the state aforesaid, CERTIFY THAT Surinder PS Multani, Manager of Abbe Properties LLC, an Illinois limited liability company, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that he signed, scaled and delivered the said instrument as his free and voluntary act as Manager, for the uses and purposes therein set forth.

Given under my hand and official seal, this _1st_ day of ___December___, ~~2007~~ 2006

___Ina Alikhan___ (Notary Public)

> **OFFICIAL SEAL**
> **INA ALIKHAN**
> **NOTARY PUBLIC - STATE OF ILLINOIS**
> **MY COMMISSION EXPIRES:06/12/09**

EXEMPT UNDER PROVISIONS OF PARAGRAPH (c) SECTION 31-45 REAL ESTATE TRANSFER TAX LAW

DATE: _12/1/06_

___Reeann Hodular___

Signature of Buyer, Seller or Representative

Prepared by:

Mail To:      ABBE MANAGEMENT GROUP, LLC
              1450 E. AMERICAN LANE, SUITE 1400
              SCHAUMBURG, IL 60173

Name & Address of Taxpayer:
Surinder PS Multani and Safanpreet Multani
302 Midwest Club
Oak Brook, Illinois 60523

FRED BUCHOLZ        R2007-022926        DUPAGE COUNTY RECORDER

**EXHIBIT 'A'**
**Legal Description**

LOT 14 IN THE MIDWEST CLUB PHASE I, BEING A SUBDIVISION OF PART OF THE NORTH 1/2 OF SECTION 33, AND THE NORTHWEST 1/4 OF SECTION 34, TOWNSHIP 39 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 6, 1978 AS DOCUMENT R78-116577 AND CERTIFICATE OF CORRECTION RECORDED NOVEMBER 20, 1979 AS DOCUMENT R79-104546 AND CERTIFICATE OF CORRECTION RECORDED JANUARY 25, 1982 AS DOCUMENT R82-02848, IN DUPAGE COUNTY, ILLINOIS.

FIRST AMERICAN TITLE

Return To:
ORDER #
WASHINGTON MUTUAL BANK   FA
2210 ENTERPRISE DR
FLORENCE, SC 29501
DOC OPS M/S FSCE 440

Prepared By:
CHRIS GRES
3050 HIGHLAND PARKWAY, 3RD FLR
DOWNERS GROVE, IL 60515
8007333303



**FRED BUCHOLZ**
DUPAGE COUNTY RECORDER
FEB.05,2007       RHSP     1:52 PM
OTHER                    06-38-202-015
**020 PAGES     R2007-022927**

203390 MR

——————— [Space Above This Line For Recording Data] ———————

ZIL1
M28

# MORTGAGE

3011354531-039

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated JANUARY 19, 2007 ,
together with all Riders to this document.
(B) "Borrower" is SAFANPREET MULTANI and Surinder P. Multani husband and wife

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is WASHINGTON MUTUAL BANK, FA

Lender is a  FEDERAL SAVINGS BANK
organized and existing under the laws of THE UNITED STATES OF AMERICA

ILLINOIS – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Form 3014 1/01

-6(IL)(0010)
Page 1 of 15       Initials:
VMP MORTGAGE FORMS • (800)521-7291




UNOFFICIAL COPY

Lender's address is 2273 N. GREEN VALLEY PARKWAY, SUITE 14, HENDERSON, NV 89014

Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated JANUARY 19, 2007 . The Note states that Borrower owes Lender ONE MILLION EIGHT HUNDRED SIXTY THOUSAND AND 00/100 Dollars (U.S. $ 1,860,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than FEBRUARY 01, 2037.

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

FRED BUCHOLZ    R2007-022927    DUPAGE COUNTY RECORDER

UNOFFICIAL COPY

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, the following described property located in the

|  | COUNTY | [Type of Recording Jurisdiction] |
|---|---|---|
| of | DU PAGE | [Name of Recording Jurisdiction]: |

    THE LEGAL DESCRIPTION IS ATTACHED HERETO AS A SEPARATE EXHIBIT AND IS MADE A PART HEREOF.

Parcel ID Number: 06-33-202-015          which currently has the address of
302 MIDWEST CLUB PKWY                      [Street]
OAKBROOK             [City] , Illinois 60523    [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security

-6(IL) (0010)            Page 3 of 15        Initials:           Form 3014 1/01

Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.

UNOFFICIAL COPY

Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in

FRED BUCHOLZ    R2007-022927    DUPAGE COUNTY RECORDER

a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and

restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or

FRED BUCHOLZ       R2007-022927      DUPAGE COUNTY RECORDER

with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for

Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair

market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the

charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If

-6(IL)(0010)    Page 11 of 15    Initials: _____    Form 3014 1/01

FRED BUCHOLZ    R2007-022927    DUPAGE COUNTY RECORDER

Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or

-6(IL) (0010)                    Page 12 of 15                    Initials: _____                    Form 3014 1/01

UNOFFICIAL COPY

removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. **Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may not pay,but need not, protect Borrower's interests.The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against

Initials: _____

**ZIL2**
against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____      _____ (Seal)
                                                        -Borrower
                             SAFANPREET MULTANI

_____      _____ (Seal)
                             Surinder Pl Multani        -Borrower

_____ (Seal)    _____ (Seal)
                -Borrower                          -Borrower

_____ (Seal)    _____ (Seal)
                -Borrower                          -Borrower

_____ (Seal)    _____ (Seal)
                -Borrower                          -Borrower

**VMP**®-6(IL) (00 10)              Page 14 of 15              Form 3014 1/01

STATE OF ILLINOIS,  DU PAGE                                    County ss:
I,  *the undersigned*                    , a Notary Public in and for said county and
state do hereby certify that  SAFANPREET MULTANI
&
*Surinder P. Multani*

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing
instrument, appeared before me this day in person, and acknowledged that he/she/they signed and
delivered the said instrument as his/her/their free and voluntary act, for the uses and purposes
therein set forth.

Given under my hand and official seal, this  *19th*  day of *January, 2007*.

My Commission Expires:  *6/4/08*                  *Leeann Hadeler*
                                          Notary Public

```
OFFICIAL SEAL
LEANN HADELER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/04/08
```

Initials: *MM*

–6(IL)(0010)                     Page 15 of 15                     Form 3014 1/01

R2US
M26                                                                3011354531-039

# FIXED/ADJUSTABLE RATE RIDER
### (LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this            19TH         day of
JANUARY, 2007          , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of
the same date given by the undersigned ("Borrower") to secure Borrower's
Fixed/Adjustable Rate Note (the "Note") to
WASHINGTON MUTUAL BANK, FA

("Lender") of the same date and covering the property described in the Security
Instrument and located at:

> 302 MIDWEST CLUB PKWY
> OAKBROOK, IL 60523
> (Property Address)

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST
RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE
AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE
AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in
the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of        6.400        %. The
Note also provides for a change in the initial fixed rate to an adjustable interest rate, as
follows:
**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A) Change Dates**
The initial fixed interest rate I will pay will change to an adjustable interest rate on
the first day of FEBRUARY 01, 2012          , and the adjustable interest rate I will
pay may change on that day every 12th month thereafter. The date on which my initial
fixed interest rate changes to an adjustable interest rate, and each date on which my
adjustable interest rate could change, is called a "Change Date."

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR – Single Family –
Fannie Mae Uniform Instrument                                Form 3187 6/01
-168R (0401)
Page 1 of 4      Initials:
VMP Mortgage Solutions
(800)521-7291

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding    TWO AND 15/100               percentage points (        2.150      %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than  11.400               % or less than    2.150                  %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than        11.400      %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

-168R (0401)                    **Page 2 of 4**                Initials: ___        **Form 3187 6/01**

UNOFFICIAL COPY

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

-188R (0401)                    Page 3 of 4                    Initials: _____    Form 3187 6/01

FRED BUCHOLZ        R2007-022927        DUPAGE COUNTY RECORDER

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)                    _____ (Seal)
            –Borrower                                      –Borrower
                                                SAFANPREET MULTANI

_____ (Seal)                    _____ (Seal)
            –Borrower                                      –Borrower
                                                Surinder P. Multani

_____ (Seal)                    _____ (Seal)
            –Borrower                                      –Borrower

_____ (Seal)                    _____ (Seal)
            –Borrower                                      –Borrower

-168R (0401)               Page 4 of 4                Form 3187 6/01

*(Attached to and becoming a part of document dated: January 19, 2007)*

# EXHIBIT A

Land situated in the County of DuPage, State of Illinois, is described as follows:

LOT 14 IN THE MIDWEST CLUB PHASE I, BEING A SUBDIVISION OF PART OF THE NORTH 1/2 OF SECTION 33, AND THE NORTHWEST 1/4 OF SECTION 34, TOWNSHIP 39 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 6, 1978 AS DOCUMENT R78-116577 AND CERTIFICATE OF CORRECTION RECORDED NOVEMBER 20, 1979 AS DOCUMENT R79-104546 AND CERTIFICATE OF CORRECTION RECORDED JANUARY 25, 1982 AS DOCUMENT R82-02848, IN DU PAGE COUNTY, ILLINOIS.

Tax Parcel Number(s): 06-33-202-015

File Number: 203390

IN THE UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS

GD Deal Holdings, LLC

vs.    Surinder Multani, et al.

Case Number    08 CV 1722

### AFFIDAVIT OF SERVICE

I, Ronald Steffens, being first duly sworn on oath deposes and states that I am over the age of 18 years and not a party to this action, and on the 11 day of April, 2008, at 08:15 PM at 24 Bright Ridge, Schaumburg, IL 60194, did serve the following document(s):

**Summons and Complaint**

Upon: **Surinder Multani**

By:    ☑ Personally serving to:  Surinder Multani

    ☐ leaving copies at the usual place of abode with:

       a member of the household 13 years or upwards and informed that person of the contents thereof

    ☐ by mailing copies of said document(s) in a sealed envelope with postage fully prepaid to the defendant:

       at 24 Bright Ridge, Schaumburg, IL 60194 on

| Description: Sex | **Male** | Race | **Middle Eastern** | Approximate Age | **56** |
|---|---|---|---|---|---|
| Height | **5'10** | Weight | **160** | Hair Color | **Black** |

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this affidavit of service are true and correct.

Further the Affiant Sayeth Naught:

Ronald Steffens
United Processing, Inc.
55 West Wacker Drive, 9th Floor
Chicago, IL  60601
IL License #117-001101

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
CASE NUMBER 08-CV-1722

GD DEAL HOLDINGS, LLC                                                     PLAINTIFF

V.

SURINDER MULTANI, et al.                                          DEFENDANTS

<u>**ORDER OF SALE OF PERSONAL PROPERTY**</u>
<u>**FOR SATISFACTION OF MONEY JUDGMENT**</u>

   This matter came before the Court on the Plaintiff's Motion for Order of Sale and the

Plaintiff's request for an order directing satisfaction of a money judgment recovered by Plaintiff

against Surinder Multani by a public judicial sale of Surinder Multani's below-described l property.

   Based on the records and files in this action, and the Court being otherwise sufficiently

advised, it appears to the Court that:

   1.  The United States District Court for the Western District of Kentucky rendered a

judgment on May 11, 2007 in the case *GD Deal Holdings, LLC, et al. v. Baker Energy, Inc., et al.*,

Case Number 1:05-cv-00003-R, for GD Deal Holdings, LLC's recovery from Surinder Multani of

$10,048,295.12 with interest thereon at the judgment rate of 4.9% per annum from May 11, 2007

until paid.

   2.  The judgment debtor Surinder Multani has not filed a supersedeas bond pursuant to

FED. R. CIV. P. 62(d) or taken any other action to stay enforcement of the judgment.

   3.  On September 4, 2007, GD Deal Holdings, LLC registered the judgment in the

United States District Court for the Northern District of Illinois, Case Number 1:07-cv-04965.  In

accordance with Title 28, Section 1962 of the United States Code, the judgment created a lien

against all the real and personal property of Surinder Multani situated in this state.

4.      On October 9, 2007, GD Deal Holdings, LLC filed a Memorandum of Judgment in the real property records for the Office of the Cook County, Illinois Recorder of Deeds.

5.      On January 7, 2008, GD Deal Holdings, LLC filed a Memorandum of Judgment in the real property records for the Office of the DuPage County, Illinois Recorder of Deeds.

6.      The judgment is subject to enforcement since no order to stay enforcement has been issued and no motion or supersedeas bond to effect a stay has been filed, and more than ten (10) days have elapsed since entry of the judgment.

7.      The Court has authority under Rule 69(a) of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2001, 2002, and 2004 to order enforcement and satisfaction of the judgment by a judicial sale of nonexempt real or personal property, or both, of Surinder Multani situated in this judicial district in lieu of allowing the usual execution proceedings that would otherwise be the procedure for the enforcement of the judgment.

8.      Surinder Multani was served with process herein on April 11, 2008.

9.      There is situated in this judicial district the following described nonexempt personal property of Surinder Multani that may be subjected to a private or public sale for satisfaction of Plaintiff's judgment against Surinder Multani: 1) Furniture and Household Effects (including audio, video, and computer equipment); 2) Books, Pictures, and other Art Objects (including stamp, coin, record, tape, compact disc, and other collections or collectibles); 3) Wearing Apparel; 4) Jewelry; 5) Cash on Hand;  6) Firearms and Sports, Photographic, and other Equipment; and 7) vehicles.  Such personal property is located at 302 Midwest Club, Oak Brook, Illinois 60523 and/or 24 Bright Ridge Drive, Schaumburg, Illinois 60194.

10.     Good cause exists for enforcement of the judgment by a public judicial sale of the above-described property instead of by execution proceedings.

11.     There are no genuine issues of material fact regarding the Plaintiff's request for judicial sale of Defendant Surinder Multani's personal property. The Plaintiff is entitled to an Order of judicial sale of Surinder Multani's personal property as a matter of law. There is no just reason for delay in entry of an Order for judicial sale of Surinder Multani's personal property.

Therefore, IT IS ORDERED that:

1.     The United States Marshall for this district shall take possession of the Defendant Surinder Multani's personal property as described above. The United States Marshall for this district shall sell as a whole to the highest bidder in cash Defendant Surinder Multani's personal property. The United States Marshall shall sell in units to the highest bidder in cash such personal property at the public sale. The public sale of the personal property shall be held pursuant to the discretion of the United States Marshall either: 1) at the Circuit Court of Cook County, Richard J. Daley Center, 50 West Washington, Chicago, Illinois 60602; or 2) upon the premises.

2.     The public sale of the personal property is to be preceded by publication of notice thereof by the United States Marshall in which notice the property is to be described as above; the notice is to be published consecutively once a week for not less than four (4) weeks in the Chicago Tribune, a newspaper regularly issued and having a general circulation in this judicial district, where the property of Defendant Surinder Multani that is to be sold is situated.

3.     The money from the sale of the property is to be applied first to the payment of the costs of the sale (including the United States Marshall's commission, fees, and expenses); next to the costs of this suit; then any remaining proceeds of the sale shall be held by the United States Marshall pending further order of this Court.

4.     Following completion of the sale, subject to its confirmation by the Court, the United States Marshall shall file a prompt report of sale, showing compliance with this Order.

5.      Jurisdiction is retained for such further orders and proceedings as may be necessary.

DATED, this the _____ day of _____, 2008.


_____
JUDGE, UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

Tendered by:

THOMAS M. FALKENBERG
WILLIAMS MONTGOMERY & JOHN LTD.
20 North Wacker Drive, Suite 2100
Chicago, Illinois 60606-3094
Telephone: (312) 443-3200

-and-

HARNED, BACHERT & DENTON, LLP
324 East Tenth Avenue
Post Office Box 1270
Bowling Green, Kentucky  42102-1270
Telephone:  (270) 782-3938


/s/ Scott A. Bachert
SCOTT A. BACHERT