**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
CASE NUMBER 08-CV-1722

GD DEAL HOLDINGS, LLC                                                                PLAINTIFF

v.

SURINDER MULTANI, et al.                                                          DEFENDANTS

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Comes now the Plaintiff, GD Deal Holdings, LLC, by and through counsel, and for its

Motion for Preliminary Injunction against Surinder Multani; ABBE Properties, LLC; Sapphire

Supply, LLC; JGG Investments, LLC; ABBE Capital and Leasing, LLC; ABBE Management

Group, LLC; Safanpreet Multani; the Gurpriya Kaur Multani Irrevocable Trust; the Gurpap Singh

Multani Irrevocable Trust; and the Japvi Singh Multani Irrevocable Trust, states as follows:

FACTUAL BACKGROUND

1.      The origin of this case can be traced back to the lease of certain gasoline stations and

convenience stores located throughout Kentucky and Tennessee.  The gasoline stations and

convenience stores were leased by GD Deal Holdings, LLC to an entity named Baker Energy, Inc.

("Baker Energy").  Surinder Multani was an officer for Baker Energy and personally guaranteed

Baker Energy's obligations under the lease.  A copy of the Declaration of Surinder Multani whereby

he personally guaranteed Baker Energy's obligations under the lease is attached hereto as "Exhibit

A" for the Court's consideration.

2.      Baker Energy subsequently defaulted on its obligations under the lease.  A copy of

correspondence dated January 20, 2005 that was sent to Baker Energy giving notification of

termination of the lease is attached hereto as "Exhibit B" for the Court's consideration.  A copy of the

correspondence was sent to Surinder Multani simultaneous with its transmission to Baker Energy.

3.      After Baker Energy defaulted on the lease, GD Deal Holdings, LLC initiated suit against Surinder Multani in the case of *GD Deal Holdings, LLC, et al. v. Baker Energy, Inc., et al.*, Case Number 1:05-cv-00003 in the United States District Court for the Western District of Kentucky.  A copy of the Plaintiffs' First Amended Complaint from the case asserting a cause of action against Surinder Multani is attached hereto as "Exhibit C" for the Court's consideration.  The Plaintiffs' First Amended Complaint asserting a cause of action against Surinder Multani was filed on January 24, 2005.

4.      Surinder Multani was served with the Plaintiffs' First Amended Complaint on April 26, 2005.  A copy of the certified mail receipt signed by Surinder Multani and demonstrating his receipt of the Plaintiffs' First Amended Complaint is attached hereto as "Exhibit D" for the Court's consideration.

5.      On the same day that Surinder Multani received the Plaintiffs' First Amended Complaint, April 26, 2005, he formed the Gurpriya Multani Irrevocable Trust, the Gurpap Singh Multani Irrevocable Trust, and the Japvi Singh Multani Irrevocable Trust (collectively, the "Trusts"). Each of the Trusts were formed for the benefit of Surinder Multani's children.  In forming the Trusts, Surinder Multani transferred substantial assets to his immediate family members for nominal consideration.  Surinder Multani is the trustee for the Trusts.  Copies of the applicable Trust Agreements demonstrating the formation of the Trusts on April 26, 2005 are attached hereto as "Exhibit E" for the Court's consideration.

6.       Surinder Multani is an owner of ABBE Properties, LLC ("ABBE Properties").  A copy of an operating agreement for ABBE Properties signed by Surinder Multani is attached hereto as "Exhibit F" for the Court's consideration.

7.     ABBE Properties owned real estate commonly known as 415 N. Bruner Street, Hinsdale, DuPage County, Illinois (the "Bruner Street Property").

8.     On August 10, 2006, ABBE Properties received $2,146,736.00 in a transaction whereby ABBE Properties granted a mortgage interest in the Bruner Street Property.  A copy of the Mortgage from the transaction as filed with the DuPage County Recorder is attached hereto as "Exhibit G" for the Court's consideration.

9.     On May 11, 2007, the United States District Court for the Western District of Kentucky granted a judgment to GD Deal Holdings, LLC against Surinder Multani for the recovery of $10,048,295.12 in the case *GD Deal Holdings, LLC, et al. v. Baker Energy, Inc., et al.*.

10.     Less than one week later, on May 17, 2007, ABBE Properties granted a Deed in Lieu of Foreclosure conveying the Bruner Street Property to the mortgage lender.  A copy of the Deed in Lieu of Foreclosure as filed with the DuPage County Recorder is attached hereto as "Exhibit H" for the Court's consideration.

11.     As of July 31, 2007, Surinder Multani was a registered owner of a 2005 Mitsubishi Endeavor, VIN 4A4MN41S25E037807.  A printout from Westlaw demonstrating Surinder Multani's ownership of the vehicle as of July 31, 2007 is attached hereto as "Exhibit I" for the Court's consideration.

12.     On or about August 20, 2007, Surinder Multani transferred the 2005 Mitsubishi Endeavor to Kulwant S. Multani, an individual residing in Indiana.  A copy of a printout from Westlaw demonstrating Surinder Multani's transfer of the Mitsubishi Endeavor is attached hereto as "Exhibit J" for the Court's consideration.

13.     On June 26, 2006, Surinder Multani maintained an account at American Chartered Bank in the amount of $101,161.03.  A copy of an account screen printout from American Chartered

Bank demonstrating such account funds is attached hereto as "Exhibit K" for the Court's consideration.

14.     Surinder Multani closed the account at American Chartered Bank on August 23, 2006.  A copy of correspondence from American Chartered Bank demonstrating Surinder Multani's closing of the account is attached hereto as "Exhibit L" for the Court's consideration.  The location of the money that was in the account remains unknown to GD Deal Holdings, LLC.

15.     Surinder Multani is engaged in the business of brokering bank debit and credit cards throughout Illinois, Indiana, Michigan, Iowa, and occasionally other states.  A copy of a Motion to Modify Terms of Bond recently filed by Surinder Multani and demonstrating his extensive financial transactions throughout multiple states is attached hereto as "Exhibit M" for the Court's consideration.

16.     On February 16, 2005, Surinder Multani transferred a 2005 Land Rover vehicle (VIN SALME11445A189725) out of his personal name to ABBE Management Group, LLC ("ABBE Management").  A copy of a Westlaw printout demonstrating the transaction is attached hereto as "Exhibit N" for the Court's consideration.

17.     Surinder Multani is the owner of ABBE Management.  Surinder Multani regularly transfers money out of ABBE Management to his wife, Safanpreet Multani.  Copies of checks signed by Surinder Multani transferring $146,157.00 from ABBE Management to Safanpreet Multani are attached hereto as "Exhibit O" for the Court's consideration.  The transfers occurred after the date that Surinder Multani incurred the debt at issue.

18.     Surinder Multani is the owner of Sapphire Supply, LLC ("Sapphire Supply").  Surinder Multani regularly transfers money out of Sapphire Supply.  Copies of checks signed by Surinder Multani transferring $28,200.00 from Sapphire Supply to Surinder Multani are attached

hereto as "Exhibit P" for the Court's consideration.  The transfers occurred after the date that Surinder Multani incurred the debt at issue.

19.    Surinder Multani transfers money out of his personal accounts to his wife, Safanpreet Multani.  A copy of a check signed by Surinder Multani transferring $10,000.00 from his personal account to Safanpreet Multani is attached hereto as "Exhibit Q" for the Court's consideration.  The transfer occurred on July 17, 2007, approximately two (2) months after the date that the judgment at issue was entered.

DISCUSSION

The judgment debtor Surinder Multani has demonstrated a propensity for continually transferring substantial assets subsequent to the date on which GD Deal Holdings, LLC's claim arose.  The judgment debtor's assets have been transferred across multiple entities that Surinder Multani controls for the benefit of the judgment debtor's immediate family members.  The Court may issue an injunction to prevent the transfer or other disposition of a judgment debtor's assets. *Ridgewood Industries, Inc. v. Ridgewood Industries, U.S.A., Inc.*, 575 F.Supp. 244 (N.D. Ill. 1983).

A preliminary injunction is utilized to minimize the hardship to the parties pending the final resolution of litigation.  *Allied Signal, Inc. v. B. F. Goodrich Co.*, 183 F.3d 492, 493 (7th Cir. 1993). In order to obtain a preliminary injunction to prevent a judgment debtor and related persons or entities from disposing of the judgment debtor's assets, a judgment creditor must demonstrate that: 1) the creditor is reasonably likely to succeed on the merits; 2) no adequate remedy at law exists; 3) the threatened irreparable injury to the creditor to occur if the injunction is not issued outweighs the threatened injury the injunction may inflict on the judgment debtor and related persons or entities; and 4) the injunction will not disserve the public interest.  *Star Insurance Co. v. Risk Marketing*

*Group, Inc.*, 507 F.Supp.2d 942, 946 (N.D. Ill. 2007). GD Deal Holdings, LLC submits that all of the factors illustrate that a preliminary injunction is appropriate in this case.

## I.      GD Deal Holdings, LLC is reasonably likely to succeed on the merits.

A Plaintiff need only demonstrate a better than negligible chance of succeeding to show a likelihood of success on the merits. *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). In this case, GD Deal Holdings, LLC holds a judgment entered against Surinder Multani. Within its Complaint filed herein, GD Deal Holdings, LLC requests well-established remedies available to a judgment creditor. GD Deal Holdings, LLC is likely to succeed on the merits of this case.

## II.     GD Deal Holdings, LLC has no adequate remedy at law and will suffer irreparable harm to its ability to satisfy the judgment in the absence of an injunction.

The judgment debtor Surinder Multani controls multiple businesses and conducts financial transactions in several states on a regular basis. Further, the judgment debtor and his companies have made numerous transfers of significant assets subsequent to the date that the debt at issue was incurred. There is a substantially high probability that the judgment debtor and his companies will continue such transfers in the absence of an injunction.

The strong likelihood that asset transfers will continue frustrates GD Deal Holdings, LLC's ability to satisfy the judgment. The obstruction of a creditor's ability to collect a judgment warrants a preliminary injunction. *Caterpillar, Inc. v. Jerryco Footwear, Inc.*, 880 F.Supp. 578, 587 (C.D. Ill. 1994) (citing *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)). Moreover, the continued transfer of assets by the judgment debtor and related persons or entities will additionally frustrate any order that this Court might enter declaring transfers as fraudulent. The circumstances of this case reflect that GD Deal Holdings, LLC has no adequate remedy at law.

**III.     The balance of harms favors granting the preliminary injunction.**

A court considering a preliminary injunction should employ a sliding scale analysis, whereby the stronger the likelihood of success on the merits, the less of a showing is necessary with regard to the risk of harm. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). GD Deal Holdings, LLC has a substantial likelihood of success on the merits. Consequently, a lesser showing of the balance of harms is required for this proceeding.

The requested preliminary injunction will not constitute a substantial burden or harm on the judgment debtor and related persons or entities. A preliminary injunction would merely require that a party hold property in status quo until the judgment creditor's rights can be determined. Such a passive injunction would act simply to prevent active transfer and concealment of the judgment debtor's assets. Given the minimal nature of the harm, if any, potentially resulting from the requested preliminary injunction, the balance of harms favors granting the preliminary injunction.

**IV.     The injunction would not harm the public interest.**

The public interest would not be harmed by an order prohibiting the transfer and concealment of the judgment debtor's assets until the claims herein are resolved. The public does have an interest in making sure that parties that breach commercial transactions are not allowed to evade the judgment of the court. *Caterpillar, Inc.*, 880 F.Supp. at 593. The public interest is harmed when a judgment debtor is allowed to transfer significant assets and frustrate satisfaction of a judgment.

The judgment debtor in this case is familiar with sophisticated financial transactions. The judgment debtor has made no arrangements for payment on the debt at issue. Conversely, the judgment debtor has engaged in continual transfers of multiple significant assets through companies that he controls in several states. It is certain that attempts to satisfy the judgment will be

substantially frustrated if the judgment debtor is allowed to continue his trend of transferring assets. The requested preliminary injunction should be granted.

WHEREFORE, the Plaintiff, GD Deal Holdings, LLC, respectfully requests that Surinder Multani; ABBE Properties, LLC; Sapphire Supply, LLC; JGG Investments, LLC; ABBE Capital and Leasing, LLC; ABBE Management Group, LLC; Safanpreet Multani; the Gurpriya Kaur Multani Irrevocable Trust; the Gurpap Singh Multani Irrevocable Trust; and the Japvi Singh Multani Irrevocable Trust be enjoined and restrained from, directly or indirectly, disposing or selling any assets without court approval for the duration of this action.

This day, August 5, 2008.

THOMAS M. FALKENBERG
WILLIAMS MONTGOMERY & JOHN LTD.
20 North Wacker Drive, Suite 2100
Chicago, Illinois 60606-3094
Telephone: (312) 443-3200

-and-

HARNED, BACHERT & DENTON, LLP
324 East Tenth Avenue
Post Office Box 1270
Bowling Green, Kentucky  42102-1270
Telephone:  (270) 782-3938

/s/ Scott A. Bachert
SCOTT A. BACHERT

<u>CERTIFICATION</u>:

       This is to certify that a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court this day, August 5, 2008, by using the CM/ECF system, which will send a notice of electronic filing to the following:

Hon. Lucia Nale
Hon. Diane Renae Sabol
Hon. Nicole Joy Highland
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 630606-4637

Hon. Robert T. Kuehl
WELTMAN, WEINBERG & REIS CO., L.P.A.
180 N. LaSalle Street, Suite 2400
Chicago, Illinois 60601

Hon. James O. Stola
LAW OFFICE OF JAMES O. STOLA
3701 West Fullerton
Chicago, Illinois 60647

       This is to certify that a true and correct copy of the foregoing document was this day, August 5, 2008, placed in the US Mail, postage prepaid, addressed to the following:

Hon. Leroy Simms
6061 Savoy Drive
Houston, Texas 77036

Babaji PS, LLC
c/o: Narendra Bhalla, Registered Agent
1718 Fry Road, Suite 415
Houston, Texas 77084

Capital Access & Investments, LLC
c/o: Narendra Bhalla, Registered Agent
1718 Fry Road, Suite 415
Houston, Texas 77084

G & S Portage, Inc.
c/o: Ajai Agnihotri, Registered Agent
1856 Samuelson Road
Portage, Indiana 46368

/s/ Scott A. Bachert
SCOTT A. BACHERT



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-------------------------------------------- x

In re:

CLARK RETAIL ENTERPRISES, INC., a
Delaware corporation; and CLARK RETAIL
GROUP, INC., a Delaware corporation

        Debtors.

-------------------------------------------- x

Case No. 02-40045 (JHS)
Chapter 11
(Jointly Administered with
Case No. 02-40046 (JHS))
Hon. John H. Squires

[This Pleading Applies To Both Cases]

Hearing Date: July 28, 2003
Hearing Time: 2:00 p.m. (Prevailing Central Time)

## DECLARATION OF SURINDER MULTANI IN SUPPORT OF CLARK RETAIL ENTERPRISES, INC.'S MOTION TO APPROVE THE SALE AND ASSUMPTION OF CERTAIN LEASED AND FEE PROPERTIES TO SELECTED ASSIGNEES

      I, Surinder Multani, declare as follows:

      1.     I am over the age of 18 years and if called as a witness I would testify to the following matters based upon my own personal knowledge.

      2.     I am a director/shareholder of Baker Energy, Inc. ("Baker") and make this declaration (the "Declaration") on behalf of Baker, in support of the "Emergency Motion For Order Under 11 U.S.C. §§ 105, 363, 365, And 1146(c) And Fed. R. Bankr. P. 2002, 6004 And 6006: (A) Approving Bidding Procedures; (B) Scheduling Sale Hearing; (C) Approving Sale Of Real Estate Assets; (D) Approving The Assumption, Assignment, And Sale of Debtor's Interest Under Certain Leases; (E) Approving The Termination Of Certain Leases; And (F) Granting Related Relief" (the "Sale Motion") filed by Clark Retail Enterprises, Inc. ("CRE," and together with Clark Retail Group, Inc., the "Debtors"), debtor and debtor in possession in the above-captioned chapter 11 cases. I have personal knowledge of the matters set forth herein.

197827.1

EXHIBIT A

3.      Baker was made aware of the auction of certain stores operated by the Debtors being conducted by National Real Estate Clearinghouse ("NRC") and elected to participate in the auction by submitting a bid by the bid deadline for forty-seven (47) stores.

4.      Pursuant to its bid, Baker is seeking the assignment to Baker from CRE of: (i) that certain Master Lease by and between GD Deal Holdings, LLC ("GD"), Landlord and CRE, Tenant, dated April 19, 2001; (ii) that certain Master Equipment and Personal Property Lease by and between GD, as lessor, and CRE, as lessee, dated April 19, 2001; (iii) nine leases relating to stores 2252, 2258, 2260, 2265, 2269, 2273, 2277, 2305 and 2306 (the "Nine Third-Party Leases"); and (iv) that certain Master Equipment and Personal Property Lease by and between Girkin Development, LLC, lessor and CRE, lessee, dated April 19, 2001 (as it relates to the Nine Third-Party Leases) (collectively, the "GD Leases").

5.      In connection with its bid, Baker submitted certain documents regarding its financial position, and that of its principals, including the Balance Sheet and Resume of Surinder Multani (see Exhibit "A" annexed hereto).

6.      Exhibit "A" annexed hereto is true and correct and presents an accurate and complete financial disclosure of my personal financial condition.

7.      I will execute a personal guaranty "unconditionally, absolutely and continuingly" guarantying the prompt payment of all of the liabilities under the GD Leases. A form of the Guaranty is annexed hereto as Exhibit "B."

I declare under penalty of perjury that the foregoing Declaration is true and correct.

Executed on July ___, 2003, at Chicago, Illinois.

_____
Surinder Multani

2

# EXHIBIT A

# SURINDER MULTANI

*2015 S. ARLINGTON HEIGHTS RD.*
*ARLINGTON HEIGHTS, IL, 60005*
*(847) 593-8333*

**Objective** *To achieve success in the Petroleum/Convenient Store, Restaurant Industries and Real Estate holdings and investments.*

**Qualifications**

- *Over a thirteen of experience in the hospitality industry, truck plaza and gas stations/ convenience stores industry.*
- *More than thirteen of experience in Real Estate sale/purchase, holding, managing and investments.*
- *Effective bilingual communications skills, both written and verbal*
- *Strong hiring and training skills*
- *Ability to coordinate multi-faceted tasks involving managing a chain of large motels, truck plazas and multiple gas stations.*
- *Underwrote qualified transactions including cash flow, collateral/management evaluation, market analysis and personal/business credit reports.*

**Education**

*1998-1999*     *Certificate of training in Real Estate Management*

*1986-1989*     *Masters in Public Administration, University of Punjab*
                *Major in Hotel Management, Business Management and Minor in Restaurant Management.*

*1984-1986*     *Masters in Computer Science, University of Punjab*

**Experience**

*2002(April)-Present*     *Managing Director, ABBE Management , Arlington Heights, IL*
                         *Overseeing Property and Business Management of multi unit gas stations within the United States.*

*2002(April)-Present*     *Managing Director, ABBE Properties, Arlington Heights, IL*
                         *Serve as a key member in managing, holding and investments in Real Estate properties consisting of multi business establishments.*

*2001-Present*     *Managing Partner, Superior Gas Inc., Quad City, IA*
                   *Serve as a key member in managing over 70 units of Gas Stations.*

**2001-Present**   *Sunrise Petro Inc., Arlington Heights, IL*
*Managing and serving as a key member in the business operations of multi units of convenience stores gas stations and restaurants.*

**1998-Present**   *CEO, Abacus Finance, Inc., Arlington Heights, IL*
*Financial partner in capital planning and raising capital. Providing Executive leadership, financial strategies and the management of financial resources to ensure achievement of business plans and objectives for the company. Established a successful clientele in real estate management and investment sector.*

**1998-Present**   *Managing Partner, SSJG Petroleum Inc., Quad City, IA*
*Serve as a key member of the company's executive group and manage the financial functions for the company during the time of strong expansion.*

**1998-Present**   *Managing Partner, JVS Petro Inc., Oakwood, IL*
*Manage and take active role in all the financial functions and participating in the programs which enhance the growth of the company.*

**1995-1999**   *Managing Partner, 3 Comfort Inn Suites and 1 Economy Inn of*
**America,**
                                                                     *Merrillville, IN*
*Managed the chain of 4 motels by overseeing all the operations of motels including hiring, accounts and daily cash flow.*

**1995-1999**   *Managing Partner, G S Portage Inc. (D/B/A ZIP FOODS*
                                            *CONVENIENCE STORE), Portage IN*
*Managed, supervised and ran a convenience store with over 500 items in inventory.*

**1989-1995**   *Managing Partner, Daswand Impex Exports and Imports, Germany*
*Managed my fathers business company in Germany. Worked with my father and supervised the complete management staff of 12 employees. Also managed the complete functioning of the company including accounting, human resources and marketing.*

Corporations/Sole Proprietorship/palLLC/Partnerships Owned by Surinder Mathani

Balance Sheet as on October 31, 2002

| | Abbe Management Group | Ahmad Pawson, Inc. | Crispino Supply | Snyderville Glen, Inc. | ARDS Leading & Equipment | Seaside Point, Inc. | ANB Petro | B&G Petroleum | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | |
| **Current Assets** | | | | | | | | | |
| Cash on hand | $ 197,533 | $ 1,345,842 | $ 119,352 | $ 115,326 | $ 172,466 | $ 488,147 | $ 125,289 | $ 199,699 | $ 2,221,438 |
| Cash in Bank | 381,948 | 1,313,378 | 365,365 | 368,355 | 278,091 | 345,478 | 372,088 | 398,951 | 4,113,739 |
| Total Current Assets | 619,198 | 2,910,221 | 484,917 | 471,322 | 501,823 | 472,925 | 454,387 | 476,851 | 5,335,175 |
| **Fixed Assets** | | | | | | | | | |
| Cost-Present Property | | 4,350,000 | 670,000 | 2,660,000 | 629,000 | 1,780,000 | 2,598,000 | 2,596,000 | 15,970,000 |
| Total Fixed Assets | | 4,950,000 | 629,000 | 2,660,000 | 900,000 | 1,790,000 | 2,100,000 | 2,000,000 | 13,979,000 |
| Goodwill | | | | | | | | | |
| Automation | | 703,090 | | 115,000 | | | | | 798,000 |
| Business Assets | 78,590 | 90,390 | | | | | | | |
| Commercial Equipment | $ | $ | 64,300 | 671,000 | 625,465 | 180,000 | 375,300 | 641,344 | 2,452,344 |
| **Total Assets** | $ 824,698 | $ 6,000,002 | $ 1,343,417 | $ 3,261,523 | $ 2,320,305 | $ 2,242,925 | $ 3,573,888 | $ 2,910,335 | $ 24,845,467 |
| | | | | | | | | | |
| **Equity & Liability** | | | | | | | | | |
| **Current Liabilities** | | | | | | | | | |
| Automotive | $ 45,547 | $ 45,000 | $ | $ 60,000 | $ 34,800 | $ | $ | $ | $ 185,000 |
| Credit Cards | | 2,435 | | 5,338 | 4,800 | | | 1,215,000 | 79,347 |
| Total Current Liabilities | | 47,435 | | 83,356 | | | 1,300,000 | 1,050,000 | 181,887 |
| **Long Term Liabilities** | | 1,000,000 | 450,000 | 1,000,000 | | 375,000 | 1,300,000 | 1,540,000 | 1,575,000 |
| Notes Payable | 45,547 | 875,000 | 490,000 | 1,003,355 | 375,000 | 423,078 | 1,300,000 | 2,442,009 | 1,375,000 |
| Total Liabilities | 1,238,318 | 722,421 | 749,317 | 1,213,255 | 729,840 | | 1,540,000 | | 5,340,367 |
| Net Worth | | 7,300,478 | | 2,130,267 | 1,030,848 | 1,857,875 | 2,273,088 | | 19,318,329 |
| **Total Liabilities & Net Worth** | $ 1,290,189 | $ 8,076,361 | $ 1,343,017 | $ 3,361,523 | $ 2,320,335 | $ 2,342,925 | $ 3,573,588 | $ 2,840,259 | $ 24,815,467 |

# EXHIBIT B

THIS PERSONAL GUARANTY dated July 27, 2003 (the "Guaranty") is being attached as an addendum to that certain Purchase and Sale Agreement executed on _____, 2003 by Clark Retail Enterprises, Inc. and Baker Energy, Inc. This Guaranty is being offered by Rohit Sharma, Dr. Bhupinder Saini, Ramesh Kapur and Surinder Multani *(individually and collectively referred to as "Guarantor")*.

WHEREAS, Baker Energy, Inc. *("Tenant")* is assuming the following leases: (i) that certain Master Lease by and between GD Deal Holdings, LLC ("GD"), Landlord and CRE, Tenant, dated April 19, 2001; (ii) that certain Master Equipment and Personal Property Lease by and between GD, as lessor, and CRE, as lessee, dated April 19, 2001; (iii) nine leases relating to stores 2252, 2258, 2260, 2265, 2269, 2273, 2277, 2305 and 2306 (the "Nine Third-Party Leases"); and (iv) that certain Master Equipment and Personal Property Lease by and between Girkin Development, LLC, lessor and CRE, lessee, dated April 19, 2001 (as it relates to the Nine Third-Party Leases) (collectively, the "GD Leases").

WHEREAS, Guarantor is financially interested in Tenant and it is to Guarantor's direct advantage to enable Tenant to assume the Leases.

NOW, THEREFORE, in consideration of the foregoing, Guarantor agrees as follows:

1.      Guaranty.  Guarantor unconditionally, absolutely and continuingly guarantees to the prompt payment *(in full)* of all "Liabilities" *(as defined herein)* associated with assuming the Leases. "Liabilities" shall be defined as all amounts due under the Leases, including all, interest, charges, fees and costs payable pursuant to the terms of the Lease. Guarantor agrees that it is directly and primarily liable, jointly and severally with Tenant, for the payment of the Liabilities. If more than one person is executing this Guaranty, the undersigned's liability under this Guaranty shall be joint and several.

2.      Representations and Warranties.  Guarantor represents and warrants as follows: (a) Guarantor has the authority and power to execute this Guaranty and to consummate the transactions contemplated hereby; (b) this Guaranty is a valid and legally binding obligation of Guarantor and is enforceable against Guarantor in accordance with its terms; (c) the execution and delivery of this Guaranty is not in violation of any agreement or court order by which Guarantor is bound.

3.      Waivers.  Guarantor waives: (a) all right to assert any claims and defenses based upon any failure of Guarantor to receive any information relating to Tenant's ability to pay the Liabilities; (b) to the extent permitted by law, Guarantor waives all other defenses, counterclaims and offsets of any kind or nature in connection with the validity and/or enforceability of this Guaranty.

4.      Default.  The occurrence of any one of the following events shall constitute an "Event of Default" under this Guaranty: (a) if Guarantor fails to pay any of the Liabilities when due and payable or properly declared due and payable; (b) if Guarantor fails or neglects to perform, keep or observe any term, provision, condition, covenant, warranty or representation contained in this Guaranty, which is required to be performed, kept or observed by Guarantor;

(c) if a notice of lien, levy or assessment is filed of record or given to Guarantor with respect to Guarantor or any of its assets by any federal, state or local department agency; (d) if a petition under Title 11, United States Code or any similar law or regulation shall be filed by or against Guarantor, or if Guarantor shall make an assignment for the benefit of its creditors; (e) the death of Guarantor or if Guarantor attempts to cancel, revoke or disclaim this Guaranty.

5.    Miscellaneous. This Guaranty shall continue in full force and effect until the Liabilities are paid and performed in full. The headings in this Guaranty are inserted solely as a matter of convenience for reference, and shall not in any way affect the meaning or interpretation of any of the provisions of this Guaranty. If any provision of this Guaranty or the application thereof to any party or circumstance is held invalid or unenforceable, reformation shall be first attempted and, if reformation is impossible, the remainder of this Guaranty and the application thereof to other parties or circumstances will not be affected thereby, the provisions of this Guaranty being severable in any such instance. This Guaranty shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns. This Guaranty shall be governed by and construed and enforced in accordance with the laws of the State of Kentucky, without regard to its choice of laws rules. All disputes concerning this Guaranty shall lay within the exclusive jurisdiction of courts sitting in the County of _____, Kentucky. GUARANTOR WAIVES ALL RIGHTS TO TRIAL BY JURY FOR DISPUTES RELATED TO THIS GUARANTY.

GUARANTOR:

By:_____
      *Rohit Sharma*

By:_____
      *Ramesh Kapur*

By:_____
      *Dr. Bhupinder Saini*

By:_____
      *Surinder Multani*

**This addendum to the Purchase and Sale Agreement is agreed to inform and substance this ____ day of _____, 2003 by:**

Clark Retail Enterprises, Inc.                     Baker Energy, Inc.

By:_____          By:_____

197828.1

07/28/2003  11:01    312-845-3045        SCHARTZ COOPER        PAGE  12/12

FROM :                    FAX NO. :              Jul. 27 2003 09:17PM  P2
    Jul 27 03 08:58p    Ritu              9298924106                p.2

(c) if a notice of lien, levy or assessment is filed of record or given to Guarantor with respect to Guarantor or any of its assets by any federal, state or local government agency; (d) ... against Guarantor, or if Guarantor shall make an assignment for the benefit of its creditors; (e) the death of Guarantor or if Guarantor attempts to cancel, revoke or disclaim this Guaranty.

5.    Miscellaneous.  This Guaranty shall continue in full force and effect until the Liabilities are paid and performed in full.  The headings in this Guaranty are inserted solely as a matter of convenience for reference, and shall not in any way affect the meaning or interpretation of any of the provisions of this Guaranty.  If any provision of this Guaranty or the application thereof to any party or circumstance is held invalid or unenforceable, reformation shall be first attempted and, if reformation is impossible, the remainder of this Guaranty and the application thereof to other parties or circumstances will not be affected thereby, the provisions of this Guaranty being severable in any such instance.  This Guaranty shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.  This Guaranty shall be governed by and construed and enforced in accordance with the laws of the State of Kentucky, without regard to its choice of laws rules.  All disputes concerning this Guaranty shall lay within the exclusive jurisdiction of courts sitting in the County of _____, Kentucky.  GUARANTOR WAIVES ALL RIGHTS TO TRIAL BY JURY FOR DISPUTES RELATED TO THIS GUARANTY.

GUARANTOR:

By: _____
    Rohit Sharma

By: _____
    Ramesh Kapur

By: _____
    Dr. Bhupinder Saini

By: _____
    Surinder Mukani


This addendum to the Purchase and Sale Agreement is agreed to in form and substance this _____ day of _____, 2003 by:

Clark Retail Enterprises, Inc.                    Baker Energy, Inc.


By: _____            By: _____

**HARNED, BACHERT & DENTON, LLP**

ATTORNEYS AT LAW

324 EAST 10TH AVENUE

P. O. BOX 1270

BOWLING GREEN, KY 42102-1270

---

NORMAN E. HARNED
SCOTT A. BACHERT
JOY D. DENTON
STEPHANIE MCGEHEE-SHACKLETTE
W. GREG HARVEY

Telephone:
(270) 782-3938
Facsimile:
(270) 781-4737

Bachert@hbd-law.com

January 20, 2005

**Federal Express Overnight Delivery:**

Baker Energy, Inc.
c/o Alok Sharma, Registered Agent
38 Old Hickory Cove
Jackson, TN  38305

## NOTICE OF TERMINATION OF LEASE

Please be advised that pursuant to Section 28.1 of the Master Lease and Section 22.1 of the Master Equipment and Personal Property Leases, you are in default by reason of the failure to timely pay the January, 2005 rent.  Based on this failure to timely cure this default, G.D. Deal Holdings, LLC and Girkin Development, LLC exercise their rights to terminate the Master Lease and the two Master Equipment and Personal Property Leases.  In addition you have failed to cure the defaults regarding (1) for your non-compliance with the remediation provision of Section 11.3 of the Master Lease; (2) your failure to make the December 2004 rent payment in accordance by wire transfer with Section 6.3 of the Master Lease; and (3) for your violation of Section 19.41 of the Master Lease for failure to provide copies of all subleases to the Landlord and/or for not providing verification that all subleases contained provisions as required by Section 19.4 and 19.41 continued violation of the trademarks of the Landlords.

In addition to the above, you are in default under the lease agreements because:  (1) failure to pay the 2004 tax bills for the various stores; (2) allowing several of the west Kentucky stores to operate without gas inventory; (3) allowing the Dawson Springs store to sell contaminated kerosene; and (4) your violation of Section 19.1 of the Master Lease and Section 14.1 of the Master Equipment and Personal Property Lease by your improper assignment, of the leasehold and/or leased personal property without the landlord's consent.

Pursuant to Section 28.2 of the Master Lease and Section 22.2 of the Master Equipment and Personal Property Lease, Landlord/Lessor intends to, and shall, exercise, at its option, concurrently, successively, or in any combination, all remedies available to it at law for in equity.  Therefore, landlord hereby gives notice of its termination of the Leases effective

EXHIBIT B

immediately. Consequently, your possession of the properties shall cease immediately and this lease, except as to your liability herein, shall be terminated. Additionally, Landlord/Lessor shall reenter and take possession of the property and expel you and any assignee.

Additionally, Landlord/Lessor shall bring an action against you for damages sustained by Landlord/Lessor and for any remedy in any equity available to Landlord.

Landlord may also relet the properties or any part thereof upon such term or terms, and at such rental or upon such other terms, as Landlord, in its sole discretion, may determine.

Landlord also hereby gives notice that as of this date, it exercises its right to accelerate and recover from you and all other monetary amounts due and owing and scheduled to become due and owing under the leases both before and after your breach for the entire original scheduled term.

Landlord shall also recover from you all costs and expenses including but not limited to fees and court costs paid or incurred by Landlord as a result of your breach.

Landlord further declares that as a result of your default and Landlord's termination of the Leases, you have assigned, transferred and you are deemed to have assigned, transferred and sent over to landlord all of your right, title and interest and into every sublease entered into by you from time to time, together with all subrents or sums of money due and payable under such subleases, and all security deposits with tenant under such subleases. You are also deemed to have granted Landlord a license to collect rent from the subleases under these circumstances. Accordingly, you are directed to deliver to Landlord any and all subleases of the property and all funds held by you with respect to said subleases.

Very truly yours,

HARNED, BACHERT & DENTON, LLP

Scott A. Bachert

SAB/ang

cc:   Mr. Rohit Sharma

Mr. Ramesh Kapur

Mr. Surinder Multani

Dr. Bhupinder S. Saini

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT BOWLING GREEN

CIVIL ACTION NO. 1:05-CV-03-M

GD DEAL HOLDINGS, LLC
GIRKIN DEVELOPMENT, LLC                                    PLAINTIFFS

V.

BAKER ENERGY, INC.,
ROMIT SHARMA,
DR. BHUPINDER SAINI,
RAMESH KAPUR,
SURINDER MULTANI                                           DEFENDANTS

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Come now the Plaintiffs, GD Deal Holdings, LLC ("GD Deal") and Girkin Development,

LLC ("Girkin"), by and through counsel, and for their causes of action herein, state as follows:

1.      The Plaintiffs adopt and incorporate by reference the allegations set forth in the

original Complaint.

### Count II

2.      Baker Energy, Inc. (hereinafter referred to as "Baker Energy") has defaulted on its

obligations under the terms and conditions of the Master Lease dated April 19, 2001 with GD

Deal; the Master Equipment and Personal Property Lease dated April 19, 2001 with GD Deal;

and the Master Equipment and Personal Property Lease dated April 19, 2001 with Girkin

(hereinafter collectively referred to as the "Lease Agreements").

3.      Pursuant to the terms of the various Lease Agreements, the Plaintiffs have

exercised their right to terminate the leases, and with it the right of possession of Baker Energy

and its subtenants.

EXHIBIT C

4.    The Plaintiffs hereby exercise their right to accelerate the rent and other monetary sums due and owing or scheduled to be due and owing under the leases.

5.    The Plaintiffs are entitled to a preliminary injunction directing that the subtenants and operators of each of the various stores pay over all further rent to the Plaintiffs, or in the alternative, the registry of the Court.

6.    In the alternative, the Court should appoint a receiver to collect all rents and to take such actions as may be necessary to protect the property in question until such time as the respective rights of the parties have been fully adjudicated.

### Count III

7.    By the terms of the aforementioned leases, the Defendant Baker Energy, agreed to maintain the leased property in good condition and surrender unto the Plaintiff upon termination the leased property in the same condition, reasonable wear and tear excepted.

8.    The Defendant, Baker Energy, acting through its agents and employees, has failed to properly maintain the property and to properly operate  same, thus resulting in the lowering of the fair market of the properties and convenience stores to the harm and damage of the Plaintiff. Because of the failure to properly operate the businesses and to maintain the property, the value of the Plaintiff's property has been permanently reduced in excess of the jurisdictional limits of this Court.

9.    The Defendant Baker Energy, acting through its officers and agents, has damaged the value of the leased property, specifically by discontinuing operations at such stores, while violating the provisions of Article 8 of the Master Lease.

10.    The closing of these stores will permanently diminish their fair market value.

11.    Plaintiff GD Deal is entitled to a judgment as against Baker Energy for the loss of fair market value.

### Count IV

12.    The Defendants, Rohit Sharma, Dr. Bhupinder Saini, Ramesh Kaput and Surinder Multaini, executed a personal guaranty dated July 13, 2003, a copy of which is attached hereto as Exhibit B, whereby said Defendants unconditionally guaranteed prompt payment of all liabilities under the Lease Agreements.

13.    The guarantor Defendants have been placed on notice of the defaults by Baker Energy under the Lease Agreements.

14.    The Plaintiffs are entitled to judgment as against the Defendants Sharma, Saini, Kapur, and Multaini for all sums owed by Baker Energy, including but not limited to all rents, fees, and damages due under the Lease Agreements.

### Count V

15.    Pursuant to the terms of the Lease Agreements, the Plaintiffs, GD Deal and Girkin, are entitled to recover all attorney fees, costs and expenses associated with the defaults under the Lease Agreements and the enforcement of the remedies thereunder.

16.    The Plaintiffs are entitled to judgments as against Baker Energy, Sharma, Saini, Kapur, and Multaini, jointly and severally, for all attorney fees, costs and expenses.

WHEREFORE, Plaintiffs, GD Deal Holdings, LLC and Girkin Development, LLC, respectfully request that the Court enter judgment in favor of the Plaintiffs as against the Defendants, Baker Energy, Sharma, Saini, Kapur, and Multani, jointly and severally, for all monetary damages to which the Plaintiffs may be entitled under the Lease Agreements, including but not limited to past due and future rent, property taxes, damages to the property, and attorney

fees and costs; injunctive relief prohibiting the Defendants from collecting further rent from the subtenants and operators and directing that the subtenants and operators of each of the various stores pay over all further rent to the Plaintiffs, or in the alternative, the registry of the Court; as well as any and all other relief to which the Plaintiffs may be entitled.

Submitted for electronic filing this day, January 24, 2005.

> HARNED, BACHERT & DENTON, LLP
> P.O. Box 1270
> Bowling Green, KY 42102-1270
> Telephone: (270) 782-3938
> Facsimile: (270) 781-4737
>
> /s/ Scott A. Bachert_____
> SCOTT A. BACHERT

CERTIFICATION:

This is to certify that a true and correct copy of the foregoing document either placed in the U.S. Mail, first class, postage prepaid or forwarded via electronic mail, this day, January 24, 2005, addressed to the following:

Byron E. Leet
C. Tyson Gorman
Wyatt, Tarrant & Combs, LLP
500 West Jefferson Street; Suite 2500
Louisville, KY 40202-2898

Kevin Brooks
Tim Edelen
1010 College Street
Bowling Green, KY 42102

Bob Riffle
416 East Main Street
Peoria, Illinois 61602

/s/ Scott A. Bachert_____
SCOTT A. BACHERT



**Trey Grayson**
Secretary of State

**Commonwealth of Kentucky**
**Office of the Secretary of State**

Summons Division
PO BOX 718
FRANKFORT, KY 40602-0718
Phone: (502) 564-2848 EXT. 440
. Fax: (502) 564-1484

U. S. District Court
Western District
213 Federal Building
214 E. Main St.
Bowling Green, KY 42101

FILED
DISTRICT COURT CLERK
WESTERN DISTRICT OF KY
2005 MAY -2  PH 12: 47

FROM:      SUMMONS DIVISION
                    SECRETARY OF STATE

RE:          CASE NO: 1:05-CV-03-R

DEFENDANT:  **SURINDER MULTANI**

DATE:       April 28, 2005

The Office of the Secretary of State was served with a summons and accompanying documents for the captioned defendant on

April 8, 2005

This office served the defendant by sending a copy of the summons and accompanying documents via certified mail, return receipt requested, on

April 8, 2005

We are enclosing the return receipt confirming receipt of summons.

---

Kentucky Secretary of State's Office              Summons Division                              4/28/2005

EXHIBIT D

**SENDER:** *COMPLETE THIS SECTION*

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

*FILED*
*DISTRICT COURT*
*EST OF KY*

2005 MAY -2

1. Article Addressed to:

4/8/2005                    1:05-CV-03-R

**SURINDER MULTANI**

2015 S. ARLINGTON HEIGHTS RD.
ARLINGTON HEIGHTS, IL 60005

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X                                      ☐ Agent
                                       ☑ Addressee

B. Received by ( Printed Name)    O. Date of Delivery
SURINDER MULTANI    4/26/05

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

RESTRICTED DELIVERY

8. Service Type
   ☑ Certified Mail     ☐ Express Mail
   ☐ Registered         ☐ Return Receipt for Merchandise
   ☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes  X

2. Article Number
   (Transfer from service label)    7004-1160-0000-6058-2716

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-154

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

SECRETARY OF STATE

P.O. BOX 718

FRANKFORT, KY 40602-0718

RECEIVED
APR 2 8 2005
SECRETARY OF STATE
COMMONWEALTH OF K

# GURPRIYA KAUR MULTANI IRREVOCABLE TRUST

I, Safampreet K. Multani, have transferred Ten Dollars ($10.00) and other good and valuable consideration ($10.00) to Surinder P. S. Multani as trustee of the Gurpriya Kaur Multani Irrevocable Trust. That asset and any other assets received by the trustee (the "trust estate") shall be held in trust subject to the provisions of this instrument.

## Article 1
## Introduction

**1.1 Family.** My "spouse" is Surinder P. S. Multani. While I have three (3) children, I intend by this instrument to provide for my children during my life and to provide for one child, namely Gurpriya Kaur Multani (my "Child") and my Child's descendants after the death of myself and my spouse.

**1.2 Name of Trust.** The name of this trust shall be the Gurpriya Kaur Multani Irrevocable Trust.

## Article 2
## Trusts Irrevocable

This trust is irrevocable, and I have no right or power, whether alone or in conjunction with others (in whatever capacity), to alter, amend, revoke or terminate this trust or any one of the terms of the trust in any respect, in whole or in part, or to designate the persons who shall possess or enjoy the trust property or the income therefrom. By this instrument, I intend to and hereby do relinquish absolutely and forever all possession and enjoyment of, or the right to the income from the trust property, whether directly, indirectly or constructively, as well as every interest of any nature, present or future, vested or contingent in the trust property or created under this instrument.

## Article 3
## Lifetime Trust

**3.1 Special Withdrawal Rights.** I intend that contributions to the trust during my life (the "Lifetime Trust") shall qualify for the annual exclusion as gifts of present interests for federal gift tax purposes to the maximum extent possible for my Child. Following each contribution to the Lifetime Trust, my Child shall have special withdrawal rights as follows:

My Child shall have a special withdrawal right over an amount equal to the lesser of:

(i) The value of the contribution and

(ii) The excess, if any, of the largest amount that then qualifies for the annual per donee exclusion allowed for federal gift tax purposes under Code Section 2503, assuming that a split gift election will be made if the donor was married on the date of the contribution, over the aggregate special withdrawal rights previously granted to the Child under this paragraph during the calendar year.

004969

EXHIBIT E

A special withdrawal right shall be deemed to be granted under this paragraph on the date of the contribution giving rise to the right.

    3.2    **Discretionary Payment of Income and Principal to Descendants.** During my life, the trustee may pay as much of the income and principal to any one or more of my descendants, as the trustee from time to time considers necessary for the health, maintenance in reasonable comfort, or education of each such person. The trustee may make the payments in equal or unequal shares, taking into account the present and prospective needs of those persons. Any income not so paid in each tax year shall be added to principal at the end of each tax year.

**Article 4**
**Gifts at My Death**

On my death, the trustee shall distribute the following gifts from the trust estate:

    4.1    **Includible Trust Estate.** I give the Includible Trust Estate to the trustee of any trust created by me, to the extent I did not intend in any such trust to relinquish all possession and enjoyment of, or the right to the income from the trust property, whether directly, indirectly or constructively, as well as every interest of any nature, present or future, vested or contingent in such trust's property. If more than one (1) such trust exists, the personal representative of my probate estate shall appoint any part or all of the Includible Trust Estate to any such trust(s) that will result in the lowest Federal Estate Tax owed by my estate. If no such trust exists at the time of my death, I give the Includible Trust Estate to the personal representative of my probate estate for administration and distribution within my probate estate.

    4.2    **Balance of Trust Estate.** I give the balance of the trust estate to the trustee to hold as the Child's Separate Trust.

**Article 5**
**Child's Separate Trust**

Any trust property gifted to the Child's Separate Trust shall be added to or used to fund the principal of a Child's Separate Trust. The trustee shall administer the Child's Separate Trust as follows:

    5.1    **Discretionary Payment of Income and Principal.** During the life of Surinder P. S. Multani, the trustee may pay as much of the income and principal to any one or more of my descendants as the trustee from time to time considers necessary for the health, maintenance in reasonable comfort, or education of each person. The trustee may make the payments in equal or unequal shares, taking into account the present and prospective needs of those persons. Any income not so paid in each tax year shall be added to principal at the end of each tax year.

2

5.2     **Limitations to Discretionary Payment of Income and Principal.** Upon the death of Surinder P. S. Multani, the trustee may pay as much of the income and principal to my Child and my Child's descendants as the trustee from time to time considers necessary for the health, maintenance in reasonable comfort, or education of each such person. The trustee may make the payments in equal or unequal shares, taking into account the present and prospective needs of those persons. Any income not so paid in each tax year shall be added to principal at the end of each tax year.

5.3     **Appointment of Income and Principal.** Without limiting the trustee's discretion in Section 5.2, after the death of Surinder P. S. Multani and upon written instruction from my Child, the trustee shall pay as much of the income and principal to my Child and my Child's descendants as appointed by my Child's written instruction subject to the following limitations:

(a)     After the beneficiary has attained age 30, the trustee may distribute the principal to any one or more persons or organizations, including the beneficiary, as the beneficiary from time to time appoints, not exceeding in the aggregate, half in value before the beneficiary has attained age 35, plus current income of that beneficiary's trust plus any accumulated income. For purposes of this paragraph, the value of the principal shall be determined as of the time the beneficiary first exercises the right to appoint, plus the value of any subsequent additions as of the time of addition.

(b)     After the beneficiary has attained age 35, the trustee may distribute the principal to any one or more persons or organizations, including the beneficiary, as the beneficiary from time to time appoints, not exceeding in the aggregate, half in value before the beneficiary has attained age 40, plus current income of that beneficiary's trust plus any accumulated income. For purposes of this paragraph, the value of the principal shall be determined as of the time the beneficiary first exercises the right to appoint, plus the value of any subsequent additions as of the time of addition.

(c)     After the beneficiary has attained age 40 and thereafter, the trustee may distribute the entire trust to any one or more persons or organizations, including the beneficiary, as the beneficiary from time to time appoints, plus any accumulated income.

Mandatory income payments shall be made at least quarterly.

5.4.    **Distribution on Child's Death.** On the death of my Child, the trustee shall distribute the Child's Separate Trust as follows:

(a)     **Any Descendant Living.** If my Child has any descendant then living, to my Child's then living descendants *per stirpes*; or

(b)     **No Descendant Living.** If my Child has no descendant then living but I have any descendant then living, to the trustee to allocate in shares of equal value for my then living children, subject to the Child's Separate Trust provisions, provided that if a child of mine is not then living but a descendant of the child is then living, the trustee shall distribute the

004971

share that would have been allocated to the child, if living, *per stirpes* to the child's then living descendants.

## Article 6
## Contingent Gift Provision

On the death of the last to die of all beneficiaries of any trust (the "termination date") any of the trust not otherwise distributable shall be distributed (a) half to my heirs and half to my spouse's heirs if my spouse and I were married to each other at the death of the first of us to die, or (b) all to my heirs if my spouse and I were not married to each other at the death of the first of us to die. Heirs and their respective shares shall be determined under the laws of descent and distribution of Illinois at my death for property located in Illinois as if I had died on the termination date unmarried and domiciled in Illinois and, if my spouse and I were married to each other at the death of the first of us to die, as if my spouse had died on the termination date unmarried and domiciled in Illinois.

## Article 7
## Trustee Succession

7.1    **Resignation.** A trustee may resign at any time by signed notice to my Child.

7.2    **Individual Trustee Succession.** Each acting individual trustee (unless limited in the instrument in which the trustee was designated) may, by signed instrument filed with the trust records, (a) designate one or more individuals or qualified corporations to act with or to succeed the trustee consecutively or concurrently, in any stated combination, and on any stated contingency, and (b) amend or revoke the designation before the designated trustee begins to act.

7.3    **Default of Designation.** If at any time no trustee is acting and no designated trustee is able and willing to act, then the first of the following who is able and willing to act, subject to any listed restrictions, shall be successor trustee to the original trustee, Surinder P. S. Multani:

(a)   Safanpreet K. Multani;

(b)   For the period my Child has not reached the age of 40, my sister-in-law, Pal Kaur Narinder;

(c)   For the period my Child has not reached the age of 40 and Pal Kaur Narinder is unable or unwilling to act, my sister-in-law, Satinder Pal Kaur Shah;

(d)   For the period my Child has not reached the age of 40 and Pal Kaur Narinder and Satinder Pal Kaur Shah are unable or unwilling to act, my brother-in-law, Inderpal Singh;

(e)   For the period my Child has not reached the age of 40 and Pal Kaur Narinder, Satinder Pal Kaur Shah and Inderpal Singh are unable or unwilling to act, any qualified corporation

4

004972

appointed in an instrument signed by or on behalf of my Child;

(f)   Upon my Child attaining the age of 40, my Child;

(g)   Any individual or qualified corporation appointed in an instrument signed by a majority of the income beneficiaries.

7.4   **Corporate Trustee Substitution.** A corporate trustee may be removed at any time by an instrument signed by a majority of the income beneficiaries but only if, on or before the effective date of removal, a qualified corporation has been appointed corporate trustee in the same manner.

## Article 8
## Trustee Actions

8.1  **Control.** Except as otherwise provided, whenever more than one trustee is acting, the "trustee" means all trustees collectively, and a majority of the trustees qualified to participate in an action or decision of the trustees shall control. Any trustee who is not qualified to participate in or dissents from such action or decision shall not be liable therefor.

8.2  **Accountings.** Upon written request, the trustee shall send a written account of all trust receipts, disbursements, and transactions, and the property comprising the trust to each income beneficiary and at the option of the trustee, to the future beneficiaries of the trust. A future beneficiary of a trust is a person to whom the assets of the trust would be distributed or distributable if the trust then terminated. Unless court proceedings on the account are commenced within three months after the account is sent, the account shall bind and be deemed approved by all of the following beneficiaries who have not filed written objections to the account with the trustee within three months after the account is sent, and the trustee shall be deemed released by all such beneficiaries from liability for all matters covered by the account as though such account was approved by a court of competent jurisdiction: (a) each beneficiary to whom the account was sent, and (b) if the account was sent to all income and future beneficiaries of the trust, then all beneficiaries of the trust who have any past, present, or future interest in the matters covered by the account.

8.3  **Trustee's Right to Account Settlement Before Distribution.** Before distribution of any trust principal (other than pursuant to a special withdrawal right), the trustee shall have the right to require settlement of any open accounts of the trust from which the distribution is being made, either by the written approval and release of all beneficiaries having an interest in the distribution or, if the releases cannot be obtained, by court settlement of the open accounts. All the trustee's reasonable fees and expenses (including attorneys' fees) attributable to approval of the trustee's accounts shall be paid by the trust involved.

5

004973

01/04/2006 15:17
Jan. 4. 2006 2:16PM
01/04/2006 01:23    8479632042
Case 1:08-cv-01722    Document 59-6    Filed 08/05/2008    Page 6 of 48    PAGE    07
ROBERT SLONE
No. 2089    P. 12

**8.4 Acceptance of Predecessor's Accounts.** On the signed direction of the income beneficiaries, the trustee shall accept without examination the accounts rendered and property delivered by or for a predecessor trustee. Such acceptance shall fully discharge the predecessor trustee and shall bind all beneficiaries.

**8.5 Notice.** If a beneficiary is under legal disability, the trustee shall give any notice or accounting to the beneficiary's personal representative, if any, and if none, to a parent of the beneficiary (other than me), if any, and if none, to any person (other than me) whom the trustee believes has demonstrated concern for the interest of the beneficiary. That person may sign any instrument for the beneficiary.

**8.6 Special Trustees.** If the trustee (the "principal trustee") is unable or unwilling to act as trustee as to any property, such person or qualified corporation as the principal trustee shall designate by signed instrument shall act as special trustee as to that property. Any special trustee may resign at any time by giving written notice to the principal trustee. The special trustee shall have the powers granted to the principal trustee under this instrument, to be exercised with the approval of the principal trustee. Net income and any proceeds of sale shall be paid to the principal trustee, to be administered under this instrument. The principal trustee may remove and replace the special trustee at any time.

**8.7 Delegation to Co-Trustee.** Any individual trustee may delegate any or all of that trustee's powers and duties to a co-trustee, except that no trustee shall be permitted to delegate any discretion with respect to the distribution of income or principal to a beneficiary. Any delegation may be for a definite or indefinite period and may be revoked by the delegating trustee. Any delegation or revocation shall be in writing, signed by the delegating trustee and delivered to the co-trustee to whom the delegation is made. Any person or institution may rely on the written certification of a co-trustee that the co-trustee has the power to act without concurrence of any other trustee, provided, however, that the co-trustee shall attach to the written certification a copy of the instrument by which the powers and duties have been delegated.

**8.8 Compensation.** The trustee shall be entitled to reimbursement for expenses, but shall not be entitled to compensation.

**8.9 Determinations by Trustee.** The trustee's reasonable determination of any question of fact shall bind all persons.

**8.10 Third-Party Dealings.** The trustee's certification that the trustee is acting according to this instrument shall protect anyone dealing with the trustee. No one need see to the application of money paid or property delivered to the trustee.

**8.11 Exoneration of Trustee.** Any individual trustee acting in good faith shall not be liable for any act or omission. No trustee shall be liable for any act or omission of another trustee.

**8.12 Bond.** No trustee need give bond, qualify before, or account to any court.

6

004974

8.13 **Powers of Successor Trustee.** Unless expressly limited, each successor trustee shall have all the titles, powers, duties, discretions, and immunities of the original trustee.

## Article 9
### Trustee Powers

In addition to all powers granted by law, the trustee shall have the following powers, to be exercised in a fiduciary capacity:

9.1 **Retention.** To retain any property transferred to the trustee, regardless of diversification and regardless of whether the property would be considered a proper trust investment;

9.2 **Sale.** To sell at public or private sale, contract to sell, grant options to buy, convey, transfer, exchange, or partition any real or personal property of the trust for such price and on such terms as the trustee sees fit;

9.3 **Real and Tangible Personal Property.** To make leases and subleases and grant options to lease, although the terms thereof commence in the future or extend beyond the termination of any trust; to purchase, operate, maintain, improve, rehabilitate, alter, demolish, abandon, release, or dedicate any real or tangible personal property; and to develop or subdivide real property, grant easements, and take any other action with respect to real or tangible personal property that an individual owner thereof could take;

9.4 **Borrowing.** To borrow money from any lender, extend or renew any existing indebtedness, and mortgage or pledge any property in the trust;

9.5 **Investing.** To invest in bonds, common or preferred stocks, notes, options, common trust funds, mutual funds, shares of any investment company or trust, or other securities, life insurance, partnership interests, general or limited, joint ventures, real estate, or other property of any kind, regardless of diversification and regardless of whether the property would be considered a proper trust investment;

9.6 **Joint Investments; Distribution; Determination of Value.** To make joint investments for two or more trusts held by the same trustee; to distribute property in cash or in kind, or partly in each; to allocate or distribute undivided interests or different property or disproportionate interests to the beneficiaries, and to determine the value of any property so allocated or distributed; but no

7

004975

adjustment shall be made to compensate for a disproportionate allocation of unrealized gain for federal income tax purposes, and no action taken by the trustee pursuant to this paragraph shall be subject to question by any beneficiary;

9.7 **Rights as to Securities.** To have all the rights, powers, and privileges of an owner of the securities held in trust, including, but not limited to, the powers to vote, give proxies, and pay assessments; to participate in voting trusts, pooling agreements, foreclosures, reorganizations, consolidations, mergers, and liquidations and, incident to such participation, to exercise or sell stock subscription or conversion rights;

9.8 **Conservation of Assets.** To take any action that an individual owner of an asset could take to conserve or realize the value of the asset and with respect to any foreclosure, reorganization, or other change with respect to the asset;

9.9 **Delegation.** To employ agents, attorneys, and proxies of all types (including any firm in which a relative of mine or his or her spouse is a partner, associate, or employee or is otherwise affiliated) and to delegate to them any powers the trustee considers advisable;

9.10 **Payment of Expenses and Taxes.** To pay all expenses incurred in the administration of the trust and to pay all taxes imposed on the trust;

9.11 **Determination of Principal and Income.** To determine in cases not covered by statute the allocation of receipts and disbursements between income and principal, except that (a) reasonable reserves for depreciation, depletion, and obsolescence may be established out of income and credited to principal only to the extent that the trustee determines that readily marketable assets in the principal of the trust will be insufficient for any renovation, major repair, improvement, or replacement of trust property that the trustee deems advisable; and (b) any premium paid for interest-bearing debt obligations shall be amortized out of income;

9.12 **Dealings with Fiduciaries.** To deal with, purchase assets from, or make loans to the fiduciary of any trust made by me or a trust or estate in which any beneficiary under this trust has an interest, even though a trustee under this instrument is the fiduciary, and to retain any assets or loans so acquired, regardless of diversification and regardless of whether the property would be considered a proper trust investment; to deal with a corporate trustee under this instrument individually or a parent or affiliate company; to deal with the fiduciary of any other estate, trust, or custodial account even though the fiduciary is a trustee under this instrument;

9.13 **Compromising Claims.** To litigate, compromise, settle, or abandon any claim or demand in favor of or against the trust;

9.14 **Nominee Arrangements.** To hold any asset in the name of a nominee, in bearer form or otherwise, without disclosure of any fiduciary relationship;

8

004976

**9.15 Elections Under Retirement Plans.** To elect, pursuant to the terms of any employee benefit plan, individual retirement plan, or insurance contract, the mode of distribution of the proceeds thereof, and no adjustment shall be made in the interests of the beneficiaries to compensate for the effect of the election;

**9.16 Liability Insurance.** To purchase liability and casualty insurance of any kind for the protection of the trust estate, including comprehensive liability insurance;

**9.17 Accepting Additional Property.** To accept additional property from any source and administer it as a part of the trust; if the addition is made by a will, the trustee may accept the statement of the personal representative of the estate of the transferor that the property delivered to the trustee constitutes all of the property to which the trustee is entitled without any duty to inquire into the representative's administration or accounting;

**9.18 Environmental Matters.** To inspect and monitor businesses and real property (whether held directly or through a partnership, corporation, trust, or other entity) for environmental conditions or possible violations of environmental laws; to remediate environmentally damaged property or to take steps to prevent environmental damage in the future, even if no action by public or private parties is currently pending or threatened; to abandon or refuse to accept property that may have environmental damage; to expend trust property to do the foregoing; and no action or failure to act by the trustee pursuant to this paragraph shall be subject to question by any beneficiary;

**9.19 Purchasing Probate and Trust Assets.** To purchase assets from my probate estate or any trust created by me at their fair market value as of the date of purchase and to lend money to my probate estate or any trust created by me, with adequate interest and with adequate security;

**9.20 Ability To Take Other Actions.** To do all other acts to accomplish the proper management, investment, and distribution of the trust.

**9.21 Restrictions.** The trustee owes a duty of loyalty to the beneficiaries, a duty to become and remain familiar with the trust estate and trust activities, and a duty to exercise reasonable care in the exercise of the trustee's powers and authority. The trustee owes to all the beneficiaries a fiduciary duty to act at all times in good faith and in the best interests of the beneficiaries, and to refrain from any act or omission that would constitute self-dealing, fraud, or any other reckless or willful misconduct. The trustee is also bound by the "prudent person" standard of care to the same extent as a director of an Illinois business corporation under the Illinois Business Corporation Act ("IBCA"), including any provision within the IBCA relating to an "interested director transaction".

004977

## Article 10
### Special Withdrawal Rights

The provisions of this Article shall apply to the special withdrawal rights granted to my Child over contributions to the Lifetime Trust.

**10.1 Contribution.** A "contribution" is any transfer to the Lifetime Trust of cash or other property, except a transfer for which the trustee furnishes full and adequate consideration. The amount of a contribution that is subject to gift tax shall be its value for federal gift tax purposes, and the amount of any other contribution shall be its fair market value on the date of contribution.

**10.2 Notice of Rights.** The trustee shall provide notice to each eligible beneficiary who is granted a special withdrawal right within a reasonable time after the trustee knows of the contribution giving rise to the right.

**10.3 Exercise of Rights.** A special withdrawal right may be exercised only by written instrument delivered to the trustee. While an eligible beneficiary is under a legal disability, the eligible beneficiary's special withdrawal rights may be exercised only by the person who received notice of the right, if the person is able to act, or by any other person to whom notice could have been given. The trustee shall satisfy the exercise of a special withdrawal right in cash to the extent practicable, and otherwise from other trust property selected by the trustee. If a special withdrawal right is exercised, the special withdrawal right shall be satisfied first from the Lifetime Trust, if any, and second from the Child's Separate Trust established for the holder of the special withdrawal right, and third in equal shares from any other Child's Separate Trust.

**10.4 Advancements.** Each distribution from the Lifetime Trust and the Child's Separate Trust in satisfaction of an eligible beneficiary's special withdrawal right shall be treated as an advancement and charged, without interest, against the share provided for the eligible beneficiary or his or her descendants.

**10.5 Termination of Rights.** Each special withdrawal right granted under this instrument shall terminate 60 days after the date of the contribution giving rise to the right. On December 31 of each year, outstanding special withdrawal rights granted under this instrument to a child of mine on or before November 1 of such calendar year or in any prior year shall terminate, if at all, in an amount equal to the greater of:

(a) The excess, if any, of $5,000 over the sum of the value of all rights to withdraw that were held by my Child over any withdrawal trust (other than a trust created under this instrument) and that previously terminated during the year or that terminate on that date, and

10

004978

(b) The lesser of:

(1) The excess, if any, of five percent of the sum of the maximum values for all withdrawal trusts for my Child for the year over the sum of the value of all rights to withdraw that were held by my Child over any withdrawal trust (other than a trust created under this instrument) and that previously terminated during the year or that terminate on that date, and

(2) Five percent of the value of the trust assets held under this instrument on December 31 of that year.

A withdrawal trust for my Child for a particular year is a trust (whether or not created under this instrument) that is subject to a right to withdraw held by my Child if a portion or all of the right to withdraw terminates or terminated at any time during that year. The maximum value of a withdrawal trust for my Child for a particular year means the greatest value of the assets of the trust that are subject to a right to withdraw held by my Child on any day during that year on which any such right to withdraw terminates or terminated.

10.6 **Conditional Contributions.** A donor who makes a contribution to the Lifetime Trust shall have the right, by a written instrument delivered to the trustee prior to acceptance of the contribution, to condition the contribution (a) to exclude any person who would otherwise have a special withdrawal right from having the right with respect to the contribution; (b) to increase or decrease the amount of any special withdrawal right that would otherwise be granted to any person by reason of the contribution, except that the aggregate amount of such special withdrawal rights so granted as a result of the contribution shall not exceed the amount of the contribution; or (c) to change the period during which any special withdrawal right granted by reason of the contribution may be exercised.

## Article 11
### Administrative Provisions

11.1 **Standard for Discretionary Payments.** In the exercise of discretion to make a payment to a beneficiary, the trustee may consider all income and resources known to the trustee to be available to the beneficiary and the standard of living of the beneficiary.

11.2 **Exercise of Power of Appointment.** A lifetime power of appointment granted under this instrument may be exercised only by written instrument specifically referring to the power. A testamentary power of appointment granted under this instrument may be exercised only by a will specifically referring to the power. The appointment may be either outright or subject to such trusts and conditions as the holder of the power designates. The holder of the power may grant further powers of appointment to any person to whom principal may be appointed. In determining whether a testamentary power of appointment has been exercised, the trustee may rely on an instrument

11

admitted to probate in any jurisdiction as the will of the holder of the power or may assume the power of appointment was not exercised in the absence of actual notice of the holder's will within three months after the holder's death.

**11.3 Advancements.** No payment made to any beneficiary under this instrument shall be treated as an advancement, except for a payment to an eligible beneficiary pursuant to a special withdrawal right.

**11.4 Small Trust Termination.** After my death, the trustee may terminate any trust with a value at the time of termination less than the Minimum Trust Value. The Minimum Trust Value shall be the sum of (a) $50,000 and (b) the percentage increase, if any, in the cost of living from January 1 of the year in which I executed this instrument until January 1 of the year of termination multiplied by $50,000. For this purpose, the increase in the cost of living shall be determined pursuant to the Consumer Price Index for Urban Wage Earners and Clerical Workers, U.S. City Average, All Items, as published by the Bureau of Labor Statistics of the U.S. Department of Labor. If the index ceases to be published, there shall be substituted any other index which the trustee determines to reflect similar information.

**11.5 Rule Against Perpetuities.** Despite any other provision, 21 years after the death of the last to die of all the beneficiaries living on the date of the execution of this instrument, each trust then held under this instrument or then held pursuant to the exercise of a power of appointment granted under this instrument shall be distributed to the income beneficiaries in equal shares.

**11.6 Facility of Payment.** The trustee may make any payments (other than distributions on termination) to a beneficiary under legal disability or whom the trustee determines to be unable to properly manage his or her affairs in any of the following ways: (a) to the legally appointed guardian of the beneficiary, (b) to an adult relative or friend of the beneficiary in reimbursement for proper expenditures on behalf of the beneficiary, (c) to a custodian for the beneficiary under a Uniform Transfers or Gifts to Minors Act, (d) by making direct expenditures for the benefit of the beneficiary, or (e) to the beneficiary directly. However, the trustee shall not make any payments to me pursuant to this paragraph.

**11.7 Spendthrift.** No interest under this instrument shall be assignable by any beneficiary, or be subject to the claims of his or her creditors, including claims for alimony or separate maintenance. The preceding sentence shall not be construed as restricting in any way the exercise of any right of withdrawal or power of appointment or the ability of any beneficiary to release his or her interest.

**11.8 Consolidation and Division of Trusts.** The trustee may at any time consolidate any trust held under this instrument with any other trust if the beneficiaries of the trusts are the same and the terms of the trusts are substantially similar. Further, the trustee, in the trustee's absolute discretion, may divide a trust (the "initial trust") into two or more separate trusts and may segregate an addition to a trust (the "initial trust") as a separate trust.

12

004980

(a) **Funding.** In dividing the initial trust, if the division is to be effective as of my death or as of the death of any other person, the trustee shall fund each separate trust with property having an aggregate fair market value fairly representative of the appreciation or depreciation in value from the date of such death to the date of division of all property subject to the division.

(b) **Terms.** A trust created pursuant to this paragraph shall have the same terms and conditions as the initial trust, and any reference to the initial trust in this instrument shall refer to that trust. The rights of beneficiaries shall be determined as if the trust and the initial trust were aggregated, but (1) different tax elections may be made as to the trusts, (2) disproportionate discretionary distributions may be made from the trusts, (3) taxes may be paid disproportionately from the trusts, (4) upon termination the share of a remainder beneficiary (including any recipient trust) may be satisfied with disproportionate distributions from the trusts, and (5) a beneficiary of the trusts may disclaim an interest in one of the trusts without having to disclaim an interest in another trust. In administering, investing, and distributing the assets of the trusts and in making tax elections, the trustee may consider differences in federal tax attributes and all other factors the trustee believes pertinent.

11.9 **Accrued and Unpaid Income.** Except as otherwise specifically provided, upon the death of any beneficiary, any accrued or unpaid income shall be paid as income to the next beneficiary succeeding in interest.

11.10 **Controlling Law.** The validity and effect of each trust and the construction of this instrument and of each trust shall be determined in accordance with the laws of Illinois. The original situs and original place of administration of each trust shall also be Illinois, but the situs and place of administration of any trust may be transferred at any time to any place the trustee determines to be for the best interests of the trust.

11.11 **Exclusion of Interested Trustee.** Notwithstanding any other provision, a trustee shall have no discretionary power to allocate or distribute assets to the extent that such would discharge the legal obligations of the trustee or any beneficiary and to the extent that such would discharge my legal obligation to support any beneficiary; however, any trustee that is my Child may allocate or distribute assets to my Child and/or my Child's descendants as beneficiary. Any trustee other than my Child or my Child's descendants, (a) shall have no discretionary power to allocate or distribute assets of that trust, directly or indirectly, to or for the trustee and/or any beneficiary, unless necessary for the beneficiary's support in reasonable comfort, health care, or education at any level (to the extent the trustee was otherwise granted such discretionary powers) and (b) shall have no other power or discretion that would be deemed a general power of appointment under Code Section 2041 unless the trustee has the power in other than a fiduciary capacity.

11.12 **Limit on Distributions.** Notwithstanding any other provision, if and to the extent that after distribution or appointment the remaining principal of the trust would be insufficient to satisfy its share of all outstanding special withdrawal rights if the rights were then exercised, then the

13

004981

trustee shall (a) make no distribution to a beneficiary from the Lifetime Trust or the Child's Separate Trust (other than a distribution in satisfaction of a special withdrawal right and other than a terminating distribution to the Child's Separate Trust) and (b) the special powerholder shall have no right to exercise a power of appointment over the Lifetime Trust.

## Article 12
### Accumulation Trusts and
### Generation-Skipping Transfers

12.1  **Accumulation Distributions.** Without in any way limiting any discretionary power granted elsewhere in this instrument, where the trustee makes a distribution of property and as a result of the application of Sections 665-667 of the Internal Revenue Code of 1986 as amended, or corresponding provisions of applicable revenue laws, and such distribution, in the judgment of the trustee, results in the payment of a tax by the beneficiary that is inequitable when considering my purposes of establishing this trust, the trustee is authorized, in the trustee's sole discretion, to distribute an additional amount from the trust to enable the beneficiary to avoid the inequity.

12.2  **Generation-Skipping Transfers.** If the trustee considers any distribution or termination of an interest or power hereunder as a distribution or termination subject to a generation-skipping tax, the trustee is authorized:

(a)  To augment any taxable distributions by an amount which the trustee estimates to be sufficient to pay such tax and charge the same to the particular trust or share to which the tax relates without adjustment of the relative interests of the beneficiaries;

(b)  To pay such tax, in the case of a taxable termination, from the particular trust or share to which the tax relates without adjustment of the relative interests of the beneficiaries. If said tax is imposed in part by reason of the trust property hereunder and in part by reason of other property, the trustee shall pay only the portion of such tax attributable to the taxable termination hereunder, taking into consideration deductions, exemption, credits and other factors which the trustee deems advisable; and

(c)  To postpone final termination of any particular trust and to withhold all or any portion of the trust property until the trustee is satisfied the trustee no longer has any liability to pay any generation-skipping tax with reference to such trust or its termination.

## Article 13
### Definitions

13.1  **Child and Descendant.**

(a)  **Child.** Other than my Child, as my Child is defined in Section 1.1, a "child" of a person means only: (1) a child born to the person or to the person's spouse while they are lawfully married; (2) a natural child of the person born while the parents are not lawfully

004982

married if the parents subsequently become lawfully married, but only for purposes of any allocation or distribution made after that marriage; or (3) a child lawfully adopted by the person prior to that child's attaining age 21.

(b) **Descendant.** A child of a person is a "descendant" of that person and of all ancestors of that person. A person's descendants include all such descendants whenever born. Except when distribution or allocation is directed to descendants *per stirpes*, the word "descendants" includes descendants of every degree whether or not a parent or more remote ancestor of a descendant is also living.

(c) **Child in Gestation.** A child in gestation on the date any allocation or distribution is to be made shall be deemed to be living on that date if the child is subsequently born alive and lives for at least 90 days.

13.2 **Code.** References to Sections of the "Code" refer to the Internal Revenue Code of 1986, as amended from time to time, and include corresponding provisions of subsequent federal tax laws.

13.3 **Education.** "Education" means a pre-school, grade school, middle school, high school, college, university, and professional or postgraduate education, any vocational studies or training, reasonable related living expenses, and reasonable travel expenses to and from the educational institution.

13.4 **Eligible Beneficiary and Eligible Beneficiaries.** My spouse and each child of mine who is living on the date of a contribution to the Lifetime Trust shall be an "eligible beneficiary" as to the contribution, and all such persons collectively shall be the "eligible beneficiaries" as to the contribution.

13.5 **Incapacity.** A person shall be considered incapacitated if under a legal disability or unable to give prompt and intelligent consideration to financial affairs. The existence of the inability may be determined by a physician, and any person may rely on written notice of the determination. A person already acting as trustee shall cease to act on incapacity.

13.6 **Includible Trust Estate.** "Includible Trust Estate" means all assets of the trust estate that are included in my gross estate for federal estate tax purposes at my death, whether by reason of my death within three years of transfer of the assets to the trustee or otherwise. The trustee may rely conclusively and without liability on a certificate from the personal representative of my probate estate as proof that all or a part of the assets of the trust estate at my death are included in my gross estate for federal estate tax purposes.

13.7 **Income Beneficiary.** An "income beneficiary" means a person to whom or for whose benefit income of any trust is or may be currently distributed.

13.8 **Per Stirpes.** Whenever assets are to be allocated for or distributed to the descendants of a person *per stirpes*, those assets shall be divided into equal shares, one such share for each then

15

living child of that person and one such share for the then living descendants collectively of each deceased child of that person who has a descendant then living. Any such deceased child's share shall then be allocated for or distributed to that child's descendants *per stirpes* in accordance with the preceding sentence and this sentence.

**13.9 Qualified Corporation.** A "qualified corporation" means any bank, trust company, or other corporate entity that is authorized to act as a trustee and that is not a related or subordinate party under Code Section 672(c) as to any beneficiary under this instrument.

**13.10 Spouse.** The "spouse" of any person, other than me, means the individual legally married to, and not legally separated from, that person on the date of the distribution then in question or on the date of the prior death of that person.

## Article 14
## Captions and Context of Terms

Captions shall have no impact or meaning as to the terms of the document. Singular and plural and masculine, feminine, and neuter shall be interchangeable as required or permitted in the context of this instrument.

Signed and agreed on _____ APRIL 26 _____, 2005.


_____
Safanpreet K. Multani, as settlor


_____
Surinder P.S. Multani, as trustee

16

004984

STATE OF         )
                    ) ss:

COUNTY OF     )

      Before me, a Notary Public in and for said County and State, personally appeared Safanpreet K. Multani, as settlor, and Surinder P. S. Multani, as trustee, and acknowledged the execution of the foregoing instrument to be their free and voluntary act this _26th_ day of _April_, 2005.

                          _Kishor c. Shah_
                          Notary Public
                          Printed: _KISHOR   C   SHAH_
                          County of Residence: _DuPage . IL._

My Commission Expires:
_2/3/2007_

"OFFICIAL SEAL"
Kishor C. Shah
Notary Public, State of Illinois
My Commission Exp, 02/03/2007

17

004985

# GURJAP SINGH MULTANI IRREVOCABLE TRUST

I, Safanpreet K. Multani, have transferred Ten Dollars ($10.00) and other good and valuable consideration ($10.00) to Surinder P. S. Multani as trustee of the Gurjap Singh Multani Irrevocable Trust. That asset and any other assets received by the trustee (the "trust estate") shall be held in trust subject to the provisions of this instrument.

## Article 1
### Introduction

1.1 **Family.** My "spouse" is Surinder P. S. Multani. While I have three (3) children, I intend by this instrument to provide for my children during my life and to provide for one child, namely Gurjap Singh Multani (my "Child") and my Child's descendants after the death of myself and my spouse.

1.2 **Name of Trust.** The name of this trust shall be the Gurjap Singh Multani Irrevocable Trust.

## Article 2
### Trusts Irrevocable

This trust is irrevocable, and I have no right or power, whether alone or in conjunction with others (in whatever capacity), to alter, amend, revoke or terminate this trust or any one of the terms of the trust in any respect, in whole or in part, or to designate the persons who shall possess or enjoy the trust property or the income therefrom. By this instrument, I intend to and hereby do relinquish absolutely and forever all possession and enjoyment of, or the right to the income from the trust property, whether directly, indirectly or constructively, as well as every interest of any nature, present or future, vested or contingent in the trust property or created under this instrument.

## Article 3
### Lifetime Trust

3.1 **Special Withdrawal Rights.** I intend that contributions to the trust during my life (the "Lifetime Trust") shall qualify for the annual exclusion as gifts of present interests for federal gift tax purposes to the maximum extent possible for my Child. Following each contribution to the Lifetime Trust, my Child shall have special withdrawal rights as follows:

My Child shall have a special withdrawal right over an amount equal to the lesser of:

(i)   The value of the contribution and

(ii)   The excess, if any, of the largest amount that then qualifies for the annual per donee exclusion allowed for federal gift tax purposes under Code Section 2503, assuming that a split gift election will be made if the donor was married on the date of the contribution, over the aggregate special withdrawal rights previously granted to the Child under this paragraph during the calendar year.

004987

A special withdrawal right shall be deemed to be granted under this paragraph on the date of the contribution giving rise to the right.

3.2    **Discretionary Payment of Income and Principal to Descendants.** During my life, the trustee may pay as much of the income and principal to any one or more of my descendants, as the trustee from time to time considers necessary for the health, maintenance in reasonable comfort, or education of each such person. The trustee may make the payments in equal or unequal shares, taking into account the present and prospective needs of those persons. Any income not so paid in each tax year shall be added to principal at the end of each tax year.

## Article 4
## Gifts at My Death

On my death, the trustee shall distribute the following gifts from the trust estate:

4.1    **Includible Trust Estate.** I give the Includible Trust Estate to the trustee of any trust created by me, to the extent I did not intend in any such trust to relinquish all possession and enjoyment of, or the right to the income from the trust property, whether directly, indirectly or constructively, as well as every interest of any nature, present or future, vested or contingent in such trust's property. If more than one (1) such trust exists, the personal representative of my probate estate shall appoint any part or all of the Includible Trust Estate to any such trust(s) that will result in the lowest Federal Estate Tax owed by my estate. If no such trust exists at the time of my death, I give the Includible Trust Estate to the personal representative of my probate estate for administration and distribution within my probate estate.

4.2    **Balance of Trust Estate.** I give the balance of the trust estate to the trustee to hold as the Child's Separate Trust.

## Article 5
## Child's Separate Trust

Any trust property gifted to the Child's Separate Trust shall be added to or used to fund the principal of a Child's Separate Trust. The trustee shall administer the Child's Separate Trust as follows:

5.1    **Discretionary Payment of Income and Principal.** During the life of Surinder P. S. Multani, the trustee may pay as much of the income and principal to any one or more of my descendants as the trustee from time to time considers necessary for the health, maintenance in reasonable comfort, or education of each person. The trustee may make the payments in equal or unequal shares, taking into account the present and prospective needs of those persons. Any income not so paid in each tax year shall be added to principal at the end of each tax year.

2

004988

share that would have been allocated to the child, if living, *per stirpes* to the child's then living descendants.

## Article 6
### Contingent Gift Provision

On the death of the last to die of all beneficiaries of any trust (the "termination date") any of the trust not otherwise distributable shall be distributed (a) half to my heirs and half to my spouse's heirs if my spouse and I were married to each other at the death of the first of us to die, or (b) all to my heirs if my spouse and I were not married to each other at the death of the first of us to die. Heirs and their respective shares shall be determined under the laws of descent and distribution of Illinois at my death for property located in Illinois as if I had died on the termination date unmarried and domiciled in Illinois and, if my spouse and I were married to each other at the death of the first of us to die, as if my spouse had died on the termination date unmarried and domiciled in Illinois.

## Article 7
### Trustee Succession

7.1   **Resignation.** A trustee may resign at any time by signed notice to my Child.

7.2   **Individual Trustee Succession.** Each acting individual trustee (unless limited in the instrument in which the trustee was designated) may, by signed instrument filed with the trust records, (a) designate one or more individuals or qualified corporations to act with or to succeed the trustee consecutively or concurrently, in any stated combination, and on any stated contingency, and (b) amend or revoke the designation before the designated trustee begins to act.

7.3   **Default of Designation.** If at any time no trustee is acting and no designated trustee is able and willing to act, then the first of the following who is able and willing to act, subject to any listed restrictions, shall be successor trustee to the original trustee, Surinder P. S. Multani:

(a)   Safanpreet K. Multani;

(b)   For the period my Child has not reached the age of 40, my sister-in-law, Pal Kaur Narinder;

(c)   For the period my Child has not reached the age of 40 and Pal Kaur Narinder is unable or unwilling to act, my sister-in-law, Satinder Pal Kaur Shah;

4

004989

(d)    For the period my Child has not reached the age of 40 and Pal Kaur Narinder and Satinder Pal Kaur Shah are unable or unwilling to act, my brother-in-law, Inderpal Singh;

(e)    For the period my Child has not reached the age of 40 and Pal Kaur Narinder, Satinder Pal Kaur Shah and Inderpal Singh are unable or unwilling to act, any qualified corporation appointed in an instrument signed by or on behalf of my Child;

(f)    Upon my Child attaining the age of 40, my Child;

(g)    Any individual or qualified corporation appointed in an instrument signed by a majority of the income beneficiaries.

7.4    **Corporate Trustee Substitution.** A corporate trustee may be removed at any time by an instrument signed by a majority of the income beneficiaries but only if, on or before the effective date of removal, a qualified corporation has been appointed corporate trustee in the same manner.

**Article 8**
**Trustee Actions**

8.1 **Control.** Except as otherwise provided, whenever more than one trustee is acting, the "trustee" means all trustees collectively, and a majority of the trustees qualified to participate in an action or decision of the trustees shall control. Any trustee who is not qualified to participate in or dissents from such action or decision shall not be liable therefor.

8.2 **Accountings.** Upon written request, the trustee shall send a written account of all trust receipts, disbursements, and transactions, and the property comprising the trust to each income beneficiary and at the option of the trustee, to the future beneficiaries of the trust. A future beneficiary of a trust is a person to whom the assets of the trust would be distributed or distributable if the trust then terminated. Unless court proceedings on the account are commenced within three months after the account is sent, the account shall bind and be deemed approved by all of the following beneficiaries who have not filed written objections to the account with the trustee within three months after the account is sent, and the trustee shall be deemed released by all such beneficiaries from liability for all matters covered by the account as though such account was approved by a court of competent jurisdiction: (a) each beneficiary to whom the account was sent, and (b) if the account was sent to all income and future beneficiaries of the trust, then all beneficiaries of the trust who have any past, present, or future interest in the matters covered by the account.

8.3 **Trustee's Right to Account Settlement Before Distribution.** Before distribution of any trust principal (other than pursuant to a special withdrawal right), the trustee shall have the right to require settlement of any open accounts of the trust from which the distribution is being made, either by the written approval and release of all beneficiaries having an interest in the distribution or, if the releases cannot be obtained, by court settlement of the open accounts. All the trustee's reasonable

5

004990

fees and expenses (including attorneys' fees) attributable to approval of the trustee's accounts shall be paid by the trust involved.

**8.4 Acceptance of Predecessor's Accounts.** On the signed direction of the income beneficiaries, the trustee shall accept without examination the accounts rendered and property delivered by or for a predecessor trustee. Such acceptance shall fully discharge the predecessor trustee and shall bind all beneficiaries.

**8.5 Notice.** If a beneficiary is under legal disability, the trustee shall give any notice or accounting to the beneficiary's personal representative, if any, and if none, to a parent of the beneficiary (other than me), if any, and if none, to any person (other than me) whom the trustee believes has demonstrated concern for the interest of the beneficiary. That person may sign any instrument for the beneficiary.

**8.6 Special Trustees.** If the trustee (the "principal trustee") is unable or unwilling to act as trustee as to any property, such person or qualified corporation as the principal trustee shall designate by signed instrument shall act as special trustee as to that property. Any special trustee may resign at any time by giving written notice to the principal trustee. The special trustee shall have the powers granted to the principal trustee under this instrument, to be exercised with the approval of the principal trustee. Net income and any proceeds of sale shall be paid to the principal trustee, to be administered under this instrument. The principal trustee may remove and replace the special trustee at any time.

**8.7 Delegation to Co-Trustee.** Any individual trustee may delegate any or all of that trustee's powers and duties to a co-trustee, except that no trustee shall be permitted to delegate any discretion with respect to the distribution of income or principal to a beneficiary. Any delegation may be for a definite or indefinite period and may be revoked by the delegating trustee. Any delegation or revocation shall be in writing, signed by the delegating trustee and delivered to the co-trustee to whom the delegation is made. Any person or institution may rely on the written certification of a co-trustee that the co-trustee has the power to act without concurrence of any other trustee, provided, however, that the co-trustee shall attach to the written certification a copy of the instrument by which the powers and duties have been delegated.

**8.8 Compensation.** The trustee shall be entitled to reimbursement for expenses, but shall not be entitled to compensation.

**8.9 Determinations by Trustee.** The trustee's reasonable determination of any question of fact shall bind all persons.

**8.10 Third-Party Dealings.** The trustee's certification that the trustee is acting according to this instrument shall protect anyone dealing with the trustee. No one need see to the application of money paid or property delivered to the trustee.

6

004991

8.11 **Exoneration of Trustee.** Any individual trustee acting in good faith shall not be liable for any act or omission. No trustee shall be liable for any act or omission of another trustee.

8.12 **Bond.** No trustee need give bond, qualify before, or account to any court.

8.13 **Powers of Successor Trustee.** Unless expressly limited, each successor trustee shall have all the titles, powers, duties, discretions, and immunities of the original trustee.

### Article 9
### Trustee Powers

In addition to all powers granted by law, the trustee shall have the following powers, to be exercised in a fiduciary capacity:

9.1 **Retention.** To retain any property transferred to the trustee, regardless of diversification and regardless of whether the property would be considered a proper trust investment;

9.2 **Sale.** To sell at public or private sale, contract to sell, grant options to buy, convey, transfer, exchange, or partition any real or personal property of the trust for such price and on such terms as the trustee sees fit;

9.3 **Real and Tangible Personal Property.** To make leases and subleases and grant options to lease, although the terms thereof commence in the future or extend beyond the termination of any trust; to purchase, operate, maintain, improve, rehabilitate, alter, demolish, abandon, release, or dedicate any real or tangible personal property; and to develop or subdivide real property, grant easements, and take any other action with respect to real or tangible personal property that an individual owner thereof could take;

9.4 **Borrowing.** To borrow money from any lender, extend or renew any existing indebtedness, and mortgage or pledge any property in the trust;

9.5 **Investing.** To invest in bonds, common or preferred stocks, notes, options, common trust funds, mutual funds, shares of any investment company or trust, or other securities, life insurance, partnership interests, general or limited, joint ventures, real estate, or other property of any kind, regardless of diversification and regardless of whether the property would be considered a proper trust investment;

9.6 **Joint Investments; Distribution; Determination of Value.** To make joint investments for two or more trusts held by the same trustee; to distribute property in cash or in kind, or partly in each; to allocate or distribute undivided interests or different property or disproportionate interests to the beneficiaries, and to determine the value of any property so allocated or distributed; but no adjustment shall be made to compensate for a disproportionate allocation of unrealized gain for federal income tax purposes, and no action taken by the trustee pursuant to this paragraph shall be subject to question by any beneficiary;

7

004992

**9.7 Rights as to Securities.** To have all the rights, powers, and privileges of an owner of the securities held in trust, including, but not limited to, the powers to vote, give proxies, and pay assessments; to participate in voting trusts, pooling agreements, foreclosures, reorganizations, consolidations, mergers, and liquidations and, incident to such participation, to exercise or sell stock subscription or conversion rights;

**9.8 Conservation of Assets.** To take any action that an individual owner of an asset could take to conserve or realize the value of the asset and with respect to any foreclosure, reorganization, or other change with respect to the asset;

**9.9 Delegation.** To employ agents, attorneys, and proxies of all types (including any firm in which a relative of mine or his or her spouse is a partner, associate, or employee or is otherwise affiliated) and to delegate to them any powers the trustee considers advisable;

**9.10 Payment of Expenses and Taxes.** To pay all expenses incurred in the administration of the trust and to pay all taxes imposed on the trust;

**9.11 Determination of Principal and Income.** To determine in cases not covered by statute the allocation of receipts and disbursements between income and principal, except that (a) reasonable reserves for depreciation, depletion, and obsolescence may be established out of income and credited to principal only to the extent that the trustee determines that readily marketable assets in the principal of the trust will be insufficient for any renovation, major repair, improvement, or replacement of trust property that the trustee deems advisable; and (b) any premium paid for interest-bearing debt obligations shall be amortized out of income;

**9.12 Dealings with Fiduciaries.** To deal with, purchase assets from, or make loans to the fiduciary of any trust made by me or a trust or estate in which any beneficiary under this trust has an interest, even though a trustee under this instrument is the fiduciary, and to retain any assets or loans so acquired, regardless of diversification and regardless of whether the property would be considered a proper trust investment; to deal with a corporate trustee under this instrument individually or a parent or affiliate company; to deal with the fiduciary of any other estate, trust, or custodial account even though the fiduciary is a trustee under this instrument;

**9.13 Compromising Claims.** To litigate, compromise, settle, or abandon any claim or demand in favor of or against the trust;

**9.14 Nominee Arrangements.** To hold any asset in the name of a nominee, in bearer form or otherwise, without disclosure of any fiduciary relationship;

**9.15 Elections Under Retirement Plans.** To elect, pursuant to the terms of any employee benefit plan, individual retirement plan, or insurance contract, the mode of distribution of the proceeds thereof, and no adjustment shall be made in the interests of the beneficiaries to compensate for the effect of the election;

8

004993

9.16 **Liability Insurance.** To purchase liability and casualty insurance of any kind for the protection of the trust estate, including comprehensive liability insurance;

9.17 **Accepting Additional Property.** To accept additional property from any source and administer it as a part of the trust; if the addition is made by a will, the trustee may accept the statement of the personal representative of the estate of the transferor that the property delivered to the trustee constitutes all of the property to which the trustee is entitled without any duty to inquire into the representative's administration or accounting;

9.18 **Environmental Matters.** To inspect and monitor businesses and real property (whether held directly or through a partnership, corporation, trust, or other entity) for environmental conditions or possible violations of environmental laws; to remediate environmentally damaged property or to take steps to prevent environmental damage in the future, even if no action by public or private parties is currently pending or threatened; to abandon or refuse to accept property that may have environmental damage; to expend trust property to do the foregoing; and no action or failure to act by the trustee pursuant to this paragraph shall be subject to question by any beneficiary;

9.19 **Purchasing Probate and Trust Assets.** To purchase assets from my probate estate or any trust created by me at their fair market value as of the date of purchase and to lend money to my probate estate or any trust created by me, with adequate interest and with adequate security;

9.20 **Ability To Take Other Actions.** To do all other acts to accomplish the proper management, investment, and distribution of the trust.

9.21 **Restrictions.** The trustee owes a duty of loyalty to the beneficiaries, a duty to become and remain familiar with the trust estate and trust activities, and a duty to exercise reasonable care in the exercise of the trustee's powers and authority. The trustee owes to all the beneficiaries a fiduciary duty to act at all times in good faith and in the best interests of the beneficiaries, and to refrain from any act or omission that would constitute self-dealing, fraud, or any other reckless or willful misconduct. The trustee is also bound by the "prudent person" standard of care to the same extent as a director of an Illinois business corporation under the Illinois Business Corporation Act ("IBCA"), including any provision within the IBCA relating to an "interested director transaction".

9

004994

## Article 10
### Special Withdrawal Rights

The provisions of this Article shall apply to the special withdrawal rights granted to my Child over contributions to the Lifetime Trust.

**10.1 Contribution.** A "contribution" is any transfer to the Lifetime Trust of cash or other property, except a transfer for which the trustee furnishes full and adequate consideration. The amount of a contribution that is subject to gift tax shall be its value for federal gift tax purposes, and the amount of any other contribution shall be its fair market value on the date of contribution.

**10.2 Notice of Rights.** The trustee shall provide notice to each eligible beneficiary who is granted a special withdrawal right within a reasonable time after the trustee knows of the contribution giving rise to the right.

**10.3 Exercise of Rights.** A special withdrawal right may be exercised only by written instrument delivered to the trustee. While an eligible beneficiary is under a legal disability, the eligible beneficiary's special withdrawal rights may be exercised only by the person who received notice of the right, if the person is able to act, or by any other person to whom notice could have been given. The trustee shall satisfy the exercise of a special withdrawal right in cash to the extent practicable, and otherwise from other trust property selected by the trustee. If a special withdrawal right is exercised, the special withdrawal right shall be satisfied first from the Lifetime Trust, if any, and second from the Child's Separate Trust established for the holder of the special withdrawal right, and third in equal shares from any other Child's Separate Trust.

**10.4 Advancements.** Each distribution from the Lifetime Trust and the Child's Separate Trust in satisfaction of an eligible beneficiary's special withdrawal right shall be treated as an advancement and charged, without interest, against the share provided for the eligible beneficiary or his or her descendants.

**10.5 Termination of Rights.** Each special withdrawal right granted under this instrument shall terminate 60 days after the date of the contribution giving rise to the right. On December 31 of each year, outstanding special withdrawal rights granted under this instrument to a child of mine on or before November 1 of such calendar year or in any prior year shall terminate, if at all, in an amount equal to the greater of:

(a) The excess, if any, of $5,000 over the sum of the value of all rights to withdraw that were held by my Child over any withdrawal trust (other than a trust created under this instrument) and that previously terminated during the year or that terminate on that date, and

10

004995

(b) The lesser of:

(1) The excess, if any, of five percent of the sum of the maximum values for all withdrawal trusts for my Child for the year over the sum of the value of all rights to withdraw that were held by my Child over any withdrawal trust (other than a trust created under this instrument) and that previously terminated during the year or that terminate on that date, and

(2) Five percent of the value of the trust assets held under this instrument on December 31 of that year.

A withdrawal trust for my Child for a particular year is a trust (whether or not created under this instrument) that is subject to a right to withdraw held by my Child if a portion or all of the right to withdraw terminates or terminated at any time during that year. The maximum value of a withdrawal trust for my Child for a particular year means the greatest value of the assets of the trust that are subject to a right to withdraw held by my Child on any day during that year on which any such right to withdraw terminates or terminated.

10.6 **Conditional Contributions.** A donor who makes a contribution to the Lifetime Trust shall have the right, by a written instrument delivered to the trustee prior to acceptance of the contribution, to condition the contribution (a) to exclude any person who would otherwise have a special withdrawal right from having the right with respect to the contribution; (b) to increase or decrease the amount of any special withdrawal right that would otherwise be granted to any person by reason of the contribution, except that the aggregate amount of such special withdrawal rights so granted as a result of the contribution shall not exceed the amount of the contribution; or (c) to change the period during which any special withdrawal right granted by reason of the contribution may be exercised.

## Article 11
### Administrative Provisions

11.1 **Standard for Discretionary Payments.** In the exercise of discretion to make a payment to a beneficiary, the trustee may consider all income and resources known to the trustee to be available to the beneficiary and the standard of living of the beneficiary.

11.2 **Exercise of Power of Appointment.** A lifetime power of appointment granted under this instrument may be exercised only by written instrument specifically referring to the power. A testamentary power of appointment granted under this instrument may be exercised only by a will specifically referring to the power. The appointment may be either outright or subject to such trusts and conditions as the holder of the power designates. The holder of the power may grant further powers of appointment to any person to whom principal may be appointed. In determining whether a testamentary power of appointment has been exercised, the trustee may rely on an instrument

11

004996

admitted to probate in any jurisdiction as the will of the holder of the power or may assume the power of appointment was not exercised in the absence of actual notice of the holder's will within three months after the holder's death.

11.3 **Advancements.** No payment made to any beneficiary under this instrument shall be treated as an advancement, except for a payment to an eligible beneficiary pursuant to a special withdrawal right.

11.4 **Small Trust Termination.** After my death, the trustee may terminate any trust with a value at the time of termination less than the Minimum Trust Value. The Minimum Trust Value shall be the sum of (a) $50,000 and (b) the percentage increase, if any, in the cost of living from January 1 of the year in which I executed this instrument until January 1 of the year of termination multiplied by $50,000. For this purpose, the increase in the cost of living shall be determined pursuant to the Consumer Price Index for Urban Wage Earners and Clerical Workers, U.S. City Average, All Items, as published by the Bureau of Labor Statistics of the U.S. Department of Labor. If the index ceases to be published, there shall be substituted any other index which the trustee determines to reflect similar information.

11.5 **Rule Against Perpetuities.** Despite any other provision, 21 years after the death of the last to die of all the beneficiaries living on the date of the execution of this instrument, each trust then held under this instrument or then held pursuant to the exercise of a power of appointment granted under this instrument shall be distributed to the income beneficiaries in equal shares.

11.6 **Facility of Payment.** The trustee may make any payments (other than distributions on termination) to a beneficiary under legal disability or whom the trustee determines to be unable to properly manage his or her affairs in any of the following ways: (a) to the legally appointed guardian of the beneficiary, (b) to an adult relative or friend of the beneficiary in reimbursement for proper expenditures on behalf of the beneficiary, (c) to a custodian for the beneficiary under a Uniform Transfers or Gifts to Minors Act, (d) by making direct expenditures for the benefit of the beneficiary, or (e) to the beneficiary directly. However, the trustee shall not make any payments to me pursuant to this paragraph.

11.7 **Spendthrift.** No interest under this instrument shall be assignable by any beneficiary, or be subject to the claims of his or her creditors, including claims for alimony or separate maintenance. The preceding sentence shall not be construed as restricting in any way the exercise of any right of withdrawal or power of appointment or the ability of any beneficiary to release his or her interest.

11.8 **Consolidation and Division of Trusts.** The trustee may at any time consolidate any trust held under this instrument with any other trust if the beneficiaries of the trusts are the same and the terms of the trusts are substantially similar. Further, the trustee, in the trustee's absolute discretion, may divide a trust (the "initial trust") into two or more separate trusts and may segregate an addition to a trust (the "initial trust") as a separate trust.

12

004997

(a) **Funding.** In dividing the initial trust, if the division is to be effective as of my death or as of the death of any other person, the trustee shall fund each separate trust with property having an aggregate fair market value fairly representative of the appreciation or depreciation in value from the date of such death to the date of division of all property subject to the division.

(b) **Terms.** A trust created pursuant to this paragraph shall have the same terms and conditions as the initial trust, and any reference to the initial trust in this instrument shall refer to that trust. The rights of beneficiaries shall be determined as if the trust and the initial trust were aggregated, but (1) different tax elections may be made as to the trusts, (2) disproportionate discretionary distributions may be made from the trusts, (3) taxes may be paid disproportionately from the trusts, (4) upon termination the share of a remainder beneficiary (including any recipient trust) may be satisfied with disproportionate distributions from the trusts, and (5) a beneficiary of the trusts may disclaim an interest in one of the trusts without having to disclaim an interest in another trust. In administering, investing, and distributing the assets of the trusts and in making tax elections, the trustee may consider differences in federal tax attributes and all other factors the trustee believes pertinent.

11.9 **Accrued and Unpaid Income.** Except as otherwise specifically provided, upon the death of any beneficiary, any accrued or unpaid income shall be paid as income to the next beneficiary succeeding in interest.

11.10 **Controlling Law.** The validity and effect of each trust and the construction of this instrument and of each trust shall be determined in accordance with the laws of Illinois. The original situs and original place of administration of each trust shall also be Illinois, but the situs and place of administration of any trust may be transferred at any time to any place the trustee determines to be for the best interests of the trust.

11.11 **Exclusion of Interested Trustee.** Notwithstanding any other provision, a trustee shall have no discretionary power to allocate or distribute assets to the extent that such would discharge the legal obligations of the trustee or any beneficiary and to the extent that such would discharge my legal obligation to support any beneficiary; however, any trustee that is my Child may allocate or distribute assets to my Child and/or my Child's descendants as beneficiary. Any trustee other than my Child or my Child's descendants, (a) shall have no discretionary power to allocate or distribute assets of that trust, directly or indirectly, to or for the trustee and/or any beneficiary, unless necessary for the beneficiary's support in reasonable comfort, health care, or education at any level (to the extent the trustee was otherwise granted such discretionary powers) and (b) shall have no other power or discretion that would be deemed a general power of appointment under Code Section 2041 unless the trustee has the power in other than a fiduciary capacity.

11.12 **Limit on Distributions.** Notwithstanding any other provision, if and to the extent that after distribution or appointment the remaining principal of the trust would be insufficient to satisfy its share of all outstanding special withdrawal rights if the rights were then exercised, then the

13

004998

trustee shall (a) make no distribution to a beneficiary from the Lifetime Trust or the Child's Separate Trust (other than a distribution in satisfaction of a special withdrawal right and other than a terminating distribution to the Child's Separate Trust) and (b) the special powerholder shall have no right to exercise a power of appointment over the Lifetime Trust.

## Article 12
## Accumulation Trusts and
## Generation-Skipping Transfers

12.1 **Accumulation Distributions.** Without in any way limiting any discretionary power granted elsewhere in this instrument, where the trustee makes a distribution of property and as a result of the application of Sections 665-667 of the Internal Revenue Code of 1986 as amended, or corresponding provisions of applicable revenue laws, and such distribution, in the judgment of the trustee, results in the payment of a tax by the beneficiary that is inequitable when considering my purposes of establishing this trust, the trustee is authorized, in the trustee's sole discretion, to distribute an additional amount from the trust to enable the beneficiary to avoid the inequity.

12.2 **Generation-Skipping Transfers.** If the trustee considers any distribution or termination of an interest or power hereunder as a distribution or termination subject to a generation-skipping tax, the trustee is authorized:

(a)    To augment any taxable distributions by an amount which the trustee estimates to be sufficient to pay such tax and charge the same to the particular trust or share to which the tax relates without adjustment of the relative interests of the beneficiaries;

(b)    To pay such tax, in the case of a taxable termination, from the particular trust or share to which the tax relates without adjustment of the relative interests of the beneficiaries. If said tax is imposed in part by reason of the trust property hereunder and in part by reason of other property, the trustee shall pay only the portion of such tax attributable to the taxable termination hereunder, taking into consideration deductions, exemption, credits and other factors which the trustee deems advisable; and

(c)    To postpone final termination of any particular trust and to withhold all or any portion of the trust property until the trustee is satisfied the trustee no longer has any liability to pay any generation-skipping tax with reference to such trust or its termination.

## Article 13
## Definitions

13.1 **Child and Descendant.**

(a) **Child.** Other than my Child, as my Child is defined in Section 1.1, a "child" of a person means only: (1) a child born to the person or to the person's spouse while they are lawfully married; (2) a natural child of the person born while the parents are not lawfully

14

married if the parents subsequently become lawfully married, but only for purposes of any allocation or distribution made after that marriage; or (3) a child lawfully adopted by the person prior to that child's attaining age 21.

(b) **Descendant.** A child of a person is a "descendant" of that person and of all ancestors of that person. A person's descendants include all such descendants whenever born. Except when distribution or allocation is directed to descendants *per stirpes,* the word "descendants" includes descendants of every degree whether or not a parent or more remote ancestor of a descendant is also living.

(c) **Child in Gestation.** A child in gestation on the date any allocation or distribution is to be made shall be deemed to be living on that date if the child is subsequently born alive and lives for at least 90 days.

13.2 **Code.** References to Sections of the "Code" refer to the Internal Revenue Code of 1986, as amended from time to time, and include corresponding provisions of subsequent federal tax laws.

13.3 **Education.** "Education" means a pre-school, grade school, middle school, high school, college, university, and professional or postgraduate education, any vocational studies or training, reasonable related living expenses, and reasonable travel expenses to and from the educational institution.

13.4 **Eligible Beneficiary and Eligible Beneficiaries.** My spouse and each child of mine who is living on the date of a contribution to the Lifetime Trust shall be an "eligible beneficiary" as to the contribution, and all such persons collectively shall be the "eligible beneficiaries" as to the contribution.

13.5 **Incapacity.** A person shall be considered incapacitated if under a legal disability or unable to give prompt and intelligent consideration to financial affairs. The existence of the inability may be determined by a physician, and any person may rely on written notice of the determination. A person already acting as trustee shall cease to act on incapacity.

13.6 **Includible Trust Estate.** "Includible Trust Estate" means all assets of the trust estate that are included in my gross estate for federal estate tax purposes at my death, whether by reason of my death within three years of transfer of the assets to the trustee or otherwise. The trustee may rely conclusively and without liability on a certificate from the personal representative of my probate estate as proof that all or a part of the assets of the trust estate at my death are included in my gross estate for federal estate tax purposes.

13.7 **Income Beneficiary.** An "income beneficiary" means a person to whom or for whose benefit income of any trust is or may be currently distributed.

13.8 **Per Stirpes.** Whenever assets are to be allocated for or distributed to the descendants of a person *per stirpes,* those assets shall be divided into equal shares, one such share for each then

15

005000

living child of that person and one such share for the then living descendants collectively of each deceased child of that person who has a descendant then living. Any such deceased child's share shall then be allocated for or distributed to that child's descendants *per stirpes* in accordance with the preceding sentence and this sentence.

13.9 **Qualified Corporation.** A "qualified corporation" means any bank, trust company, or other corporate entity that is authorized to act as a trustee and that is not a related or subordinate party under Code Section 672(c) as to any beneficiary under this instrument.

13.10 **Spouse.** The "spouse" of any person, other than me, means the individual legally married to, and not legally separated from, that person on the date of the distribution then in question or on the date of the prior death of that person.

### Article 14
### Captions and Context of Terms

Captions shall have no impact or meaning as to the terms of the document. Singular and plural and masculine, feminine, and neuter shall be interchangeable as required or permitted in the context of this instrument.

Signed and agreed on _____ APRIL 26 _____, 2005.

_____
Safanpreet K. Multani, as settlor

_____
Surinder P. S. Multani, as trustee

16

005001

STATE OF        )
                   ) ss:
COUNTY OF    )

     Before me, a Notary Public in and for said County and State, personally appeared Safanpreet K. Multani, as settlor, and Surinder P. S. Multani, as trustee, and acknowledged the execution of the foregoing instrument to be their free and voluntary act this _26th_ day of _April_, 2005.

                                 _Kishor C. Shah_
                                 Notary Public
                                 Printed: _KISHOR  C  SHAH_
                                 County of Residence: _DuPage, IL_

My Commission Expires:
  _2/3/2007_

                                 "OFFICIAL SEAL"
                                 Kishor C. Shah
                                Notary Public, State of Illinois
                                My Commission Exp. 02/03/2007

005002



# JAPJI SINGH MULTANI IRREVOCABLE TRUST

I, Safanpreet K. Multani, have transferred Ten Dollars ($10.00) and other good and valuable consideration ($10.00) to Surinder P. S. Multani as trustee of the Japji Singh Multani Irrevocable Trust. That asset and any other assets received by the trustee (the "trust estate") shall be held in trust subject to the provisions of this instrument.

## Article 1
### Introduction

1.1 **Family.** My "spouse" is Surinder P. S. Multani. While I have three (3) children, I intend by this instrument to provide for my children during my life and to provide for one child, namely Japji Singh Multani (my "Child") and my Child's descendants after the death of myself and my spouse.

1.2 **Name of Trust.** The name of this trust shall be the Japji Singh Multani Irrevocable Trust.

## Article 2
### Trusts Irrevocable

This trust is irrevocable, and I have no right or power, whether alone or in conjunction with others (in whatever capacity), to alter, amend, revoke or terminate this trust or any one of the terms of the trust in any respect, in whole or in part, or to designate the persons who shall possess or enjoy the trust property or the income therefrom. By this instrument, I intend to and hereby do relinquish absolutely and forever all possession and enjoyment of, or the right to the income from the trust property, whether directly, indirectly or constructively, as well as every interest of any nature, present or future, vested or contingent in the trust property or created under this instrument.

## Article 3
### Lifetime Trust

3.1 **Special Withdrawal Rights.** I intend that contributions to the trust during my life (the "Lifetime Trust") shall qualify for the annual exclusion as gifts of present interests for federal gift tax purposes to the maximum extent possible for my Child. Following each contribution to the Lifetime Trust, my Child shall have special withdrawal rights as follows:

My Child shall have a special withdrawal right over an amount equal to the lesser of:

(i)  The value of the contribution and

(ii)  The excess, if any, of the largest amount that then qualifies for the annual per donee exclusion allowed for federal gift tax purposes under Code Section 2503, assuming that a split gift election will be made if the donor was married on the date of the contribution, over the aggregate special withdrawal rights previously granted to the Child under this paragraph during the calendar year.

005005

01/04/2006 15:21
Jan. 4. 2006 2:21PM No. 2009 P. 42
01/04/2006 01:23 8479632042 ROBERTSLUCE PAGE 37

A special withdrawal right shall be deemed to be granted under this paragraph on the date of the contribution giving rise to the right.

3.2     **Discretionary Payment of Income and Principal to Descendants.** During my life, the trustee may pay as much of the income and principal to any one or more of my descendants, as the trustee from time to time considers necessary for the health, maintenance in reasonable comfort, or education of each such person. The trustee may make the payments in equal or unequal shares, taking into account the present and prospective needs of those persons. Any income not so paid in each tax year shall be added to principal at the end of each tax year.

## Article 4
## Gifts at My Death

On my death, the trustee shall distribute the following gifts from the trust estate:

4.1     **Includible Trust Estate.** I give the Includible Trust Estate to the trustee of any trust created by me, to the extent I did not intend in any such trust to relinquish all possession and enjoyment of, or the right to the income from the trust property, whether directly, indirectly or constructively, as well as every interest of any nature, present or future, vested or contingent in such trust's property. If more than one (1) such trust exists, the personal representative of my probate estate shall appoint any part or all of the Includible Trust Estate to any such trust(s) that will result in the lowest Federal Estate Tax owed by my estate. If no such trust exists at the time of my death, I give the Includible Trust Estate to the personal representative of my probate estate for administration and distribution within my probate estate.

4.2     **Balance of Trust Estate.** I give the balance of the trust estate to the trustee to hold as the Child's Separate Trust.

## Article 5
## Child's Separate Trust

Any trust property gifted to the Child's Separate Trust shall be added to or used to fund the principal of a Child's Separate Trust. The trustee shall administer the Child's Separate Trust as follows:

5.1     **Discretionary Payment of Income and Principal.** During the life of Surinder P. S. Multani, the trustee may pay as much of the income and principal to any one or more of my descendants as the trustee from time to time considers necessary for the health, maintenance in reasonable comfort, or education of each person. The trustee may make the payments in equal or unequal shares, taking into account the present and prospective needs of those persons. Any income not so paid in each tax year shall be added to principal at the end of each tax year.

2

005006

**5.2     Limitations to Discretionary Payment of Income and Principal.** Upon the death of Surinder P. S. Multani, the trustee may pay as much of the income and principal to my Child and my Child's descendants as the trustee from time to time considers necessary for the health, maintenance in reasonable comfort, or education of each such person. The trustee may make the payments in equal or unequal shares, taking into account the present and prospective needs of those persons. Any income not so paid in each tax year shall be added to principal at the end of each tax year.

**5.3     Appointment of Income and Principal.** Without limiting the trustee's discretion in Section 5.2, after the death of Surinder P. S. Multani and upon written instruction from my Child, the trustee shall pay as much of the income and principal to my Child and my Child's descendants as appointed by my Child's written instruction subject to the following limitations:

(a)     After the beneficiary has attained age 30, the trustee may distribute the principal to any one or more persons or organizations, including the beneficiary, as the beneficiary from time to time appoints, not exceeding in the aggregate, half in value before the beneficiary has attained age 35, plus current income of that beneficiary's trust plus any accumulated income. For purposes of this paragraph, the value of the principal shall be determined as of the time the beneficiary first exercises the right to appoint, plus the value of any subsequent additions as of the time of addition.

(b)     After the beneficiary has attained age 35, the trustee may distribute the principal to any one or more persons or organizations, including the beneficiary, as the beneficiary from time to time appoints, not exceeding in the aggregate, half in value before the beneficiary has attained age 40, plus current income of that beneficiary's trust plus any accumulated income. For purposes of this paragraph, the value of the principal shall be determined as of the time the beneficiary first exercises the right to appoint, plus the value of any subsequent additions as of the time of addition.

(c)     After the beneficiary has attained age 40 and thereafter, the trustee may distribute the entire trust to any one or more persons or organizations, including the beneficiary, as the beneficiary from time to time appoints, plus any accumulated income.

Mandatory income payments shall be made at least quarterly.

**5.4.   Distribution on Child's Death.** On the death of my Child, the trustee shall distribute the Child's Separate Trust as follows:

(a)     **Any Descendant Living.** If my Child has any descendant then living, to my Child's then living descendants *per stirpes*; or

(b)     **No Descendant Living.** If my Child has no descendant then living but I have any descendant then living, to the trustee to allocate in shares of equal value for my then living children, subject to the Child's Separate Trust provisions, provided that if a child of mine is not then living but a descendant of the child is then living, the trustee shall distribute the

3

005007

share that would have been allocated to the child, if living, *per stirpes* to the child's then living descendants.

## Article 6
### Contingent Gift Provision

On the death of the last to die of all beneficiaries of any trust (the "termination date") any of the trust not otherwise distributable shall be distributed (a) half to my heirs and half to my spouse's heirs if my spouse and I were married to each other at the death of the first of us to die, or (b) all to my heirs if my spouse and I were not married to each other at the death of the first of us to die. Heirs and their respective shares shall be determined under the laws of descent and distribution of Illinois at my death for property located in Illinois as if I had died on the termination date unmarried and domiciled in Illinois and, if my spouse and I were married to each other at the death of the first of us to die, as if my spouse had died on the termination date unmarried and domiciled in Illinois.

## Article 7
### Trustee Succession

7.1   **Resignation.** A trustee may resign at any time by signed notice to my Child.

7.2   **Individual Trustee Succession.** Each acting individual trustee (unless limited in the instrument in which the trustee was designated) may, by signed instrument filed with the trust records, (a) designate one or more individuals or qualified corporations to act with or to succeed the trustee consecutively or concurrently, in any stated combination, and on any stated contingency, and (b) amend or revoke the designation before the designated trustee begins to act.

7.3   **Default of Designation.** If at any time no trustee is acting and no designated trustee is able and willing to act, then the first of the following who is able and willing to act, subject to any listed restrictions, shall be successor trustee to the original trustee, Surinder P. S. Multani:

(a)   Safanpreet K. Multani;

(b)   For the period my Child has not reached the age of 40, my sister-in-law, Pal Kaur Narinder;

(c)   For the period my Child has not reached the age of 40 and Pal Kaur Narinder is unable or unwilling to act, my-sister-in-law, Satinder Pal Kaur Shah;

(d)   For the period my Child has not reached the age of 40 and Pal Kaur Narinder and Satinder Pal Kaur Shah are unable or unwilling to act, my brother-in-law, Inderpal Singh;

(e)   For the period my Child has not reached the age of 40 and Pal Kaur Narinder, Satinder Pal Kaur Shah and Inderpal Singh are unable or unwilling to act, any qualified corporation

4

005008

appointed in an instrument signed by or on behalf of my Child;

(f) Upon my Child attaining the age of 40, my Child;

(g) Any individual or qualified corporation appointed in an instrument signed by a majority of the income beneficiaries.

7.4 **Corporate Trustee Substitution.** A corporate trustee may be removed at any time by an instrument signed by a majority of the income beneficiaries but only if, on or before the effective date of removal, a qualified corporation has been appointed corporate trustee in the same manner.

## Article 8
## Trustee Actions

8.1 **Control.** Except as otherwise provided, whenever more than one trustee is acting, the "trustee" means all trustees collectively, and a majority of the trustees qualified to participate in an action or decision of the trustees shall control. Any trustee who is not qualified to participate in or dissents from such action or decision shall not be liable therefor.

8.2 **Accountings.** Upon written request, the trustee shall send a written account of all trust receipts, disbursements, and transactions, and the property comprising the trust to each income beneficiary and at the option of the trustee, to the future beneficiaries of the trust. A future beneficiary of a trust is a person to whom the assets of the trust would be distributed or distributable if the trust then terminated. Unless court proceedings on the account are commenced within three months after the account is sent, the account shall bind and be deemed approved by all of the following beneficiaries who have not filed written objections to the account with the trustee within three months after the account is sent, and the trustee shall be deemed released by all such beneficiaries from liability for all matters covered by the account as though such account was approved by a court of competent jurisdiction: (a) each beneficiary to whom the account was sent, and (b) if the account was sent to all income and future beneficiaries of the trust, then all beneficiaries of the trust who have any past, present, or future interest in the matters covered by the account.

8.3 **Trustee's Right to Account Settlement Before Distribution.** Before distribution of any trust principal (other than pursuant to a special withdrawal right), the trustee shall have the right to require settlement of any open accounts of the trust from which the distribution is being made, either by the written approval and release of all beneficiaries having an interest in the distribution or, if the releases cannot be obtained, by court settlement of the open accounts. All the trustee's reasonable fees and expenses (including attorneys' fees) attributable to approval of the trustee's accounts shall be paid by the trust involved.

5

005009

**8.4 Acceptance of Predecessor's Accounts.** On the signed direction of the income beneficiaries, the trustee shall accept without examination the accounts rendered and property delivered by or for a predecessor trustee. Such acceptance shall fully discharge the predecessor trustee and shall bind all beneficiaries.

**8.5 Notice.** If a beneficiary is under legal disability, the trustee shall give any notice or accounting to the beneficiary's personal representative, if any, and if none, to a parent of the beneficiary (other than me), if any, and if none, to any person (other than me) whom the trustee believes has demonstrated concern for the interest of the beneficiary. That person may sign any instrument for the beneficiary.

**8.6 Special Trustees.** If the trustee (the "principal trustee") is unable or unwilling to act as trustee as to any property, such person or qualified corporation as the principal trustee shall designate by signed instrument shall act as special trustee as to that property. Any special trustee may resign at any time by giving written notice to the principal trustee. The special trustee shall have the powers granted to the principal trustee under this instrument, to be exercised with the approval of the principal trustee. Net income and any proceeds of sale shall be paid to the principal trustee, to be administered under this instrument. The principal trustee may remove and replace the special trustee at any time.

**8.7 Delegation to Co-Trustee.** Any individual trustee may delegate any or all of that trustee's powers and duties to a co-trustee, except that no trustee shall be permitted to delegate any discretion with respect to the distribution of income or principal to a beneficiary. Any delegation may be for a definite or indefinite period and may be revoked by the delegating trustee. Any delegation or revocation shall be in writing, signed by the delegating trustee and delivered to the co-trustee to whom the delegation is made. Any person or institution may rely on the written certification of a co-trustee that the co-trustee has the power to act without concurrence of any other trustee, provided, however, that the co-trustee shall attach to the written certification a copy of the instrument by which the powers and duties have been delegated.

**8.8 Compensation.** The trustee shall be entitled to reimbursement for expenses, but shall not be entitled to compensation.

**8.9 Determinations by Trustee.** The trustee's reasonable determination of any question of fact shall bind all persons.

**8.10 Third-Party Dealings.** The trustee's certification that the trustee is acting according to this instrument shall protect anyone dealing with the trustee. No one need see to the application of money paid or property delivered to the trustee.

**8.11 Exoneration of Trustee.** Any individual trustee acting in good faith shall not be liable for any act or omission. No trustee shall be liable for any act or omission of another trustee.

**8.12 Bond.** No trustee need give bond, qualify before, or account to any court.

6

**8.13 Powers of Successor Trustee.** Unless expressly limited, each successor trustee shall have all the titles, powers, duties, discretions, and immunities of the original trustee.

## Article 9
## Trustee Powers

In addition to all powers granted by law, the trustee shall have the following powers, to be exercised in a fiduciary capacity:

**9.1 Retention.** To retain any property transferred to the trustee, regardless of diversification and regardless of whether the property would be considered a proper trust investment;

**9.2 Sale.** To sell at public or private sale, contract to sell, grant options to buy, convey, transfer, exchange, or partition any real or personal property of the trust for such price and on such terms as the trustee sees fit;

**9.3 Real and Tangible Personal Property.** To make leases and subleases and grant options to lease, although the terms thereof commence in the future or extend beyond the termination of any trust; to purchase, operate, maintain, improve, rehabilitate, alter, demolish, abandon, release, or dedicate any real or tangible personal property; and to develop or subdivide real property, grant easements, and take any other action with respect to real or tangible personal property that an individual owner thereof could take;

**9.4 Borrowing.** To borrow money from any lender, extend or renew any existing indebtedness, and mortgage or pledge any property in the trust;

**9.5 Investing.** To invest in bonds, common or preferred stocks, notes, options, common trust funds, mutual funds, shares of any investment company or trust, or other securities, life insurance, partnership interests, general or limited, joint ventures, real estate, or other property of any kind, regardless of diversification and regardless of whether the property would be considered a proper trust investment;

**9.6 Joint Investments; Distribution; Determination of Value.** To make joint investments for two or more trusts held by the same trustee; to distribute property in cash or in kind, or partly in each; to allocate or distribute undivided interests or different property or disproportionate interests to the beneficiaries, and to determine the value of any property so allocated or distributed; but no adjustment shall be made to compensate for a disproportionate allocation of unrealized gain for federal income tax purposes, and no action taken by the trustee pursuant to this paragraph shall be subject to question by any beneficiary;

7

005011

**9.7 Rights as to Securities.** To have all the rights, powers, and privileges of an owner of the securities held in trust, including, but not limited to, the powers to vote, give proxies, and pay assessments; to participate in voting trusts, pooling agreements, foreclosures, reorganizations, consolidations, mergers, and liquidations and, incident to such participation, to exercise or sell stock subscription or conversion rights;

**9.8 Conservation of Assets.** To take any action that an individual owner of an asset could take to conserve or realize the value of the asset and with respect to any foreclosure, reorganization, or other change with respect to the asset;

**9.9 Delegation.** To employ agents, attorneys, and proxies of all types (including any firm in which a relative of mine or his or her spouse is a partner, associate, or employee or is otherwise affiliated) and to delegate to them any powers the trustee considers advisable;

**9.10 Payment of Expenses and Taxes.** To pay all expenses incurred in the administration of the trust and to pay all taxes imposed on the trust;

**9.11 Determination of Principal and Income.** To determine in cases not covered by statute the allocation of receipts and disbursements between income and principal, except that (a) reasonable reserves for depreciation, depletion, and obsolescence may be established out of income and credited to principal only to the extent that the trustee determines that readily marketable assets in the principal of the trust will be insufficient for any renovation, major repair, improvement, or replacement of trust property that the trustee deems advisable; and (b) any premium paid for interest-bearing debt obligations shall be amortized out of income;

**9.12 Dealings with Fiduciaries.** To deal with, purchase assets from, or make loans to the fiduciary of any trust made by me or a trust or estate in which any beneficiary under this trust has an interest, even though a trustee under this instrument is the fiduciary, and to retain any assets or loans so acquired, regardless of diversification and regardless of whether the property would be considered a proper trust investment; to deal with a corporate trustee under this instrument individually or a parent or affiliate company; to deal with the fiduciary of any other estate, trust, or custodial account even though the fiduciary is a trustee under this instrument;

**9.13 Compromising Claims.** To litigate, compromise, settle, or abandon any claim or demand in favor of or against the trust;

**9.14 Nominee Arrangements.** To hold any asset in the name of a nominee, in bearer form or otherwise, without disclosure of any fiduciary relationship;

**9.15 Elections Under Retirement Plans.** To elect, pursuant to the terms of any employee benefit plan, individual retirement plan, or insurance contract, the mode of distribution of the proceeds thereof, and no adjustment shall be made in the interests of the beneficiaries to compensate for the effect of the election;

8

005012

**9.16 Liability Insurance.** To purchase liability and casualty insurance of any kind for the protection of the trust estate, including comprehensive liability insurance;

**9.17 Accepting Additional Property.** To accept additional property from any source and administer it as a part of the trust; if the addition is made by a will, the trustee may accept the statement of the personal representative of the estate of the transferor that the property delivered to the trustee constitutes all of the property to which the trustee is entitled without any duty to inquire into the representative's administration or accounting;

**9.18 Environmental Matters.** To inspect and monitor businesses and real property (whether held directly or through a partnership, corporation, trust, or other entity) for environmental conditions or possible violations of environmental laws; to remediate environmentally damaged property or to take steps to prevent environmental damage in the future, even if no action by public or private parties is currently pending or threatened; to abandon or refuse to accept property that may have environmental damage; to expend trust property to do the foregoing; and no action or failure to act by the trustee pursuant to this paragraph shall be subject to question by any beneficiary;

**9.19 Purchasing Probate and Trust Assets.** To purchase assets from my probate estate or any trust created by me at their fair market value as of the date of purchase and to lend money to my probate estate or any trust created by me, with adequate interest and with adequate security;

**9.20 Ability To Take Other Actions.** To do all other acts to accomplish the proper management, investment, and distribution of the trust.

**9.21 Restrictions.**  The trustee owes a duty of loyalty to the beneficiaries, a duty to become and remain familiar with the trust estate and trust activities, and a duty to exercise reasonable care in the exercise of the trustee's powers and authority. The trustee owes to all the beneficiaries a fiduciary duty to act at all times in good faith and in the best interests of the beneficiaries, and to refrain from any act or omission that would constitute self-dealing, fraud, or any other reckless or willful misconduct. The trustee is also bound by the "prudent person" standard of care to the same extent as a director of an Illinois business corporation under the Illinois Business Corporation Act ("IBCA"), including any provision within the IBCA relating to an "interested director transaction".

## Article 10
## Special Withdrawal Rights

The provisions of this Article shall apply to the special withdrawal rights granted to my Child over contributions to the Lifetime Trust.

**10.1 Contribution.** A "contribution" is any transfer to the Lifetime Trust of cash or other property, except a transfer for which the trustee furnishes full and adequate consideration. The amount of a contribution that is subject to gift tax shall be its value for federal gift tax purposes, and the amount of any other contribution shall be its fair market value on the date of contribution.

9

005013

**10.2 Notice of Rights.** The trustee shall provide notice to each eligible beneficiary who is granted a special withdrawal right within a reasonable time after the trustee knows of the contribution giving rise to the right.

**10.3 Exercise of Rights.** A special withdrawal right may be exercised only by written instrument delivered to the trustee. While an eligible beneficiary is under a legal disability, the eligible beneficiary's special withdrawal rights may be exercised only by the person who received notice of the right, if the person is able to act, or by any other person to whom notice could have been given. The trustee shall satisfy the exercise of a special withdrawal right in cash to the extent practicable, and otherwise from other trust property selected by the trustee. If a special withdrawal right is exercised, the special withdrawal right shall be satisfied first from the Lifetime Trust, if any, and second from the Child's Separate Trust established for the holder of the special withdrawal right, and third in equal shares from any other Child's Separate Trust.

**10.4 Advancements.** Each distribution from the Lifetime Trust and the Child's Separate Trust in satisfaction of an eligible beneficiary's special withdrawal right shall be treated as an advancement and charged, without interest, against the share provided for the eligible beneficiary or his or her descendants.

**10.5 Termination of Rights.** Each special withdrawal right granted under this instrument shall terminate 60 days after the date of the contribution giving rise to the right. On December 31 of each year, outstanding special withdrawal rights granted under this instrument to a child of mine on or before November 1 of such calendar year or in any prior year shall terminate, if at all, in an amount equal to the greater of:

(a) The excess, if any, of $5,000 over the sum of the value of all rights to withdraw that were held by my Child over any withdrawal trust (other than a trust created under this instrument) and that previously terminated during the year or that terminate on that date, and

(b) The lesser of:

(1) The excess, if any, of five percent of the sum of the maximum values for all withdrawal trusts for my Child for the year over the sum of the value of all rights to withdraw that were held by my Child over any withdrawal trust (other than a trust created under this instrument) and that previously terminated during the year or that terminate on that date, and

(2) Five percent of the value of the trust assets held under this instrument on December 31 of that year.

A withdrawal trust for my Child for a particular year is a trust (whether or not created under this instrument) that is subject to a right to withdraw held by my Child if a portion or all of the right to withdraw terminates or terminated at any time during that year. The maximum value of a withdrawal trust for my Child for a particular year means the greatest value of the assets of the trust that are

10

005014

subject to a right to withdraw held by my Child on any day during that year on which any such right to withdraw terminates or terminated.

10.6 **Conditional Contributions.** A donor who makes a contribution to the Lifetime Trust shall have the right, by a written instrument delivered to the trustee prior to acceptance of the contribution, to condition the contribution (a) to exclude any person who would otherwise have a special withdrawal right from having the right with respect to the contribution; (b) to increase or decrease the amount of any special withdrawal right that would otherwise be granted to any person by reason of the contribution, except that the aggregate amount of such special withdrawal rights so granted as a result of the contribution shall not exceed the amount of the contribution; or (c) to change the period during which any special withdrawal right granted by reason of the contribution may be exercised.

## Article 11
## Administrative Provisions

11.1 **Standard for Discretionary Payments.** In the exercise of discretion to make a payment to a beneficiary, the trustee may consider all income and resources known to the trustee to be available to the beneficiary and the standard of living of the beneficiary.

11.2 **Exercise of Power of Appointment.** A lifetime power of appointment granted under this instrument may be exercised only by written instrument specifically referring to the power. A testamentary power of appointment granted under this instrument may be exercised only by a will specifically referring to the power. The appointment may be either outright or subject to such trusts and conditions as the holder of the power designates. The holder of the power may grant further powers of appointment to any person to whom principal may be appointed. In determining whether a testamentary power of appointment has been exercised, the trustee may rely on an instrument admitted to probate in any jurisdiction as the will of the holder of the power or may assume the power of appointment was not exercised in the absence of actual notice of the holder's will within three months after the holder's death.

11.3 **Advancements.** No payment made to any beneficiary under this instrument shall be treated as an advancement, except for a payment to an eligible beneficiary pursuant to a special withdrawal right.

11.4 **Small Trust Termination.** After my death, the trustee may terminate any trust with a value at the time of termination less than the Minimum Trust Value. The Minimum Trust Value shall be the sum of (a) $50,000 and (b) the percentage increase, if any, in the cost of living from January 1 of the year in which I executed this instrument until January 1 of the year of termination multiplied by $50,000. For this purpose, the increase in the cost of living shall be determined pursuant to the Consumer Price Index for Urban Wage Earners and Clerical Workers, U.S. City Average, All Items, as published by the Bureau of Labor Statistics of the U.S. Department of Labor. If the index ceases to be published, there shall be substituted any other index which the trustee determines to reflect similar information.

11

**11.5 Rule Against Perpetuities.** Despite any other provision, 21 years after the death of the last to die of all the beneficiaries living on the date of the execution of this instrument, each trust then held under this instrument or then held pursuant to the exercise of a power of appointment granted under this instrument shall be distributed to the income beneficiaries in equal shares.

**11.6 Facility of Payment.** The trustee may make any payments (other than distributions on termination) to a beneficiary under legal disability or whom the trustee determines to be unable to properly manage his or her affairs in any of the following ways: (a) to the legally appointed guardian of the beneficiary, (b) to an adult relative or friend of the beneficiary in reimbursement for proper expenditures on behalf of the beneficiary, (c) to a custodian for the beneficiary under a Uniform Transfers or Gifts to Minors Act, (d) by making direct expenditures for the benefit of the beneficiary, or (e) to the beneficiary directly. However, the trustee shall not make any payments to me pursuant to this paragraph.

**11.7 Spendthrift.** No interest under this instrument shall be assignable by any beneficiary, or be subject to the claims of his or her creditors, including claims for alimony or separate maintenance. The preceding sentence shall not be construed as restricting in any way the exercise of any right of withdrawal or power of appointment or the ability of any beneficiary to release his or her interest.

**11.8 Consolidation and Division of Trusts.** The trustee may at any time consolidate any trust held under this instrument with any other trust if the beneficiaries of the trusts are the same and the terms of the trusts are substantially similar. Further, the trustee, in the trustee's absolute discretion, may divide a trust (the "initial trust") into two or more separate trusts and may segregate an addition to a trust (the "initial trust") as a separate trust.

(a) **Funding.** In dividing the initial trust, if the division is to be effective as of my death or as of the death of any other person, the trustee shall fund each separate trust with property having an aggregate fair market value fairly representative of the appreciation or depreciation in value from the date of such death to the date of division of all property subject to the division.

(b) **Terms.** A trust created pursuant to this paragraph shall have the same terms and conditions as the initial trust, and any reference to the initial trust in this instrument shall refer to that trust. The rights of beneficiaries shall be determined as if the trust and the initial trust were aggregated, but (1) different tax elections may be made as to the trusts, (2) disproportionate discretionary distributions may be made from the trusts, (3) taxes may be paid disproportionately from the trusts, (4) upon termination the share of a remainder beneficiary (including any recipient trust) may be satisfied with disproportionate distributions from the trusts, and (5) a beneficiary of the trusts may disclaim an interest in one of the trusts without having to disclaim an interest in another trust. In administering, investing, and distributing the assets of the trusts and in making tax elections, the trustee may consider differences in federal tax attributes and all other factors the trustee believes pertinent.

12

**11.9 Accrued and Unpaid Income.** Except as otherwise specifically provided, upon the death of any beneficiary, any accrued or unpaid income shall be paid as income to the next beneficiary succeeding in interest.

**11.10 Controlling Law.** The validity and effect of each trust and the construction of this instrument and of each trust shall be determined in accordance with the laws of Illinois. The original situs and original place of administration of each trust shall also be Illinois, but the situs and place of administration of any trust may be transferred at any time to any place the trustee determines to be for the best interests of the trust.

**11.11 Exclusion of Interested Trustee.** Notwithstanding any other provision, a trustee shall have no discretionary power to allocate or distribute assets to the extent that such would discharge the legal obligations of the trustee or any beneficiary and to the extent that such would discharge my legal obligation to support any beneficiary; however, any trustee that is my Child may allocate or distribute assets to my Child and/or my Child's descendants as beneficiary. Any trustee other than my Child or my Child's descendants, (a) shall have no discretionary power to allocate or distribute assets of that trust, directly or indirectly, to or for the trustee and/or any beneficiary, unless necessary for the beneficiary's support in reasonable comfort, health care, or education at any level (to the extent the trustee was otherwise granted such discretionary powers) and (b) shall have no other power or discretion that would be deemed a general power of appointment under Code Section 2041 unless the trustee has the power in other than a fiduciary capacity.

**11.12 Limit on Distributions.** Notwithstanding any other provision, if and to the extent that after distribution or appointment the remaining principal of the trust would be insufficient to satisfy its share of all outstanding special withdrawal rights if the rights were then exercised, then the trustee shall (a) make no distribution to a beneficiary from the Lifetime Trust or the Child's Separate Trust (other than a distribution in satisfaction of a special withdrawal right and other than a terminating distribution to the Child's Separate Trust) and (b) the special powerholder shall have no right to exercise a power of appointment over the Lifetime Trust.

### Article 12
### Accumulation Trusts and
### Generation-Skipping Transfers

**12.1 Accumulation Distributions.** Without in any way limiting any discretionary power granted elsewhere in this instrument, where the trustee makes a distribution of property and as a result of the application of Sections 665-667 of the Internal Revenue Code of 1986 as amended, or corresponding provisions of applicable revenue laws, and such distribution, in the judgment of the trustee, results in the payment of a tax by the beneficiary that is inequitable when considering my purposes of establishing this trust, the trustee is authorized, in the trustee's sole discretion, to distribute an additional amount from the trust to enable the beneficiary to avoid the inequity.

13

Jan. 4. 2006  2:23PM
01/04/2006  01:23    8479632042                        No. 2089   P. 55
                                          ROBERTSLUCE                        PAGE  58

(c) **Child in Gestation.** A child in gestation on the date any allocation or distribution is to be made shall be deemed to be living on that date if the child is subsequently born alive and lives for at least 90 days.

13.2 **Code.** References to Sections of the "Code" refer to the Internal Revenue Code of 1986, as amended from time to time, and include corresponding provisions of subsequent federal tax laws.

13.3 **Education.** "Education" means a pre-school, grade school, middle school, high school, college, university, and professional or postgraduate education, any vocational studies or training, reasonable related living expenses, and reasonable travel expenses to and from the educational institution.

13.4 **Eligible Beneficiary and Eligible Beneficiaries.** My spouse and each child of mine who is living on the date of a contribution to the Lifetime Trust shall be an "eligible beneficiary" as to the contribution, and all such persons collectively shall be the "eligible beneficiaries" as to the contribution.

13.5 **Incapacity.** A person shall be considered incapacitated if under a legal disability or unable to give prompt and intelligent consideration to financial affairs. The existence of the inability may be determined by a physician, and any person may rely on written notice of the determination. A person already acting as trustee shall cease to act on incapacity.

13.6 **Includible Trust Estate.** "Includible Trust Estate" means all assets of the trust estate that are included in my gross estate for federal estate tax purposes at my death, whether by reason of my death within three years of transfer of the assets to the trustee or otherwise. The trustee may rely conclusively and without liability on a certificate from the personal representative of my probate estate as proof that all or a part of the assets of the trust estate at my death are included in my gross estate for federal estate tax purposes.

13.7 **Income Beneficiary.** An "income beneficiary" means a person to whom or for whose benefit income of any trust is or may be currently distributed.

13.8 **Per Stirpes.** Whenever assets are to be allocated for or distributed to the descendants of a person *per stirpes*, those assets shall be divided into equal shares, one such share for each then living child of that person and one such share for the then living descendants collectively of each deceased child of that person who has a descendant then living. Any such deceased child's share shall then be allocated for or distributed to that child's descendants *per stirpes* in accordance with the preceding sentence and this sentence.

13.9 **Qualified Corporation.** A "qualified corporation" means any bank, trust company, or other corporate entity that is authorized to act as a trustee and that is not a related or subordinate party under Code Section 672(c) as to any beneficiary under this instrument.

15

13.10 **Spouse.** The "spouse" of any person, other than me, means the individual legally married to, and not legally separated from, that person on the date of the distribution then in question or on the date of the prior death of that person.

### Article 14
### Captions and Context of Terms

Captions shall have no impact or meaning as to the terms of the document. Singular and plural and masculine, feminine, and neuter shall be interchangeable as required or permitted in the context of this instrument.

Signed and agreed on _____APRIL 26_____, 2005.

_____
Safanpreet K. Multani, as settlor

_____
Surinder P. S. Multani, as trustee

STATE OF      )
              ) ss:
COUNTY OF    )

Before me, a Notary Public in and for said County and State, personally appeared Safanpreet K. Multani, as settlor, and Surinder P. S. Multani, as trustee, and acknowledged the execution of the foregoing instrument to be their free and voluntary act this 26th day of April, 2005.

_____
Notary Public
Printed: KISHOR C SHAH
County of Residence: DuPAGE, IL

My Commission Expires:
2/3/2007

"OFFICIAL SEAL"
Kishor C. Shah
Notary Public, State of Illinois
My Commission Exp. 02/03/2007

16

005019

*11 - 3690/80*

## Operating Agreement of ABBE PROPERTIES LLC
### An Illinois Limited Liability Company
### Effective as of May 15, 2003

## TABLE OF CONTENTS

*To: Ellen Mooney*

*From: Bob Shanahan*

*Re: Singh*

*FEIN 11-3690180*

ARTICLE 1 DEFINITION

ARTICLE 2   FORMATION OF COMPANY

    2.1     Formation
    2.2     Name
    2.3     Principal Place of Business
    2.4     Registered Office and Registered Agent
    2.5     Term

ARTICLE 3   BUSINESS OF COMPANY

ARTICLE 4   NAMES AND ADDRESSES OF MEMBERS

ARTICLE 5   RIGHTS AND DUTIES OF MANAGERS

    5.1     Management
    5.2     Number, Tenure and Qualifications
    5.3     Certain Powers of Managers
    5.4     Members Have No Authority to Bind
    5.5     Liability of Certain Acts
    5.6     Managers Have No Exclusive Duty to Company
    5.7     Bank Accounts
    5.8     Indemnity of the Managers, Employees and Other Agents
    5.9     Resignation
    5.10    Removal
    5.11    Vacancies
    5.12    Salaries
    5.13    Meetings
    5.14    Place of Meetings
    5.15    Notice of Meetings
    5.16    Action by Managers Without a Meeting
    5.17    Waiver of Notice

11/09/05

003958

EXHIBIT F

5.19 Telephonic Meetings
5.20 Officers

ARTICLE 6 RIGHTS AND OBLIGATIONS OF MEMBERS

6.1 Limitation of Liability
6.2 Company Debt Liability
6.3 List of Members
6.4 Approval of Sale of All Assets
6.5 Company Books
6.6 Priority and Return of Capital
6.7 Liability of a Member to the Company

ARTICLE 7 MEETINGS OF MEMBERS

7.1 Meetings
7.2 Place of Meetings
7.3 Notice of Meeting
7.4 Meeting of All Members
7.5 Record Date
7.6 Quorum
7.7 Manner of Acting
7.8 Proxies
7.9 Action by Members Without a meeting
7.10 Waiver of Notice
7.11 Telephonic Meetings

ARTICLE 8 CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

8.1 Members' Capital Contributions
8.2 Additional Contributions
8.3 Capital Accounts
8.4 Withdrawal or Reduction of Members' Contributions to Capital

ARTICLE 9 ALLOCATIONS, INCOME TAX, DISTRIBUTIONS, ELECTIONS,
AND REPORTS

9.1 Allocations of Profits and Losses from Operations
9.2 Special Allocations to Capital Accounts
9.3 Distributions
9.4 Limitation upon Distributions
9.5 Accounting Principles
9.6 Interest on and Return of Capital Contributions

ii

9.7     Loans to Company
9.8     Accounting Period
9.9     Records, Audits, and Reports
9.10    Returns and Other Elections
9.11    Tax Matters Partner

ARTICLE 10 TRANSFERABILITY

10.1    General
10.2    Right of First Refusal
10.3    Transferee Not Member in Absence of Unanimous Consent

ARTICLE 11  ADDITIONAL MEMBERS

ARTICLE 12  DISSOLUTION AND TERMINATION

12.1    Dissolution
12.2    Winding Up, Liquidation, and Distribution of Assets
12.3    Articles of Dissolution
12.4    Effect of Filing of Articles of Dissolution
12.5    Return of Contribution Nonrecourse to Other Members

ARTICLE 13  MISCELLANEOUS PROVISIONS

13.1    Notices
13.2    Books of Account and Records
13.3    Application of Illinois Law
13.4    Waiver of Action for Partition
13.5    Amendments
13.6    Execution of Additional Instruments
13.7    Construction
13.8    Headings
13.9    Waivers
13.10   Rights and Remedies Cumulative
13.11   Severability
13.12   Heirs, Successors, and Assigns
13.13   Creditors
13.14   Counterparts

iii

003960

13.15   Entire Agreement
13.16   Joint Preparation
13.17   Incorporation of Exhibits, Annexes & Schedules

EXHIBIT A
EXHIBIT B

iv

003961

# ARTICLE 1

## DEFINITIONS

This Operating Agreement is made and entered into as of May 15, 2003, by and between the Members, whose signatures appear on the signature page hereof.

## W I T N E S S E T H:

**WHEREAS,** the Members have caused to be filed Articles of Organization for Abbe Properties LLC with the Secretary of State of Illinois on or about May 15, 2005.

**NOW, THEREFORE,** the parties agree as follows:

1.1    **Definitions.** The following terms used in this Operating Agreement shall have the following meanings:

(a)    "Act" shall mean the Illinois Limited Liability Company Act at 805 ILCS 180/1-5, et seq.

(b)    "Articles of Organization" shall mean the Articles of Organization of Abbe Properties LLC as filed with the Secretary of State of Illinois, as amended from time to time.

(c)    "Capital Account" as of any given date shall mean the Capital Contribution to the Company by a Member as adjusted up to such date pursuant to Article 8.

(d)    "Capital Contribution" shall mean any contribution to the capital of the Company in cash or property by a Member whenever made. "Initial Capital Contribution" shall mean the initial contribution to the capital of the Company pursuant to this Operating Agreement.

(e)    "Code" shall mean the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

(f)    "Company" shall refer to Abbe Properties LLC.

- 1 -

003962

(g)     "Deficit Capital Account" shall mean with respect to any Member, the deficit balance, if any, in such member's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(i)     credit to such Capital Account any amount which such Member is obligated to restore under Section1.704-1(b)(2)(ii)(c) of the Treasury Regulations, as well as any addition thereto pursuant to the next to last sentence of Sections 1.704-2(g)(1) and (i)(5) of the Treasury Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704-2(d) of the Treasury Regulations) and in the minimum gain attributable to any partner for nonrecourse debt (as determined under Section 1.704-2(I)(3) of the Treasury Regulations); and

(ii)    debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4),(5), and (6) of the Treasury Regulations.

This definition of Deficit Capital Account is intended to comply with the provisions of Treasury Regulation Sections 1.704-1(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

(g)     "Distributable Cash" shall mean all cash, revenues and funds received by the Company from Company operations, less the sum of the following to the extent paid or set aside by the Company: (i) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (ii) all cash expenditures incurred in the normal operation of the Company's business; (iii) such reserves as the Members deem reasonably necessary for the proper operation of the Company's business.

(i)     "Economic Interest" shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including, the right to vote on, consent to, or otherwise participate in any decision of the Members.

(j)     "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

(k)     "Entity" shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust or foreign business organization.

(l)     "Gifting Member" shall mean any Member or Economic Interest Owner who gifts, bequeaths, or otherwise transfers for no consideration (by operation of law or otherwise, except with respect to bankruptcy) all or any part of its Membership Interest or Economic Interest.

-2-

003963

(m) "Interest Holder" shall mean either a Member holding an Economic Interest or an Economic Interest Owner.

(n) "Majority Interest" shall mean one or more Interests of Members which in the aggregate exceed 50% of all Percentage Interests.

(o) "Manager" shall mean one or more managers. For the purposes hereof, the Manager of the Company shall be Ms. Safanpreet Kaur Multani. References to the Manager in the singular or as him, her, it, itself, or other like references shall also, where the context so requires, be deemed to include the plural or the masculine or feminine reference, as the case may be.

(p) "Member" shall mean each of the parties who executes a counterpart of this Operating Agreement as a Member and each of the parties who may hereafter become Members. If a Person is a Member immediately prior to the purchase or other acquisition by such person of an Economic Interest, such Person shall have all the rights of a member with respect to such purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be.

(q) "Membership Interest" shall mean a Member's entire interest in the Company including such Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement and the Act.

(r) "Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles employed under the cash method of accounting at the close of each fiscal year on the Company's tax return filed for federal income tax purposes.

(s) "Operating Agreement" shall mean this Operating Agreement as originally executed and as amended from time to time.

(t) "Percentage Interest" shall mean, for any member, the percentage interest in the Company as set forth on Exhibit A, as may be changed from time to time by the unanimous vote of the members.

(u) "Persons" shall mean any individual or entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

003964

(v) "Reserves" shall mean funds set aside or amounts allocated to reserves which shall be maintained in amounts deemed sufficient by the Members for working capital and to pay taxes, insurance, debt service, or other costs or expenses incident to the ownership or operation of the Company's business.

(w) "Selling Member" shall mean any Interest Holder that sells, assigns, pledges, hypothecates or otherwise transfers for consideration all or any portion of its Membership Interest or Economic Interest.

(x) "Transferring Member" shall collectively mean a Selling Member and a Gifting Member.

(y) "Treasury Regulations" shall include proposed, temporary and final regulations promulgated under the Code.

(z) "Withdrawal Event" shall occur upon the death, retirement, resignation, expulsion, bankruptcy, or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company.

## ARTICLE 2

## FORMATION OF COMPANY

2.1     Formation.     Abbe Properties LLC has been organized as an Illinois Limited Liability Company by executing and delivering Articles of Organization to the Illinois Secretary of State in accordance with and pursuant to the Act.

2.2     Name.     The name of the Company is Abbe Properties LLC.

2.3     Principal Place of Business. The principal place of business of the Company within the State of Illinois shall be 2015 S. Arlington Heights Road, Suite 120, Arlington Heights, Illinois 60005. The Company may locate its places of business and registered office at any other place or places as the Members may deem advisable.

2.4     Registered Office and Registered Agent. The Company's initial registered office shall be at the office of its registered agent at 2015 S. Arlington Heights Road, Suite 120, Arlington Heights, Illinois 60005 and the name of its initial registered agent shall be Surinder P. S. Multani. The registered office and registered agent may be changed by filing the address of the new registered office and/or the name of the new registered agent with the Illinois Secretary of State pursuant to the Act.

- 4 -

2.5    Term. The term of this Agreement shall be fifty one (51) years from the date of filing of Articles of Organization with the Illinois Secretary of State, unless the Company is earlier dissolved in accordance with either the provisions of this Operating Agreement or the Act.

## ARTICLE 3

## BUSINESS OF COMPANY

The business of the Company shall be:

3.1    The conduct of any and all purposes for which a limited liability company may be organized under the business laws of the State of Illinois under the name "Abbe Properties LLC".

3.2    To accomplish any lawful business whatsoever, or which shall at any time appear conducive to or expedient for the protection or benefit of the Company and its assets.

## ARTICLE 4

## NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members are as follows:

| NAME | ADDRESS |
|---|---|
| Surinder P. S. Multani as Trustee of the Japi Singh Multani Irrevocable Trust | c/o 2015 South Arlington Heights Road Suite 120, Arlington Heights, IL 60005 |
| Surinder P. S. Multani as Trustee of the Gurpriya Kaur Multani Irrevocable Trust | c/o 2015 South Arlington Heights Road Suite 120, Arlington Heights, IL 60005 |
| Surinder P. S. Multani as Trustee of the Gurtap Singh Multani Irrevocable Trust | c/o 2015 South Arlington Heights Road Suite 120, Arlington Heights, IL 60005 |
| Safanpreet Kaur Multani | c/o 2015 South Arlington Heights Road Suite 120, Arlington Heights, IL 60005 |
| Surinder P. S. Multani | c/o 2015 South Arlington Heights Road Suite 120, Arlington Heights, IL 60005 |

- 5 -

003966

## ARTICLE 5

### RIGHTS AND DUTIES OF THE MANAGERS

5.1    Management. The business and affairs of the Company shall be managed by its Manager. The Manager shall direct, manage and control the business of the Company. Except for situations in which the approval of the Members is expressly required by this Operating Agreement or by non-waivable provisions of the Act, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. At any time when there is more than one Manager, the Managers must agree on any action permitted to be taken by the Managers.

5.2    Number, Tenure and Qualifications. The Company shall initially have one (1) Manager who is set forth in Exhibit A. The number of Managers of the Company shall be fixed from time to time by the affirmative vote of Members holding at least a majority of all Percentage Interests in the Company, but in no instance shall there be less than one Manager. Each Manager shall hold office until his successor shall have been elected and qualified. Managers shall be elected by the affirmative vote of Members holding at least a Majority Interest. Managers need not be Members of the Company.

5.3    Certain Powers of the Manager(s). Without limiting the generality of Section 5.1, the Manager shall have power and authority, on behalf of the Company:

(a)    To acquire property from any Person as the Manager may determine, whether or not such Person is directly or indirectly affiliated or connected with any Manager or Member.

(b)    To borrow money for the Company from banks, other lending institutions, the Manager(s) Members, or affiliates of the Manager(s) or Members on such terms as the Manager(s) deems appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums. No debt shall be contracted or liability incurred by or on behalf of the Company except by the Manager(s), or to the extent permitted under the Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Manager(s).

- 6 -

003967

(c)      To purchase liability and other insurance to protect the Company's property and business;

(d)      To hold and own Company real and personal properties in the name of the Company;

(e)      To invest Company funds in time deposits, short-term governmental obligations, commercial paper or other investments;

(f)      Upon the affirmative vote of the Members holding at least a majority of all Percentage Interests, to sell or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan as long as such disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound;

(g)      To execute on behalf of the Company all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments, bills of sale; leases; and any other instruments or documents necessary to the business of the Company;

(h)      To employ accountants, legal counsel, managing agents or other experts to perform services for the Company;

(i)      To enter into any and all other agreements on behalf of the Company, in such forms as the Manager(s) may approve; and

(j)      To do and perform all other acts as may be necessary or appropriate to the Conduct of the Company's business.

5.4      Members Have No Authority To Bind. Unless authorized to do so by this Operating Agreement or by the Manager(s) of the Company, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose. No Member shall have any power or authority to bind the Company, unless the Member has been authorized by the Manager(s) to act as an agent of the Company in accordance with the previous sentence.

003968

5.5     Liability for Certain Acts. Each Manager shall perform his duties as Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager(s).

5.6     Managers Have No Exclusive Duty to Company. A Manager shall not be required to manage the Company as his sole and exclusive function and he may have other business interests and engage in activities in addition to those relating to the Company. Neither the Company nor any member shall have any right, by virtue of this Operating Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom.

5.7     Bank Accounts. The Manager(s) may from time to time open bank accounts in the name of the Company, and the Manager shall be the sole signatory thereon, unless all Members determine otherwise.

5.8     Indemnity of the Managers, Employees and Other Agents. Provided that Members owning a Majority Interest approve, the Company shall, to the maximum extent permitted under Section 15-10 of the Act, indemnify and make advances for expenses to Managers, its employees, and other agents.

5.9     Resignation. Any Manager of the Company may resign at any time by giving written notice to the Members of the Company. The resignation of any Manager shall take effect upon receipt of notice thereof or at such later date specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.10     Removal. At a meeting called expressly for that purpose, all or any lesser number of Managers may be removed at any time, with or without cause, by the affirmative vote of Members holding a Majority Interest. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

- 8 -

003969

5.11    Vacancies. Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the affirmative vote of Members holding a Majority Interest. Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the election at a meeting of Members called for that purpose or by the Members' unanimous written consent. A Manager elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office and shall hold office until the expiration of such term and until his successor shall be elected and qualified , or until his earlier death, resignation or removal.

5.12    Salaries. The salaries and other compensation of the Manager(s) shall be fixed from time to time by an affirmative vote of Members holding at least a Majority Interest, and no Manager shall be prevented from receiving such salary because he is also a Member of the Company.

5.13    Meetings. Meetings of the Managers, for any purpose or purposes, may be called by the Tax Matters Partner or by any Manager. Action to be taken by the Managers shall be by simple majority of all the Managers.

5.14    Place of Meetings. The Tax Matters partner may designate any place, either within or outside the State of Illinois, as the place of meeting for any meeting of the Managers. If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal place of business of the Company in the State of Illinois.

5.15    Notice of Meetings. Except as otherwise provided in this Agreement, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten (10) nor more than thirty (30) days before the date of the meeting, either personally or by mail, by or at the direction of the Tax Matters Partner or Manager calling the meeting, to each Manager entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered two calendar days after being deposited in the United States mail, addressed to the Manager at his or her address as it appears on the books of the Company, with postage thereon prepaid.

5.16    Meeting of All Managers. If all of the Managers shall meet at any time and place, either within or outside of the State of Illinois, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

003970

5.17    Action by Managers Without a Meeting. Action required or permitted to be taken at a meeting of Managers may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by each Manager entitled to vote and delivered to the tax Matters Partner for inclusion in the minutes or for filing with the Company records. Action taken under this Section is effective when all Managers entitled to vote have signed the consent, unless the consent specifies a different effective date.

5.18    Waiver of Notice. When any notice is required to be given to any Manager, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

5.19    Telephonic Meetings. A Manager may participate in a meeting of Managers by means of conference telephone or similar communications equipment enabling all Managers participating in the meeting to hear one another. Participation in a meeting pursuant to this section shall constitute presence in person at such meeting.

5.20    Officers.

(a)    Election of Officers. The officers of the Company shall be a President, a Secretary and a Treasurer. The Company also may have, at the discretion of the Managers, one or more vice-presidents, one or more assistant secretaries, one or more assistant financial officers, and such other officers as may be appointed in accordance with the provisions of Section 5.20(c). Any number of offices may be held by the same person.

(b)    Election.    The officers of the Company, except such officers as may be appointed in accordance with the provisions of Section 5.20(c), shall be chosen by majority vote of the Managers, and each shall hold his or her office until he or she shall resign or shall be removed by the Managers or otherwise disqualified to serve, or his or her successor shall be elected and qualified.

(c)    Subordinate Officers. The Manager(s) may appoint, and may empower the President to appoint, such other officers as the business of the Company may require, each of whom shall hold office for such period, have such authority and perform such duties as the appointing authority may designate, subject to any limitations imposed by resolution of the Manager(s).

(d)    Removal. Any officer may be removed, either with or without cause, by the Manager(s) or by a majority vote of the Managers, except in case of an officer chosen by the managers, by any officer upon whom such power of removal may be conferred by the Manager(s) (subject, in each case, to the rights, if any, of an officer under any contract of employment).

-10-

(e)    Resignation. An officer may resign at any time by giving notice to the Manager(s) or to the President or to the Secretary of the Company, without prejudice, however, to the rights, if any, of the Company under any contract to which such officer is a party. Any such resignation shall take effect at the date of the receipt of such notice or any later time specified therein; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

(f)    Vacancies. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Agreement for regular appointments to such office.

(g)    Salaries. The salaries of all officers and agents of the Company shall be fixed by the Manager, or if applicable, a majority vote of the Managers, excluding, however, the vote of any interested Manager who may also serve as an officer of the Company. In such situations, the "majority vote of the Managers" shall mean the approval of the remaining Manager(s) representing Members who collectively hold more than 50% of the Percentage Interests entitled to vote on the matter.

(h)    Initial Officers. Effective as of the date hereof and until their respective successors are nominated and appointed, the following persons shall hold the offices and officer titles as set opposite their name:

Ms. Safanpreet Kaur Multani - President, Secretary Treasurer and Tax Matters Partner

## ARTICLE 6

## RIGHTS AND OBLIGATIONS OF MEMBERS

6.1    Limitation of Liability. Each member's liability shall be limited as set forth in this Operating Agreement, the Act, and other applicable law.

6.2    Company Debt Liability. A Member will not be personally liable for any debts or losses of the Company beyond his respective Capital Contributions and any obligation of the Member under Sections 8.1 and 8.2 to make Capital Contributions, except as provided in Section 6.7 or as otherwise required by law.

6.3    List of Members. Upon the written request of any Member, the Tax Matters Partner shall provide a list showing the names, address, and Membership Interests and economic Interests of all Members. ·

- 11 -

003972

6.4     Approval of Sale of All Assets. The Members shall have the right, by the affirmative vote of members holding at least a majority of all percentage Interests, to approve the sale, exchange, or other disposition of all, or substantially all, of the Company's assets which is to occur as part of a single transaction or plan.

6.5     Company Books. The Tax Matters Partner shall maintain and preserve, during the term of the Company, the accounts, books, and other relevant Company documents described in Section 9.9. Upon reasonable written request, each member and Economic Interest Owner shall have the right, at a time during ordinary business hours, as reasonably determined by the Tax Matters Partner to inspect and copy, at the requesting Interest Holder's expense, the Company documents identified in Section 1-40 of the Act, and such other documents as the Tax Matters Partner, in his discretion, deems appropriate.

6.6     Priority and Return of Capital. Except as may be expressly provided in Article 9, no Interest Holder shall have priority over any other Interest Holder, either as to the return of Capital Contributions or as to Net Profits, Net Losses, or distributions; provided that this Section shall not apply to loans a Member has made to the Company.

6.7     Liability of a Member to the Company. A Member who receives a distribution or the return in whole or in part of its contribution is liable to the Company only to the extent provided by the Act.

## ARTICLE 7

## MEETINGS OF MEMBERS

7.1     Meetings. Meetings of the Members, for any purpose or purposes, may be called by any Member or Members holding at least 10% of the Percentage Interests, or by the Tax Matters Partner.

7.2     Place of Meetings. The Member(s) calling the meeting may designate any place, either within or outside the State of Illinois, as the place of meeting for any meeting of the Members. If no designation is made, or if a special meeting be called by the Tax Matters Partner or otherwise called, the place of meeting shall be the principal place of business of the Company in the State of Illinois.

- 12 -

003973

7.3    Notice of Meetings. Except as provided in Section 7.4, written notice stating the place, day, and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten (10) days nor more than thirty (30) days before the date of the meeting, either personally or by mail, by or at the direction of the Member or Members calling the meeting, to each Member entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered two calendar days after being deposited in the United States mail, addressed to the Member at its address as it appears on the books of the company, with postage thereon prepaid.

7.4    Meeting of All Members. If all of the Members shall meet at any time and place, either within or outside of the State of Illinois, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

7.5    Record Date. For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

7.6.    Quorum. Members holding at least two thirds (2/3) of all Percentage Interests, represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, a majority of the Percentage Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty days without further notice. However, if the adjournment is for more than sixty days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Percentage Interests whose absence would cause loss of a quorum.

003974

7.7     Manner of Acting. If a quorum is present, the affirmative vote of Members holding a Majority Interest shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, by the Articles of Organization, or by the Operating Agreement. Unless otherwise expressly provided herein or required under applicable law, only Members who have a Membership Interest may vote or consent upon any matter and their vote or consent, as the case may be, shall be counted in the determination of whether the matter was approved by the Members.

7.8     Proxies. At meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Tax Matters Partner before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

7.9     Action by Members Without a Meeting. Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by each member entitled to vote, and delivered to the Tax Matters Partner for inclusion in the minutes or for filing with the Company records. Action taken under this Section is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date.

7.10    Waiver of Notice. When any notice is required to be given to any Member, a waiver thereof win writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

7.11    Telephonic Meetings. A Member may participate in a meeting of Members by means of conference telephone or similar communications equipment enabling all Members participating in the meeting to hear one another. Participation in a meeting pursuant to this section shall constitute presence in person at such meeting.

ARTICLE 8

CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

8.1     Members' Capital Contributions. Each Member shall contribute such amount as is set forth in Exhibit A hereto as its share of the Initial Capital Contribution.

- 14 -

003975

8.2     Additional Contributions. A Member shall be required to make such additional Capital Contributions as shall be determined by Members owning a Majority Interest from time to time to be reasonably necessary to meet the expenses and obligations of the Company. After the making of any such determination, the Tax Matters Partner shall give written notice to each Member of the amount of required additional contribution, and each Member shall deliver to the Company its pro rata share thereof (in proportion to the respective Percentage Interest of the Member on the date such notice is given) no later than thirty days following the date such notice is given. None of the terms, covenants, obligations, or rights contained in this Section 8.2 is or shall be deemed to be for the benefit of any person or entity other than the Members and the Company, and no such third person shall under any circumstances have any right to compel any actions or payments by the Tax Matters Partner and/or the Members.

8.3     Capital Accounts.

(a) A separate Capital Account will be maintained for each Member. Each Member's Capital Account will be increased by (1) the amount of money contributed by such Member to the Company; (2) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752); (3) allocations to such Member of Net Profits and Net Losses; and (4) allocations to such Member of income described in Code Section 705(a)(1)(B). Each Member's Capital Account will be decreased by (1) the amount of money distributed to such Member by the Company; (2) the fair market value of property distributed to such member by the Company (net of liabilities secured by such distributed property that such member is considered to assume or take subject to under Code Section 752); (3) allocations to such Member of expenditures described in Code Section 705(a)(2)(B); and (4) allocations to the account of such Member of Company loss and deduction as set forth in such Regulations, taking into account adjustments to reflect book value.

(b) In the event of a permitted sale or exchange of a Membership Interest or Economic Interest in the Company, the Capital Account of the transferor shall become the Capital account of the transferee to the extent it relates to the transferred Membership Interest or Economic Interest in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

- 15 -

003976

(c) The manner in which Capital Accounts are to be maintained pursuant to this Section 8.3 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder. If the Company determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 8.3 should be modified in order to comply with Code Section 704(b) and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 8.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members as set forth in the Operating Agreement.

(d) Upon liquidation of the Company (or any Member's Membership Interest or Economic Interest Owner's Economic Interest), liquidating distributions will be made in accordance with the positive Capital Account balances of the Members and Economic Interest Owners, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs. Liquidation proceeds will be paid within sixty days of the end of the taxable year (or, if later, within one hundred twenty days after the date of the liquidation). The company may offset damages for breach of this Operating Agreement by an Interest Holder whose interest is liquidated (either upon the withdrawal of the Member of the liquidation of the Company) against the amount otherwise distributable to such Member.

(e) Except as otherwise required in the Act (and subject to Section 8.1 and 8.2), no Interest Holder shall have any liability to restore all or any portion of a deficit balance in such Interest Holder's Capital Account.

(f) In the event of the advance of any loan(s) to the Company by any Member, the repayment of such loan(s) shall be made from such Member's share of operating revenues.

8.4    Withdrawal or Reduction of Members' Contributions to Capital.

(a) A Member shall not receive out of the Company's property any part of its Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

(b) A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for its Capital Contribution.

- 16 -

003977

## ARTICLE 9

## ALLOCATIONS, INCOME TAX, DISTRIBUTIONS, ELECTIONS, AND REPORTS

9.1     Allocations of Profits and Losses from Operations. The Net Profits and Net Losses of the Company for each fiscal year will be allocated as follows:

### Member Allocation

| NAME | PERCENTAGE |
|------|------------|
| Surinder P. S. Multani as Trustee of the Japi Singh Multani Irrevocable Trust | 16.666% |
| Surinder P. S. Multani as Trustee of the Gurpriya Kaur Multani Irrevocable Trust | 16.666% |
| Surinder P. S. Multani as Trustee of the Gurtap Singh Multani Irrevocable Trust | 16.666% |
| Ms. Safanpreet Kaur Multani | 40% |
| Mr. Surinder P. S. Multani | 10% |

9.2     Special Allocations to Capital Accounts. Notwithstanding Section 9.1 hereof:

(a) No allocations of loss, deduction, and/or expenditures described in Code Section 705(a)(2)(B) shall be charged to the Capital Account of any Member if such allocation would cause such member to have a Deficit Capital Account. The amount of the loss, deduction, and/or Code Section 705(a)(2)(B) expenditure that would have caused a Member to have a Deficit Capital Account shall instead be charged to the Capital account of any Members that would not have a Deficit Capital Account as a result of the Treasury Regulations shall be allocated to the Members' Capital Accounts in accordance with Section 1.704-2(i) of the Treasury Regulations.

(b) Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Treasury Regulations) such deductions shall be allocated to the Members in accordance with, and as a part of, the allocations of Company profit or loss for such period.

- 17 -

(c) In accordance with Code Section 704(c)(1)(A) and Section 1.704-1(b)(2)(i)(iv) of the Treasury Regulations, if a Member within five years of being contributed, then, except as provided in Code Section 704(c)(2), the contributing Member shall be treated as recognizing gain or loss from the sale of such property in an amount equal to the gain or loss that would have been allocated to such Member under Code Section 704(c)(1)(A) if the property had been sold at its fair market value at the time of the distribution.

(d) Pursuant to Code Section 704(c)(1)(B), if any contributed property is distributed by the Company other than to the contributing Member within five years of being contributed, then, except as provided in Code Section 704(c)(2), the contributing Member shall be treated as recognizing gain or loss from the sale of such property in an amount equal to the gain or loss that would have been allocated to such Member under Code Section 704(c)(1)(A) if the property had been sold at its fair market value at the time of the distribution.

(e) In the case of any distribution by the Company to an Interest Holder, such Interest Holder shall be treated as recognizing gain in an amount equal to the lesser of:

(i) the excess (if any) of (A) the fair market value of the property (other than money) received in the distribution over (B) the adjusted basis of such Member's Membership Interest or Economic Interest Owner's Economic Interest in the Company immediately before the distribution reduced (but not below zero) by the amount of money received in the distribution, or

(ii) the Net Precontribution Gain (as defined in Code Section 737(b) of the Inerest Holder. The Net Precontribution gain means the net gain (if any) which would have been recognized by the distributee Interest Holder under Code Section 704(c)(1)(B) of all property which (a) had been contributed to the Company within five years of the distribution, and (b) is held by the Company immediately before the distribution, if such property had been distributed by the Company to another Interest Holder. If any portion of the property distributed consists of property that had been contributed by the distributee Interest Holder to the Company, then such property shall not be taken into account under this Section 9.2(i) and shall not be taken into account in determining the amount of the Net PreContribution Gain. If the property distributed consists of an interest in an entity, the preceding sentence shall not apply to the extent that the value of such interest is attributable to the property contributed to such entity after such interest had been contributed to the Company.

- 18 -

003979

(f)     In connection with a Capital Contribution of money or other property (other than a de minimis amount) by a new or existing Interest Holder as a consideration for an Economic Interest or Membership Interest, or in connection with the liquidation of the Company or a distribution of money or other property (other than a de minimis amount) by the Company to a retiring Interest Holder (as consideration for an Economic Interest or Membership Interest), the Capital Accounts of the members shall be adjusted to reflect a revaluation of Company property (including intangible assets) in accordance with Treasury Regulation Section 1.704(1(b)(2)(iv)(f). If, under Section 1.704-1 (b) (2) (iv) (f) of the Treasury Regulations, Company property that has been revalued is properly reflected in the Capital Accounts and on the books of the Company at a book value that differs from the adjusted tax basis of such proper6ty, then depreciation, depletion, amortization, and gain or loss with respect to such property shall be shared among the Members in a manner that takes account of the variations between the adjusted tax basis and fair market value of property contributed to the Company are taken into account in determining the Members' shares of tax items Under Code Section 704(c).

(g)     All recapture of income tax deductions resulting from the sale or disposition of Company property shall be allocated to the Member or Members to whom the deduction that gave rise to such recapture was allocated hereunder to the extent that such Member is allocated any gain from the sale or other disposition of such property.

(h)     Any credit or charge to the Capital Accounts of the Members pursuant to Sections 9.2(b) (c), and/or (d), hereof shall be taken into account in computing subsequent allocations of profits and losses pursuant to Section 9.1, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 9.1 and 9.2 shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each member pursuant to the provisions of this Article 9. If the special allocations required by Section 9.2(b), (c), and/or (d), had not occurred.

9.3     Distributions. Except as provided in Section 8.3(d), a Member has no right to demand and receive any distribution in a form other than cash. All distributions of cash or other property shall be made to the Members pro rata in proportion to the respective Percentage Interests of the Members on the record date of such distribution. Except as provided in Section 9.4, all distributions of Distributable Cash and property shall be made at such time as determined by the Members. All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the members from the Company shall be treated as amounts distributed to the relevant Member or Members pursuant to this Section 9.3.

- 19 -

9.4    Limitation upon Distributions.

(a) No distributions or return of contributions shall be made and paid if, after the distribution or return of distribution is made either

(i) the Company would be insolvent; or

(ii) the net assets of the Company would be less than zero.

(b)    The Members may base a determination that a distribution or return of contribution may be made under Section 9.4(a) in good faith reliance upon a balance sheet and profit and loss statement of the Company represented to be correct by the person having charge of its books of account or certified by an independent public or certified public accountant or firm of accountants to fairly reflect the financial condition of the Company.

9.5    Accounting Principles. The profits and losses of the Company shall be determined in accordance with generally accepted accounting principles applied on a consistent basis using the cash method of accounting.

9.6    Interest on Return of Capital Contributions. No member shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution.

9.7    Loans to Company. Nothing in this Operating Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company.

9.8    Accounting Period. The Company's accounting period shall be the calendar year ("Fiscal Year").

9.9    Records, Audits, and Reports. At the expense of the Company, the Tax Matters Partner shall maintain records and accounts of the operations and expenditures of the Company. At a minimum the Company shall keep at its principal place of business the following records:

(a)    A current list of the full name and last known address of each Member and Economic Interest Owner setting forth the amount of cash each Member and Economic Interest Owner has contributed, a description and statement of the agreed value of the other property or services each Member and Economic Interest Owner has contributed or has agreed to contribute in the future, and the date on which each became an Interest Holder;

- 20 -

003981

(b) A copy of the Articles of Organization of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(c) Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

(d) Copies of the Company's currently effective written Operating Agreement, and copies of any financial statements of the Company for the three most recent years;

(e) Minutes of every meeting;

(f) Any written consents obtained from Members for actions taken by Members without a meeting; and

(g) Unless contained in the Articles of Organization or the Operating Agreement, a writing prepared by the Tax Matters Partner setting out the following:

(i) The times at which or events on the happening of which any additional contributions agreed to be made by each Member and Economic Interest Owner are to be made.

(ii) Any right of an Interest Holder to receive distributions that include a return of all or any part of the Interest Holder's contributions.

(iii) Any power of an Interest Holder to grant the right to become an assignee of any part of the Interest Holder's interest, and the terms and conditions of the power.

9.10 Returns and Other Elections. The Tax Matters Partner shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year upon the Members' written request. All elections permitted to be made by the Company under federal or state laws shall be made by the Tax Matters Partner in his sole discretion. Provided that the Tax Matters Partner shall make any tax election requested by Members owning a Majority Interest.

- 21 -

003982

9.11    Tax Matters Partner. Ms. Safanpreet Kaur Multani is designated the "Tax Matters Partners" (as defined in Code Section 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

## ARTICLE 10

## TRANSFERABILITY

10.1    General. Except as otherwise specifically provided herein, no Interest Holder shall have the right, as to all or any part of its Membership Interest or Economic Interest to:

(a)    sell, assign, pledge, hypothecate, transfer, exchange, or otherwise transfer for consideration, (collectively, "sell");

(b)    gift, bequeath, or otherwise transfer for no consideration (whether or not by operation of law, except in the case of bankruptcy); or

(c)    permit any transfer by reason of death of any equity holder or dissolution of marriage of any equity holder.

10.2    Right of First Refusal

(a)    If a selling Member desires to sell all or any portion of its Membership Interest or Economic Interest in the Company to a third party purchaser, the selling Member shall obtain from such third party purchaser a bona fide written offer to purchase such interest, stating the terms and conditions upon which the purchase is to be made and the consideration offered. The selling Member shall give written notification to the remaining Members, by certified mail or personal delivery, of its intention to so transfer such interest furnishing to the remaining Members a copy of the written offer to purchase such interest, and the name and business and personal addresses of the proposed transferee.

003983

(b)      Primary Option to Purchase. Within 35 days of the receipt of the notice of intention to transfer a Percentage Interest by the last of the Members to receive such notice, each remaining Member may exercise an option to purchase that proportion of the Percentage Interest proposed to be transferred which equals the proportion which the Percentage Interest owned by such remaining Member at the time of his receipt of the notice is of the total of the Percentage Interests then owned by all the remaining Members. The purchase option granted in this paragraph is herein referred to as the "Primary Option".

(c)      Secondary Option to Purchase. If a Member fails to exercise a Primary Option granted to him to purchase the Percentage Interest proposed to be transferred, each remaining Member who is granted and who exercises a Primary Option may, within ten days after the expiration of the 35-day option period provided for above, exercise an option to purchase the Percentage Interest with respect to which such Member has failed to exercise his Primary Option (hereinafter "the Option Interest"). In the case of a single remaining Member, his option shall be to purchase all of the Option Interest. In the case of two or more remaining Members, each such remaining Member's option shall be to purchase the portion of Option Interest which bears the same proportion to the total Option Interest as the Percentage Interest owned by each such remaining Member at the time of receipt of the notice provided for above bears to the total Percentage Interest then owned by all such remaining Members; provided that all such remaining Members may, by agreement among themselves, determine the proportions in which some or all of their number may exercise the option granted in this paragraph. The purchase option granted by this paragraph is referred to as the "Secondary Option".

(d)      In the event the remaining Members (or any one or more of the remaining Members) give written notice to the selling Member of their desire to exercise this right of first refusal and to purchase all of the selling Member's interest in the Company which the selling Member desires to sell upon the same terms and conditions as are stated in the aforesaid written offer to purchase, the remaining Members shall have the right to designate the time, date, and place of closing, provided that the date of closing shall be within sixty days after written notification to the Selling Member of the remaining Member or Members' election to exercise their right of the first refusal.

(e)      As a condition to the Company recognizing the effectiveness of either the purchase of the Selling Member's interest in the Company by a third party purchaser or the gift of an interest in the Company (including an Economic Interest), (subject to Section 10.3) substitution of a new Member, the remaining Members may

- 23 -

003984

require the Selling Member, Gifting Member or the proposed purchaser, donee or successor-in-interest, as the case may be, to execute, acknowledge, and deliver to the remaining Members such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the remaining Members may deem necessary or desirable to:

(i) verify the purchase, gift, or transfer, as the case may be;

(ii) confirm that the person desiring to acquire an interest in the Company, or to be admitted as a Member, has accepted, assumed, and agreed to be subject and bound by all of the terms, obligations, and conditions of the Operating Agreement, (whether such Person is to be admitted as a new Member or an Economic Interest Owner);

(iii) maintain the status of the Company as a partnership for federal tax purposes; and

(iv) assure compliance with any applicable state and federal laws including securities laws and regulations.

(f)     Any sale or gift of a Membership Interest or Economic Interest or admission of a Member in compliance with this Article 10 shall be deemed effective as of the last day of the calendar month in which the remaining Members' consent thereto was given, or, if no such consent was required pursuant to Section 10.2(e), then on such date that the donee or successor interest complies with the conditions set forth in Section 10.2 (c ). The Selling Member agrees, upon request of the remaining Members, to execute such certificates or other documents and to perform such other acts as may be reasonably requested by the remaining Members from time to time in connection with such sale, transfer, assignment, or substitution. The Selling Member hereby indemnifies the Company and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any transfer or purported transfer in violation of this Article 10.

10.3    Transferee Not Member in Absence of Unanimous Consent.

(a)     Notwithstanding anything contained herein to the contrary (including, without limitation, Section 10.2 hereof), if all of the remaining Members do not approve by unanimous written consent of the proposed sale or gift of the Transferring Member's Membership Interest or Economic Interest to a transferee or donee which is not

~ 24 ~

003985

a Member immediately prior to the sale or gift, then the proposed transferee or donee shall have no right to participate in the management of the business and affairs of the Company or to become a member. The transferee or donee shall be merely an Economic Interest Owner. No transfer of a Member's interest in the Company (including any transfer of the Economic Interest or any other transfer that has not been approved by unanimous written consent of the Members) shall be effective unless and until written notice (including the name and address of the proposed transferee or donee and the date of such transfer) has been provided t the Company and the non transferring Member(s)

(b)    Upon and contemporaneously with any sale or gift of a Transferring Member's Economic Interest in the Company which does not at the same time transfer the balance of the rights associated with the Economic Interest transferred by the Transferring Member (including, without limitation, the rights of the Transferring Member to participate in the management of the business and affairs of the Company), all remaining rights and interest that were owned by the Transferring Member immediately prior to such sale or gift or that were associated with the transferred Economic Interest shall immediately lapse until either (1) the remaining Members, by unanimous consent, reinstate such rights to the Economic Interest Owner who did not previously obtain the unanimous written consent of the Members or (2) upon the remaining Members, by unanimous written consent, reinstating such rights to a successor or transferee of such Economic Interest Owner.

## ARTICLE II

## ADDITIONAL MEMBERS

11.1    From the date of the formation of the Company, any Person or Entity acceptable to the Members by a majority vote thereof may become a Member in this Company either by the issuance by the Company of Membership Interests for such consideration as the Members by their votes shall determine, or as a transferee of a member's Membership Interest or any portion thereof, subject to the terms and conditions of this Operating Agreement. No new Members shall be entitled to any retroactive allocation of losses, income, or expense deductions incurred by the Company. The Tax Matters Partner may, at his option, at the time a member is admitted, close the Company books (as though the Company's tax year has ended) or make pro rata allocations of loss, income, and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of Code Section 706(d) and the Treasury Regulations promulgated thereunder.

- 25 -

003986

## ARTICLE 12

### DISSOLUTION AND TERMINATION

12.1    Dissolution

(a)    The Company shall be dissolved upon the occurrence of any of the following events:

(i)    When the period fixed for the duration of the Company shall expire pursuant to Section 2.5 hereof;

(ii)    by the unanimous written agreement of all Members; or

(iii)    upon the happening of a Withdrawal Event, unless the business of the Company is continued by the consent of all the remaining Members within ninety days after the Withdrawal Event.

(b)    Notwithstanding anything to the contrary in this Operating Agreement, if a Member or Members owning Percentage Interests which in the aggregate constitute not less than two thirds (2/3) of the Percentage Interest vote to dissolve the Company at a meeting of the Company pursuant to Article 7, then all of the Members shall agree in writing to dissolve the Company on the date agreed upon or in the event of no agreement, as soon as possible, but in any event not more than thirty days thereafter.

(c)    If a Member who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage his person or his property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling his estate or administering his property.

(d)    A Member shall not take any voluntary action that directly causes a Withdrawal Event. Unless otherwise approved by Members owning a Majority Interest, a Member who resigns (a "Resigning Member") or whose Membership Interest is otherwise terminated by virtue of a Withdrawal Event, regardless of whether such Withdrawal Event was the result of a voluntary act by such Member, shall not be entitled to receive any distributions in excess of those distributions to which such Member would have been entitled had such Member remained a Member. Except as otherwise expressly provided herein, a Resigning Member shall immediately become an Economic Interest Owner. Damages for breach of this Section 12.1(d) shall be monetary damages only (and not specific performance), and such damages may be offset against distributions by the Company to which the Resigning Member would otherwise be entitled.

- 26 -

003987

12.2    Winding Up, Liquidation, and Distribution of Assets

(a)    Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets liabilities, and operations, from the date of the last previous accounting until the date of dissolution. The Members shall immediately proceed to wind up the affairs of the Company.

(b)    If the Company is dissolved and its affairs are to be wound up, the Members shall:

(i)    Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Members may determine to distribute any assets to the Members in kind),

(ii)    Allocate any profit or loss resulting from such sales to the Members' and Economic Interest Owners' capital Accounts in accordance with Article 9 hereof,

(iii)    Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for Distributions, and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members and Economic Interest Owners, the amounts of such Reserves shall be deemed to be an expense of the Company),

(iv)    Distribute the remaining assets in the following order:

(1)    If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of Article 9 and Section 8.3 of this Operating Agreement to reflect such deemed sale.

- 27 -

003988

(2)     The positive balance (if any) of each Member's and Economic Interest Owner's Capital Account (as determined after taking into account all Capital Account adjustments of the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Members, with any assets distributed in kind being valued for this purpose at their fair market value as determined pursuant to Section 12.2(b)(i). Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

(c)     Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocation, and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such member to the Company or to any other Person for any purpose whatsoever.

(d)     Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(e)     The Members shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

12.3    Articles of Dissolution. When all debts, liabilities, and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed, articles of dissolution as required by the Act, shall be executed in duplicate and filed with the Illinois Secretary of State.

12.4    Effect of Filing of Articles of Dissolution. Upon the filing of articles of dissolution with the Illinois Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act. The Members shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

003989

12.5 Return of Contribution Nonrecourse to Other Members. Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

## ARTICLE 13

## MISCELLANEOUS PROVISIONS

13.1 Notices. Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if (1) either by actual delivery of the notice into the hands of the parties thereunto entitled; (2) or by the mailing of the notice in the U.S. mail, certified mail, return receipt requested; or (3) sent by nationally recognized, overnight delivery service, addressed to the Member's and/or Company's address, as appropriate, which is set forth in this Operating Agreement. The notice shall be deemed to be received in case (1) on the date of its actual receipt by the party entitled thereto and in case (2) or (3) on the date of its mailing or deposit with such delivery service. The failure or refusal of any party to accept any notice given pursuant to this paragraph shall be conclusively deemed receipt thereof and knowledge of its contents.

13.2 Books of Account and Records. Proper and complete records and books of account shall be kept or shall be caused to be kept by the Managers in which shall be entered fully and accurately all transactions relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. Such books and records shall be maintained as provided in Section 9.9. The books and records shall at all times be maintained at the principal place of business of the Company or at such other location as the Managers may determine.

13.3 Application of Illinois Law. This Operating Agreement and its interpretation shall be governed exclusively by its terms and by the laws of the State of Illinois, and specifically the Act.

13.4 Waiver of Action for Partition. Each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that it may have to maintain any action for the partition with respect to the property of the Company.

- 29 -

003990

13.5   Amendments. This Operating Agreement may not be amended except in writing by the affirmative vote of Members holding at least two thirds (2/3) of all Percentage Interests. Any amendment changing the Percentage Interests of the Members requires the unanimous vote of the Members.

13.6   Execution of Additional Instruments. Each Member hereby agrees to execute such other and further statements of interests and holdings, designations and other instruments necessary to comply with any laws, rules, or regulations.

13.7   Construction. Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

13.8   Holdings. The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Operating Agreement or any provision hereof.

13.9   Waivers. The failure of any party to seek redress for default of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a default, from having the effect of an original default.

13.10   Rights and Remedies Cumulative. The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties may have.

13.11   Severability. If any provision of this Operating Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

13.12   Heirs, Successors, and Assigns. Each and all of the covenants, terms, provisions, and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors, and assigns.

13.13   Creditors. None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

- 30 -

003991

13.14 Counterparts. This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

13.15 Entire Agreement. This Operating Agreement supersedes all agreements previously made between the parties relating to its subject matter. There are no other understandings or agreements between them. It contains the entire agreement of the parties. It may not be changed orally but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought.

13.16 Joint Preparation. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

13.17 Incorporation of Exhibits, Annexes, and Schedules. The Exhibits, Annexes, and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

IN WITNESS WHEREOF, the parties hereto have caused their signatures, or the signatures of their duly authorized representatives, to be set forth below on the day and year first above written.

By:_____
Name: Surinder P. S. Multani as Trustee of the
Gurpriya Kaur Multani Irrevocable Trust


By:_____
Name: Surinder P. S. Multani as Trustee of the Japi
Singh Multani Irrevocable Trust


By:_____
Name: Surinder P. S. Multani as Trustee of the
Gurtap Singh Multani Irrevocable Trust

- 31 -

003992

By:_____
Name: Safanpreet Kaur Multani


By:_____
Name: Surinder P. S. Multani

- 32 -

003993

EXHIBIT A
to
Operating Agreement
for
ABBE PROPERTIES LLC

MEMBERS

| Name | Description of Contribution | Amount | % |
|---|---|---|---|
| Surinder P. S. Multani as Trustee of the Japi Singh Multani Irrevocable Trust | Cash | 166.66 | 16.666% |
| Surinder P. S. Multani as Trustee of the Gurpriya Kaur Multani Irrevocable Trust | Cash | 166.66 | 16.666% |
| Surinder P. S. Multani As Trustee of the Gurtap Singh Multani Irrevocable Trust | Cash | 166.66 | 16.666% |
| Safanpreet Kaur Multani | Cash | 400.00 | 40% |
| Surinder P. S. Multani | Cash | 100.00 | 10% |

MANAGER

Safanpreet Kaur Multani

INSERT NO.1 page 5

NAME AND ADDRESS OF EACH MEMBER

Surinder P. S. Multani as Trustee of the Japi Singh Multani Irrevocable Trust c/o 2015 South Arlington Heights Road, Suite 120, Arlington Heights, Illinois 60005

Surinder P. S. Multani as Trustee of the Gurpriya Kaur Multani Irrevocable Trust c/o 2015 South Arlington Heights Road, Suite 120, Arlington Heights, Illinois 60005

Surinder P. S. Multani as Trustee of the Gurtap Singh Multani Irrevocable Trust c/o 2015 South Arlington Heights Road, Suite 120, Arlington Heights, Illinois 60005.

Safanpieet Kaur Multani c/o 2015 South Arlington Heights Road, Suite 120, Arlington Heights, Illinois 60005.

Surinder P. S. Multani c/o 2015 South Arlington Heights Road, Suite 120, Arlington Heights, Illinois 60005.

INSERT NO. 1 AT PAGE 17

Surinder P. S. Multani as Trustee of the Japi Singh Multani Irrevocable Trust and under his percentage it will be 16.666%

Surinder P. S. Multani as Trustee of the Gurpriya Kaur Multani Irrevocable Trust and under the percentage it will be 16.666%.

Surinder P. S. Multani as Trustee of the Gurtap Singh Multani Irrevocable Trust and under the percentage it will be 16.666%.

INSERT NO. 1-31 FIRST SIGNATURE LINE By: Surinder P.S. Multani as Trustee of the Gurpriya Kaur Multani Irrevocable Trust.
Next Signature Line by: Surinder P. S. Multani as Trustee of the Japi Singh Multani Irrevocable Trust
Next Signature Line By: Name: Surinder P.S. Multani as Trustee of the Gurtap Singh Multani Irrevocable Trust
Next Signature Line By: Name: Safanpieet Kaur Multani
Last Signature Line by: Name: Surinder P. S. Multani

INSERT 1 FOR EXHIBIT A TO THE OPERATING AGREEMENT

FIRST NAME Surinder P. S. Multani as Trustee of the Japi Singh Multani Irrevocable Trust percentage should be 16.666%

Surinder P. S. Multani as Trustee of the Gurpriya Kaur Multani Irrevocable Trust cash stays the same and the amount is 166.66 percentage is 10%

Then Surinder P.S. Multani as Trustee of the Gurtap Singh Multani Irrevocable Trust

003996

13.14  Counterparts. This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

13.15  Entire Agreement. This Operating Agreement supersedes all agreements previously made between the parties relating to its subject matter. There are no other understandings or agreements between them. It contains the entire agreement of the parties. It may not be changed orally but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought.

13.16  Joint Preparation. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

13.17  Incorporation of Exhibits, Annexes, and Schedules. The Exhibits, Annexes, and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

IN WITNESS WHEREOF, the parties hereto have caused their signatures, or the signatures of their duly authorized representatives, to be set forth below on the day and year first above written.

By: _____
Name: Surinder P. S. Multani as Trustee of the
Gurpriya Kaur Multani Irrevocable Trust

By: _____
Name: Surinder P. S. Multani as Trustee of the Japi
Singh Multani Irrevocable Trust

By: _____
Name: Surinder P. S. Multani as Trustee of the
Gurtap Singh Multani Irrevocable Trust

- 31 -

003997

By:_____
Name: Safanpreet Kaur Multani

By:_____
Name: Surinder P. S. Multani

003998

FIRST AMERICA TITLE

ORDER # _____

18180

RECORDATION REQUESTED BY:
Midwest Community Bank
510 S. Park Crest Drive
P.O. Box 689
Freeport, IL 61032-0689

WHEN RECORDED MAIL TO:
Midwest Community Bank
510 S. Park Crest Drive
P.O. Box 689
Freeport, IL 61032-0689

FRED BUCHOLZ
DUPAGE COUNTY RECORDER
AUG.10,2006          RHSP        1:49 PM
OTHER                 09-02-402-007
015 PAGES     R2006-155274

FOR RECORDER'S USE ONLY

This Mortgage prepared by:
Midwest Community Bank
510 S. Park Crest Dr., P.O. Box 689
Freeport, IL 61032-0689

## CONSTRUCTION MORTGAGE

**MAXIMUM LIEN.** At no time shall the principal amount of indebtedness secured by the Mortgage, not including sums advanced to protect the security of the Mortgage, exceed $2,146,736.00.

THIS MORTGAGE dated July 31, 2006, is made and executed between ABBE PROPERTIES, LLC, an Illinois Limited Liability Company, whose address is 2015 S ARLINGTON HEIGHTS RD, STE 120, ARLINGTON HEIGHTS, IL 60005 (referred to below as "Grantor") and Midwest Community Bank, whose address is 510 S. Park Crest Drive, P.O. Box 689, Freeport, IL 61032-0689 (referred to below as "Lender").

**GRANT OF MORTGAGE.** For valuable consideration, Grantor mortgages, warrants, and conveys to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in DUPAGE County, State of Illinois:

LOT 38 (EXCEPT THE SOUTH 30 FEET THEREOF) AND ALL OF LOT 37 IN BLOCK 3 IN STOUGH'S RESUBDIVISION OF BLOCK 3, 4, 5, 6, 11, 12, 13, 14, 19 AND 20 OF ESTBROOK'S ADDITION TO HINSDALE, BEING A SUBDIVISION IN THE SOUTHEAST QUARTER AND PART OF THE NORTHEAST QUARTER, LYING SOUTH OF ROAD, IN SECTION 2, TOWNSHIP 38 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT OF STOUGH'S RESUBDIVISION, RECORDED APRIL 2, 1874, AS DOCUMENT 17786, IN DUPAGE COUNTY, ILLINOIS

The Real Property or its address is commonly known as 415 N BRUNER ST, HINSDALE, IL 60521. The Real Property tax identification number is 09-02-402-007.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Mortgage secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or

005483

EXHIBIT G

**MORTGAGE**
(Continued)

indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

FUTURE ADVANCES. In addition to the Note, this Mortgage secures all future advances made by Lender to Grantor whether or not the advances are made pursuant to a commitment. Specifically, without limitation, this Mortgage secures, in addition to the amounts specified in the Note, all future amounts Lender in its discretion may loan to Grantor, together with all interest thereon.

THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS INTENDED TO AND SHALL BE VALID AND HAVE PRIORITY OVER ALL SUBSEQUENT LIENS AND ENCUMBRANCES, INCLUDING STATUTORY LIENS, EXCEPTING SOLELY TAXES AND ASSESSMENTS LEVIED ON THE REAL PROPERTY, TO THE EXTENT OF THE MAXIMUM AMOUNT SECURED HEREBY. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

PAYMENT AND PERFORMANCE. Except as otherwise provided in this Mortgage, Grantor shall pay to Lender all amounts secured by this Mortgage as they become due and shall strictly perform all of Grantor's obligations under this Mortgage.

CONSTRUCTION MORTGAGE. This Mortgage is a "construction mortgage" for the purposes of Sections 9-334 and 2A-309 of the Uniform Commercial Code, as those sections have been adopted by the State of Illinois.

POSSESSION AND MAINTENANCE OF THE PROPERTY. Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions:

Possession and Use. Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

Duty to Maintain. Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

Compliance With Environmental Laws. Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only

**MORTGAGE**
(Continued)

Loan No: 18180                                                                                     Page 3

and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

Without otherwise limiting Grantor's covenants as provided herein, Grantor shall not without Lender's prior written consent, remove or permit the removal of sand, gravel or topsoil, or engage in borrow pit operations, or use or permit the use of the Property as a land fill or dump, or store, burn or bury or permit the storage, burning or burying of any material or product which may result in contamination of the Property or the groundwater or which may require the issuance of a permit by the Environmental Protection Agency or any state or local government agency governing the issuance of hazardous or toxic waste permits, or request or permit a change in zoning or land use classification, or cut or remove or suffer the cutting or removal of any trees or timber from the Property.

At its sole cost and expense, Grantor shall comply with and shall cause all occupants of the Property to comply with all Environmental Laws with respect to the disposal of industrial refuse or waste, and/or the discharge, processing, manufacture, generation, treatment, removal, transportation, storage and handling of Hazardous Substances, and pay immediately when due the cost of removal of any such wastes or substances from, and keep the Property free of any lien imposed pursuant to such laws, rules, regulations and orders.

Grantor shall not install or permit to be installed in or on the Property, friable asbestos or any substance containing asbestos and deemed hazardous by federal, state or local laws, rules, regulations or orders respecting such material. Grantor shall further not install or permit the installation of any machinery, equipment or fixtures containing polychlorinated biphemyls (PCBs) on or in the Property. With respect to any such material or materials currently present in or on the Property, Grantor shall promptly comply with all applicable Environmental Laws regarding the safe removal thereof, at Grantor's expense.

Grantor shall indemnify Lender and hold Lender harmless from and against all loss, cost, damage and expense (including, without limitation, attorneys' fees and costs incurred in the investigation, defense and settlement of claims) that Lender may incur as a result of or in connection with the assertion against Lender of any claim relating to the presence or removal of any Hazardous Substance, or compliance with any Environmental Law. No notice from any governmental body has ever been served upon Grantor or, to Grantor's knowledge after due inquiry, upon any prior owner of the Property, claiming a violation of or under any Environmental Law or concerning the environmental state, condition or quality of the Property, or the use thereof, or requiring or calling attention to the need for any work, repairs, construction, removal, cleanup, alterations, demolition, renovation or installation on, or in connection with, the Property in order to comply with any Environmental Law; and upon receipt of any such notice, Grantor shall take any and all steps, and shall perform any and all actions necessary or appropriate to comply with the same, at Grantor's expense. In the event Grantor fails to do so, Lender may declare this Mortgage to be in default.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property

005485

## MORTGAGE

### (Continued)

without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

Lender's Right to Enter. Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

Compliance with Governmental Requirements. Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

Duty to Protect. Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

CONSTRUCTION LOAN. If some or all of the proceeds of the loan creating the Indebtedness are to be used to construct or complete construction of any Improvements on the Property, the Improvements shall be completed no later than the maturity date of the Note (or such earlier date as Lender may reasonably establish) and Grantor shall pay in full all costs and expenses in connection with the work. Lender will disburse loan proceeds under such terms and conditions as Lender may deem reasonably necessary to insure that the interest created by this Mortgage shall have priority over all possible liens, including those of material suppliers and workmen. Lender may require, among other things, that disbursement requests be supported by receipted bills, expense affidavits, waivers of liens, construction progress reports, and such other documentation as Lender may reasonably request.

DUE ON SALE - CONSENT BY LENDER. Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Grantor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Grantor. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Illinois law.

TAXES AND LIENS. The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

Payment. Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

Right to Contest. Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized.

## MORTGAGE
(Continued)

Loan No: 18180                                                                              Page 5

If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

PROPERTY DAMAGE INSURANCE. The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption and boiler insurance as Lender may require. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Unexpired Insurance at Sale.** Any unexpired insurance shall inure to the benefit of, and pass to, the

005487

**MORTGAGE**
**(Continued)**

purchaser of the Property covered by this Mortgage at any trustee's sale or other sale held under the provisions of this Mortgage, or at any foreclosure sale of such Property.

Grantor's Report on Insurance. Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Mortgage or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Mortgage or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Mortgage also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

Title. Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

Defense of Title. Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

Compliance With Laws. Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

Survival of Representations and Warranties. All representations, warranties, and agreements made by Grantor in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

Notice of Proceedings. Grantor shall immediately notify Lender in writing should all or any part of the Property become subject to any condemnation or expropriation proceedings or other similar proceedings, including without limitation, any condemnation, confiscation, eminent domain, inverse condemnation or temporary requisition or taking of the mortgaged Property, or any part or parts of the Property. Grantor

**MORTGAGE**
(Continued)

further agrees to promptly take such steps as may be necessary and proper within Lender's sole judgment and at Grantor's expense, to defend any such condemnation or expropriation proceedings and obtain the proceeds derived from such proceedings. Grantor shall not agree to any settlement or compromise or any condemnation or expropriation claim without Lender's prior written consent.

**Lender's Participation.** Lender may, at Lender's sole option, elect to participate in any such condemnation or expropriation proceedings and be represented by counsel of Lender's choice. Grantor agrees to provide Lender with such documentation as Lender may request to permit Lender to so participate and to reimburse Lender for Lender's costs associated with Lender's participation, including Lender's reasonable attorneys' fees.

**Conduct of Proceedings.** If Grantor fails to defend any such condemnation or expropriation proceedings to Lender's satisfaction, Lender may undertake the defense of such a proceeding for and on behalf of Grantor. To this end, Grantor irrevocably appoints Lender as Grantor's agent and attorney-in-fact, such agency being coupled with an interest, to bring, defend, adjudicate, settle, or otherwise compromise such condemnation or expropriation claims; it being understood, however, that, unless one or more Events of Default (other than the condemnation or expropriation of the Property) then exists under this Mortgage, Lender will not agree to any final settlement or compromise of any such condemnation or expropriation claim without Grantor's prior approval, which approval shall not be unreasonably withheld.

**Application of Net Proceeds.** Lender shall have the right to receive all proceeds derived or to be derived from the condemnation, expropriation, confiscation, eminent domain, inverse condemnation, or any permanent or temporary requisition or taking of the Property, or any part or parts of the Property ("condemnation proceeds"). In the event that Grantor should receive any such condemnation proceeds, Grantor agrees to immediately turn over and to pay such proceeds to Lender. All condemnation proceeds, which are received by, or which are payable to either Grantor or Lender, shall be applied, at Lender's sole option and discretion, and in such manner as Lender may determine (after payment of all reasonable costs, expenses and attorneys' fees necessarily paid or incurred by Grantor and/or Lender), for the purpose of: (a) replacing or restoring the condemned, expropriated, confiscated, or taken Property; or (b) reducing the then outstanding balance of the Indebtedness, together with interest thereon, with such payments being applied in the manner provided in this Mortgage. Lender's receipt of such condemnation proceeds and the application of such proceeds as provided in this Mortgage shall not affect the lien of this Mortgage.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a

**MORTGAGE**
(Continued)

security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1)   Grantor's obligations under the Note, this Mortgage, and the Related Documents, and   (2)   the liens and security interests created by this Mortgage as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Grantor pays all the Indebtedness, including without limitation all future advances, when due, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Grantor, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment  (A)   to Grantor's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors,  (B)  by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or   (C)  by reason of any settlement or compromise of any claim made by Lender with any claimant (including without limitation Grantor), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Mortgage and this Mortgage shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Mortgage or of any note or other instrument or agreement evidencing the Indebtedness and

**MORGAGE**
(Continued)

the Property will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Mortgage.

**EVENTS OF DEFAULT.**  Each of the following, at Lender's option, shall constitute an Event of Default under this Mortgage:

**Payment Default.**  Grantor fails to make any payment when due under the Indebtedness.

**Default on Other Payments.**  Failure of Grantor within the time required by this Mortgage to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Other Defaults.**  Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.**  Should Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or Grantor's ability to repay the Indebtedness or Grantor's ability to perform Grantor's obligations under this Mortgage or any related document.

**False Statements.**  Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf, or made by Guarantor, or any other guarantor, endorser, surety, or accommodation party, under this Mortgage or the Related Documents in connection with the obtaining of the Indebtedness evidenced by the Note or any security document directly or indirectly securing repayment of the Note is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.**  This Mortgage or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.**  The dissolution of Grantor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.**  Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any property securing the Indebtedness.  This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender.  However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Execution; Attachment.**  Any execution or attachment is levied against the Property, and such execution or attachment is not set aside, discharged or stayed within thirty (30) days after the same is levied.

**Change in Zoning or Public Restriction.**  Any change in any zoning ordinance or regulation or any other public restriction is enacted, adopted or implemented, that limits or defines the uses which may be made of the Property such that the present or intended use of the Property, as specified in the Related Documents, would be in violation of such zoning ordinance or regulation or public restriction, as changed.

**Default Under Other Lien Documents.**  A default occurs under any other mortgage, deed of trust or security agreement covering all or any portion of the Property.

**MORTGAGE**

**Judgment.** Unless adequately covered by insurance in the opinion of Lender, the entry of a final judgment for the payment of money involving more than ten thousand dollars ($10,000.00) against Grantor and the failure by Grantor to discharge the same, or cause it to be discharged, or bonded off to Lender's satisfaction, within thirty (30) days from the date of the order, decree or process under which or pursuant to which such judgment was entered.

**Breach of Other Agreement.** Any breach by Grantor under the terms of any other agreement between Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor, or any other guarantor, endorser, surety, or accommodation party of any of the Indebtedness or any Guarantor, or any other guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty which Grantor would be required to pay.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Mortgagee in Possession.** Lender shall have the right to be placed as mortgagee in possession or to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The mortgagee in possession or receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Note or

**MORTGAGE**
(Continued)

available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Grantor hereby waives any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Mortgage, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies. Nothing under this Mortgage or otherwise shall be construed so as to limit or restrict the rights and remedies available to Lender following an Event of Default, or in any way to limit or restrict the rights and ability of Lender to proceed directly against Grantor and/or against any other co-maker, guarantor, surety or endorser and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any party may change its address for notices under this Mortgage by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during

**MORTGAGE**

**(Continued)**

Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law.** This Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Mortgage has been accepted by Lender in the State of Illinois.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Stephenson County, State of Illinois.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Mortgage unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Mortgage shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Mortgage. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Mortgage. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Mortgage shall not affect the legality, validity or enforceability of any other provision of this Mortgage.

**Non-Liability of Lender.** The relationship between Grantor and Lender created by this Mortgage is strictly a debtor and creditor relationship and not fiduciary in nature, nor is the relationship to be construed as creating any partnership or joint venture between Lender and Grantor. Grantor is exercising Grantor's own judgement with respect to Grantor's business. All information supplied to Lender is for Lender's protection only and no other party is entitled to rely on such information. There is no duty for Lender to review, inspect, supervise or inform Grantor of any matter with respect to Grantor's business. Lender and Grantor intend that Lender may reasonably rely on all information supplied by Grantor to Lender, together with all representations and warranties given by Grantor to Lender, without investigation or confirmation by Lender and that any investigation or failure to investigate will not diminish Lender's right to so rely.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Sole Discretion of Lender.** Whenever Lender's consent or approval is required under this Mortgage, the decision as to whether or not to consent or approve shall be in the sole and exclusive discretion of Lender and Lender's decision shall be final and conclusive.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**MORTGAGE**
**(Continued)**

Time is of the Essence. Time is of the essence in the performance of this Mortgage.

Waive Jury. All parties to this Mortgage hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

Waiver of Homestead Exemption. Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Illinois as to all Indebtedness secured by this Mortgage.

DEFINITIONS. The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Uniform Commercial Code:

Borrower. The word "Borrower" means ABBE PROPERTIES, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

Default. The word "Default" means the Default set forth in this Mortgage in the section titled "Default".

Environmental Laws. The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

Event of Default. The words "Event of Default" mean individually, collectively, and interchangeably any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

Grantor. The word "Grantor" means ABBE PROPERTIES, LLC.

Guarantor. The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness, and, in each case, the successors, assigns, heirs, personal representatives, executors and administrators of any guarantor, surety, or accommodation party.

Guaranty. The word "Guaranty" means the guaranty from Guarantor, or any other guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

Hazardous Substances. The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

Improvements. The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

Indebtedness. The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly

**MORTGAGE**

secured by the Cross-Collateralization provision of this Mortgage.

Lender. The word "Lender" means Midwest Community Bank, its successors and assigns.

Mortgage. The word "Mortgage" means this Mortgage between Grantor and Lender.

Note. The word "Note" means the promissory note dated July 31, 2006, in the original principal amount of $2,146,736.00 from Grantor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The interest rate on the Note is a variable interest rate based upon an index. The index currently is 8.250% per annum. Payments on the Note are to be made in accordance with the following payment schedule: in one payment of all outstanding principal plus all accrued unpaid interest on August 1, 2007. In addition, Grantor will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning September 1, 2006, with all subsequent interest payments to be due on the same day of each month after that. If the index increases, the payments tied to the index, and therefore the total amount secured hereunder, will increase. Any variable interest rate tied to the index shall be calculated as of, and shall begin on, the commencement date indicated for the applicable payment stream. NOTICE: Under no circumstances shall the interest rate on this Mortgage be more than the maximum rate allowed by applicable law. NOTICE TO GRANTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.

Personal Property. The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

Property. The word "Property" means collectively the Real Property and the Personal Property.

Real Property. The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

Rents. The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.

GRANTOR:

ABBE PROPERTIES, LLC

By: _____

SAFANPREET KAUR MULTANI, Managing Member of ABBE PROPERTIES, LLC

**MORGAGE**
(Continued)

Loan No: 18180

Page 15

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE OF _____Illinois_____ )
                                                                    ) SS
COUNTY OF _____Kane_____ )

On this __31st__ day of __July__, __2006__ before me, the undersigned Notary Public, personally appeared SAFANPREET KAUR/MULTANI, Managing Member of ABBE PROPERTIES, LLC, and known to me to be a member or designated agent of the limited liability company that executed the Mortgage and acknowledged the Mortgage to be the free and voluntary act and deed of the limited liability company, by authority of statute, its articles of organization or its operating agreement, for the uses and purposes therein mentioned, and on oath stated that he or she is authorized to execute this Mortgage and in fact executed the Mortgage on behalf of the limited liability company.

By___Leann Hadeler___                Residing at _____

Notary Public in and for the State of _____Illinois_____

My commission expires _____10/4/08_____

OFFICIAL SEAL
LEANN HADELER
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:06/04/08

LASER PRO Lending, Ver 6-20.00.004 Copr Harland Financial Solutions, Inc 1997, 2006   All Rights Reserved   IL   H\LII\6\CFI\LPL\G203.FC   TR-3201 PR-34

005497

FRED BUCHOLZ
DUPAGE COUNTY RECORDER
MAY 21,2007          RHSP     9:44 AM
DEED                 09-02-402-007
002 PAGES    R2007-093754

**DEED IN
LIEU OF
FORECLOSURE**

Grantor, Abbe Properties LLC, an Illinois Limited Liability Company, for and in consideration of One Dollar and other valuable consideration, CONVEY and QUIT CLAIM to THE GRANTEE: Midwest Community Bank, whose address is 3963 N. Perryville Road, Rockford, Illinois 61114, the property commonly known as: 415 N. Bruner Street, Hinsdale, Illinois 60521, and legally described as:

Lot 38 (except the South 30 feet thereof) and all of Lot 37 in Block 3 in Stough's Resubdivision of Blocks 3, 4, 5, 6, 11, 12, 13, 14, 19 and 20 in Estabrooks Addition to the Town of Hinsdale, a Subdivision of that part of the East ½ of Section 2, Township 38 North, Range 11, East of the Third Principal Meridian, lying South of Ogden Avenue, according to the Plat of said Stough's Resubdivision recorded April 2, 1874 as Document 17786, in DuPage County, Illinois.

This is a Deed in Lieu of Foreclosure as contemplated by 735 ILCS 5/15-1401 and the Grantee agrees that its acceptance of the Deed relieves from personal liability all persons who may owe payment or the performance of other obligations secured by the mortgage held by the Grantee upon the conveyed premises.

Dated this 17th day of May, 2007.

Abbe Properties LLC

By: _____
Safaripreet Kaur Multani, sole Manager
and authorized Member

005557

EXHIBIT H

2

STATE OF ILLINOIS                    )
                                     )SS.
COUNTY OF _Dupage_                   )

    I, the undersigned, a Notary Public in and for said County in the State aforesaid, do hereby certify that **Safanpreet Kaur Multani, sole Manager and authorized Member,** personally known to me to be the same person whose name is subscribed to the foregoing document, appeared before me this day in person and acknowledged that she signed, sealed and delivered the said document as her free and voluntary act, and as the free and voluntary act of Abbe Properties LLC as authorized by all of the Members thereof, for the uses and purposes therein set forth.

                Given under my hand and Notarial seal this 17th day of May, 2007.

> "OFFICIAL SEAL"
> KEVIN NORMAN
> Notary Public, State of Illinois
> My Commission Expires 02/17/10

                        Notary Public

"Exempt under provisions of Paragraph _L_,
Section 200/31-45, Real Estate Transfer Tax Law."

_May 17 2007_
Date

Signature of Buyer, Seller or Representative

Property Index No.                09-02-402-007

Send future tax bill to:          **Midwest Community Bank**
                                  **3963 N. Perryville Road**
                                  **Rockford, IL  61114**

Return this deed to               **Midwest Community Bank**
                                  **3963 N. Perryville Road**
                                  **Rockford, IL 61114**

PREPARED BY:                      **SNOW, HUNTER, WHITON**
                                  **& FISHBURN, LTD.**
                                  **Attorney Dan G. Fishburn (tim)**
                                  **8 East Stephenson Street**
                                  **Freeport, IL  61032**

Westlaw.

**MOTOR VEHICLE RECORD**

| | |
|---|---|
| Information current through: | 08-14-2007 |
| Database Updated: | 09-28-2007 |
| Update Frequency: | MONTHLY |
| Current Date: | 10/12/2007 |
| Source: | IL |
| Record Type: | COMBINED RECORD |

**VEHICLE INFORMATION**

| | |
|---|---|
| VIN: | 4A4MN41S25E037807 |
| Vehicle Type: | PASSENGER CAR |
| Model Year: | 2005 |
| Make: | MITSUBISHI |
| Body Style: | UTILITY |
| Model/Series: | ENDEAVOR LIMITED |

**REGISTRATION INFORMATION**

| | |
|---|---|
| License Plate Number: | 8331205 |
| Issuing State: | IL |
| Previous Plate Number: | 8331205 |
| Previous Plate State: | IL |
| Registration Renewal Date: | 07/21/2006 |
| Expiration Date: | 07/31/2007 |
| Registrant(s) Since: | 08/02/2005 |
| Name: | BALWINDER S. BALI |
| Interest: | REGISTRANT |
| Mailing Address: | 24 BRIGHT RIDGE DR |
| | SCHAUMBURG, IL 60194 |
| County: | COOK |

| | |
|---|---|
| License Plate Number: | 8331205 |
| Issuing State: | IL |
| Previous Plate Number: | 8331205 |
| Previous Plate State: | IL |
| Registration Renewal Date: | 07/21/2006 |
| Expiration Date: | 07/31/2007 |
| Registrant(s) Since: | 08/02/2005 |
| Name: | SURINDER MULTANI |
| Interest: | REGISTRANT |
| Mailing Address: | 24 BRIGHT RIDGE DR |

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT I

Westlaw.

**MOTOR VEHICLE RECORD**

| | |
|---|---|
| Information current through: | 07-21-2008 |
| Database Updated: | 07-29-2008 |
| Update Frequency: | MONTHLY |
| Current Date: | 08/04/2008 |
| Source: | IL |
| Record Type: | COMBINED RECORD |

### VEHICLE INFORMATION

| | |
|---|---|
| VIN: | 4A4MN41S25E037807 |
| Vehicle Type: | PASSENGER CAR |
| Model Year: | 2005 |
| Make: | MITSUBISHI |
| Body Style: | SUV~UTILITY|4D| |
| Model/Series: | ENDEAVOR LIMITED |

### TITLE INFORMATION

| | |
|---|---|
| Original Title Date: | 08/20/2007 |
| Title Number: | X7232603644 |
| Name: | KULWANT S. MULTANI |
| Interest: | OWNER |
| Title Transaction Date: | 08/20/2007 |
| Mailing Address: | 321 W 75TH PL |
| | MERRILLVILLE, IN 46410 |
| County: | LAKE |

### LIEN HOLDER INFORMATION

| | |
|---|---|
| Name: | USBANK NA |
| Interest: | LIEN HOLDER |
| Mailing Address: | PO BOX 3427 |
| | OSHKOSH, WI 54903 |
| County: | WINNEBAGO |

**END OF DOCUMENT**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT J

Print

p.1

Page 1

NOW ACCOUNT 3251972
Printed by: MELISSA SCHMULDT

AMERICAN CHARTERED BANK

6/26/2006 11:40:28 AM
Reporting Institution: 20

## Demand Deposit 3251972 - SAFANPREET KAUR MULTANI

| | Rel | Birthdate | Phone | Tax Identification |
|---|---|---|---|---|
| [01] SAFANPREET KAUR MULTANI | P | | [H] (847) 490-0449 | SSN |
| | | | [B] (847) 593-8333 | |
| [02] SURINDER P MULTANI | | S | [H] (847) 437-2191 | SSN |
| | | | [B] (847) 593-8333 | |
| 24 BRIGHT RIDGE DR | | | | |
| SCHAUMBURG IL 60194-3696 | | | | |

Tax Name: [1] SAFANPREET KAUR
MULTANI

### Account Classification

| | | | |
|---|---|---|---|
| Portfolio: | 25713 | Responsibility Code: | [770] |
| | | | SCHMULDT/AMBROSON/OLSON |
| Product: | [200106] NOW ACCOUNT | Account Type Code: | [100] INDIVIDUALS |
| Accounting Branch: | [60] | | |

### Memo Balances

| | | | |
|---|---|---|---|
| Current Ledger Balance: | $98,723.00 | Current Reg CC Cash Available: | $98,723.00 |
| Plus Presentments: | $2,438.03 | Memo Available Balance: | $98,723.00 |
| Memo Ledger Balance: | $101,161.03 | | |

EXHIBIT K

MNR

# American Chartered Bank

1199 E. Higgins Road
Schaumburg, IL 60173
847.517.5400 tel
www.americanchartered.com

March 11, 2008

Williams Montgomery & John Ltd
Attn:  Michael N. Ripani
20 North Wacker Drive, Suite 2100
Chicago, IL 60606

RE:    Non-Wage Garnishment, Case No. 07- CV-04965
       G.D. Deal Holdings, Inc et al.  vs. Baker Energy, Inc, et al.

Dear Mr. Ripani:

Enclosed is American Chartered Bank's Interrogatories to Garnishee regarding the
above case.  American Chartered Bank did hold account(s) in the name of the
defendant, however, the account(s) are **CLOSED as of 8/23/06.**  Therefore, American
Chartered Bank holds no funds to satisfy this Garnishment proceeding.

Should you have any questions, please contact me at (847) 407-2620.

Sincerely,

Linda Halpin
Legal Department

Enclosure

CC:  Harned, Bachert & Denton, LLP
Attn:  Scott Bachert/William Codell
324 East 10th Street
Bowling Green, KY 42101

Member FDIC

EXHIBIT L

(Rev. 12/7/00)  CCG 0098 B

## INTERROGATORIES TO GARNISHEE/RESPONDENT

Case No. 07 - CV - 049465

Interrogatory - At the time of service of the garnishment summons, did you have in your custody or control any personal property or monies belonging to the judgment debtor?    ☐ yes    ☒ no

### ANSWER

I, Linda Halpin, American Chartered Bank , certify under penalty of perjury that with regard to the
    <span>Agent of Garnishee</span>
property of the judgment debtor, the Garnishee/Respondent files the following answer to this Garnishment and on day of service of Garnishment Summons had possession of the following property of the judgment debtor:

Circle one or more of the following and indicate the amount held:

A)  Savings Account (Amount withheld) $ _____

B)  Checking and / or Now Account (Amount withheld) $ _____

C)  Certificate of Deposit (Amount held) $ _____

D)  Money Market Account (Amount held) $ _____ *Acct closed 8/23/06*

E)  Trust Account (Amount held) $ _____

F)  Safety Deposit Box $ _____

G)  Adverse Claimant: Name _____  Address _____

H)  Other Personal Property (Describe) _____

    Less right of offset for other loans _____    Sub Total  0 _____

    Less deduction for fees limited by
    205 ILCS 5/48.1 (g)    _____    Total  0 _____

According to the business records kept by the Garnishee/ Respondent, we show the above accounts to be held in the name(s) of others in addition to the defendant.  Their name(s) and address(es) are as follows:

Garnishee/Agent

Name (s) _____    Name _____

_____    Address _____

Address _____    City/State/Zip _____

City/State/Zip _____    Telephone/Fax _____

and we show all funds held as of  3/11/08 _____
      (as of date of service of Garn. Summons)

The agent of the garnishee certifies under penalties as provided by law pursuant to 735 ILCS 5/1-109 that the answers to the interrogatories are true.  I further certify that I have mailed, to the address indicated on the reverse side, a copy of the completed interrogatories, to the judgment debtor.

A copy of the answer to these interrogatories must be filed with the Clerk of the Circuit Court, Room _____

located at  N/A _____
      (Street)    (City)    (Zip)

(In addition, a copy must be sent to the Judgment creditor's representative, whose name appears on the reverse side.)

Linda Halpin
      Agent for Garnishee/Respondent

**AMERICAN CHARTERED BANK**
DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
Schaumburg, IL 60173

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,
v.
SURINDER MULTANI,
        also known as "Sam Multani")

No. 07CR655

## MOTION TO MODIFY TERMS OF BOND

    1. SURINDER MULTANI is engaged in a business of brokering bank debit and credit cards throughout Illinois, Wisconsin, Indiana, Michigan, Iowa, and occasionally other states which requires him to leave the jurisdiction of the Northern District of Illinois two to three times per week.

    2. The terms of the bond issued in the above cause require SURINDER MULTANI to report to pretrial services in order to leave the jurisdiction of the Northern District of Illinois which is time consuming for both defendant and pretrial services.

    Wherefore, Defendant SURINDER MULTANI moves this court to modify the terms of his bond to allow him to travel outside of the Northern District of Illinois to other parts of Illinois, Wisconsin, Iowa, Indiana, Michigan, and require him only to report should he need to travel to a state other than those listed.

Respectfully submitted,

/s/ James O. Stola
    JAMES O. STOLA

ATTORNEY NO. 51775
LAW OFFICE OF JAMES O. STOLA
3701 WEST FULLERTON AVENUE
CHICAGO, IL 60647
(773)342-1170
FAX: (773)342-1185
E-MAIL: JSTOLA@SBCGLOBAL.NET

EXHIBIT M

Westlaw.

**MOTOR VEHICLE RECORD**

| | |
|---|---|
| Information current through: | 07-21-2008 |
| Database Updated: | 07-29-2008 |
| Update Frequency: | MONTHLY |
| Current Date: | 08/05/2008 |
| Source: | IL |
| Record Type: | COMBINED RECORD |

### VEHICLE INFORMATION

| | |
|---|---|
| VIN: | SALME11445A189725 |
| Vehicle Type: | PASSENGER CAR |
| Model Year: | 2005 |
| Make: | LAND ROVER |
| Body Style: | HARDTOP|4D|4D|| |
| Model/Series: | RANGE ROVER BASE |

### REGISTRATION INFORMATION

| | |
|---|---|
| License Plate Number: | 7895262 |
| Issuing State: | IL |
| Previous Plate Number: | 7895262 |
| Previous Plate State: | IL |
| Registration Renewal Date: | 01/03/2008 |
| Expiration Date: | 12/31/2008 |
| Registrant(s) Since: | 02/16/2005 |
| Name: | SURINDER MULTANI |
| Interest: | REGISTRANT |
| Mailing Address: | 2015 S ARLINGTON HEIGHTS RD |
| | ARLINGTON HEIGH, IL 60005 |
| County: | COOK |
| Registration Renewal Date: | 01/03/2008 |
| Expiration Date: | 12/31/2008 |
| Registrant(s) Since: | 02/16/2005 |
| Name: | ABBE MGMT. LLC |
| Interest: | REGISTRANT |
| Mailing Address: | 2015 S ARLINGTON HEIGHTS RD |

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT N

# American Chartered Bank





Transit - 06/27/2005 - $5,000.00 - ███     Transit - 06/27/2005 - $5,000.00 - ███

EXHIBIT O

# American Chartered Bank





OnUS – 07/26/2005 – ⬛⬛⬛ – $10,000.00 – 149     OnUS – 07/26/2005 – ⬛⬛⬛ – $10,000.00 – 149

# American Chartered Bank




1435 - $5,000.00 - 08/26/2005 - ███    1435 - $5,000.00 - 08/26/2005 - ███

# American Chartered Bank

 

2007 – $5,000.00 – 09/26/2005 –    2007 – $5,000.00 – 09/26/2005 –

# American Chartered Bank





2019 - $5,217.00 - 10/25/2005 - ███████     2019 - $5,217.00 - 10/25/2005 - ███████

# American Chartered Bank





996 – $11,000.00 – 11/02/2005 – Redacted    996 – $11,000.00 – 11/02/2005 – Redacted

004069

# American Chartered Bank







2043 - $5,217.00 - 11/28/2005 -

2043 - $5,217.00 - 11/28/2005 -

# American Chartered Bank

 

**Transit - 06/26/2006 - $98,723.00 -** ███    **Transit - 06/26/2006 - $98,723.00 -** ███



503

ABBE MANAGEMENT
1450 AMERICAN LN STE 1400
SCHAUMBURG IL 60173-6084

DATE 12-04-06

PAY TO THE ORDER OF SAEANPREET K. MULTANI    $ 1000.00

ONE THOUSAND . 00/100 —    DOLLARS

usbank
www.usbank.com
Five Star Service Guaranteed

MEMO

Andrea Nutzmann

# American Chartered Bank

 

0 – $12,000.00 – 01/18/2006 – █████    0 – $12,000.00 – 01/18/2006 – ████████

EXHIBIT P

# American Chartered Bank




0 – $10,000.00 – 01/26/2006 – ⬛   0 – $10,000.00 – 01/26/2006 – ⬛

# American Chartered Bank




0 - $6,200.00 - 11/27/2006 - ▓▓▓▓    0 - $6,200.00 - 11/27/2006 - ▓▓▓▓

SAFANPREET K MULTANI
SURINDER MULTANI          07-17-07
2A BRIGHT RIDGE DR.
SCHAUMBURG, IL  60194-3698

70-177/713
19XTT1533340

1535

DATE 07-16-07

PAY TO THE
ORDER OF  *SAFANPREET  KAUR  MULTANI*     $ 10,000*

*Ten  Thousand* 00/100 _____ DOLLARS

**us bank.**
Five Star Service Guaranteed
usbank.com

MEMO 203-c

MIAMI FL

WASHINGTON MUTUAL FL
07-17-07

for deposit only

PROCESSING BANK
SVC.          12PK

003074

Andrea Nutzmann

EXHIBIT Q

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
CASE NUMBER 08-CV-1722

GD DEAL HOLDINGS, LLC                                                    PLAINTIFF

V.

SURINDER MULTANI, et al.                                                    DEFENDANTS

**PRELIMINARY INJUNCTION AS TO SURINDER MULTANI;**
**ABBE PROPERTIES, LLC; SAPPHIRE SUPPLY, LLC; JGG INVESTMENTS, LLC;**
**ABBE CAPITAL AND LEASING, LLC; ABBE MANAGEMENT GROUP, LLC;**
**SAFANPREET MULTANI; THE GURPRIYA KAUR MULTANI IRREVOCABLE**
**TRUST; THE GURPAP SINGH MULTANI IRREVOCABLE TRUST; AND THE**
**JAPVI SINGH MULTANI IRREVOCABLE TRUST**

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Surinder Multani; ABBE

Properties, LLC; Sapphire Supply, LLC; JGG Investments, LLC; ABBE Capital and Leasing, LLC;

ABBE Management Group, LLC; Safanpreet Multani; the Gurpriya Kaur Multani Irrevocable Trust;

the Gurpap Singh Multani Irrevocable Trust; and the Japvi Singh Multani Irrevocable Trust (the

"Defendants"), and each of them, be and are hereby enjoined and restrained from directly or

indirectly, disposing of or selling any assets of Defendants without prior Court approval for the

duration of this action.

IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED, that the

Defendants' agents, affiliates, servants, employees, attorneys, and those persons in active concert or

participation with them who receive actual notice of this Order by personal service or otherwise , and

each of them, be and are hereby enjoined and restrained from, directly or indirectly, disposing of or

selling any assets of Defendants for the duration of this action.

DATED, this the _____ day of _____, 2008.

_____
JUDGE, UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

Tendered by:

THOMAS M. FALKENBERG
WILLIAMS MONTGOMERY & JOHN LTD.
20 North Wacker Drive, Suite 2100
Chicago, Illinois 60606-3094
Telephone: (312) 443-3200

-and-

HARNED, BACHERT & DENTON, LLP
324 East Tenth Avenue
Post Office Box 1270
Bowling Green, Kentucky  42102-1270
Telephone:  (270) 782-3938

/s/ Scott A. Bachert
SCOTT A. BACHERT